### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PETRA FUND REIT CORP,      )
a Maryland Corp.           )
                           )
        Plaintiff,         )
                           )        FILED: MAY 20, 2008
        v.                 )        Case No. 08CV2921        TG
                           )        JUDGE GOTTSCHALL
DAVID E. WISH AND          )        MAGISTRATE JUDGE SCHENKIER
LANCE W. KUPISCH,          )
                           )
        Defendants.        )

## COMPLAINT

Plaintiff, Petra Fund REIT Corp., by its attorneys, complains of defendants, David

E. Wish and Lance W. Kupisch, as follows:

### Parties

1.      Plaintiff, Petra Fund REIT Corp. ("PETRA"), is a Maryland corporation

with its principal place of business in New York.

2.      Defendant, David E. Wish ("Wish"), is an individual and a resident and

citizen of Illinois.

3.      Defendant, Lance W. Kupisch ("Kupisch"), is an individual and a resident

and citizen of Illinois.

### Jurisdiction and Venue

4.      This Court has subject mater jurisdiction based on complete diversity of

citizenship and the amount in controversy exceeds $75,000 exclusive of interest and

costs.

5.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Cook County is where one of the defendant resides.

**Common Allegations**

6.    Petra Mortgage Capital Corp, LLC made a loan (the "Loan") to J. Jireh's Corporation ("Borrower"), an Illinois corporation, pursuant to that certain Loan and Security Agreement dated April 30, 2007 (the "Loan Agreement") and other documents related thereto.  A true and correct copy of the Loan Agreement is attached hereto as Exhibit A and made a part hereof.

7.    The Loan is evidenced in part by the Promissory Note dated April 30, 2007 ("Note") in the original principal amount of $33,645,000 (the "Note").  A true and correct copy of the Note is attached hereto as Exhibit B and made a part hereof.

8.    In order to induce Petra Mortgage Capital Corp, LLC to make the Loan to Borrower, Wish and Kupisch executed and delivered to Petra Mortgage Capital Corp, LLC that certain Guaranty dated April 30, 2007 ("Guaranty").  A true and correct copy of the Guaranty is attached hereto as Exhibit C and made a part hereof.

9.    On or about May 17, 2007, Petra Mortgage Capital Corp, LLC assigned to Petra all of its right, title and interest in the Loan, Loan Agreement, Note, Guaranty, and other documents related thereto (collectively referred to hereinafter as "Loan Documents"), pursuant to, among other things, that certain Allonge and the Omnibus Assignment, true and correct copies of which are attached hereto as Exhibits D and E, respectively, and made a part hereof.

10.    Petra is the current holder of the Note and the other Loan Documents.

11.    The Note matured on May 9, 2008.  The Loan and all indebtedness due from the Borrower under the Loan Documents therefore became due and payable in full to Petra on May 9, 2008.

12.    Demand was made upon the Borrower for payment of the entire unpaid principal balance of the Loan, plus accrued interest and other charges due under the Loan Documents (collectively referred to as the "Indebtedness").  A true and correct copy of that demand is attached hereto as Exhibit F and made a part hereof.

13.    Borrower failed to pay the Indebtedness, and such failure constituted a material default under the Loan Documents.

14.    The Loan Documents provide that upon default, including the failure to pay the Loan at maturity, interest on the outstanding Indebtedness shall be assessed and due and owing at the interest rate set forth in the Note plus five percent (5%) per annum.

15.    The unpaid principal amount due and owing by the Borrower to Petra is $33,645,000, together with interest accrued thereon and hereafter.  In addition, there is default interest due and owing by Borrower.

16.    Pursuant to the Loan Agreement and the Note, Borrower agreed to pay all costs, fees and expenses, including, without limitation, reasonable attorneys' fees, costs and expenses, incurred by Petra in collecting the Indebtedness or in enforcing Petra's rights and remedies under the Loan Documents and applicable law.

17.    Pursuant to the Loan Documents, Borrower is obligated to pay to Petra the Indebtedness together with all other costs, fees, and expenses, including attorneys' fees, costs and expenses, incurred by Petra in collecting the Indebtedness and enforcing Petra's rights and remedies.

## COUNT I

18.     For this paragraph 18 of Count I of its Complaint, Petra realleges and incorporates by reference herein the allegations of paragraphs 1-17 of this Complaint as if fully set forth herein.

19.     Defendant Wish guaranteed the full and prompt payment to Petra of the Indebtedness owing by Borrower under the Loan Documents pursuant to the terms of the Guaranty.

20.     Petra made demand upon Wish for payment of the Indebtedness in accordance with the terms of his Guaranty.  A true and correct copy of that demand is attached hereto as Exhibit G and made a part hereof.

21.     Wish has failed to pay the Indebtedness, or any part thereof, and such failure constituted a material default under the Guaranty.

22.     Pursuant to the Guaranty, Wish agreed to pay to Petra all expenses, including, without limitation, legal fees and court costs, paid or incurred by Petra in enforcing the Guaranty.

WHEREFORE, plaintiff Petra Fund REIT Corp. respectfully requests that this Court enter judgment in its favor and against David E. Wish on this Count I in the amount of the Indebtedness, or such amount for which he is liable under his Guaranty, and all other costs, fees and expenses incurred by Petra, together with any other relief the Court deems just and proper.

## COUNT II

23.     For this paragraph 23 of Count II of its Complaint, Petra realleges and incorporates by reference herein the allegations of paragraphs 1-17 of this Complaint as if fully set forth herein.

24.    Defendant Kupisch guaranteed the full and prompt payment to Petra of the Indebtedness owing by Borrower under the Loan Documents pursuant to the terms of the Guaranty.

25.    Petra made demand upon Kupisch for payment of the Indebtedness in accordance with the terms of his Guaranty.  A true and correct copy of that demand is attached hereto as Exhibit G and made a part hereof.

26.    Kupisch has failed to pay the Indebtedness, or any part thereof, and such failure constituted a material default under the Guaranty.

27.    Pursuant to the Guaranty, Kupisch agreed to pay to Petra all expenses, including, without limitation, legal fees and court costs, paid or incurred by Petra in enforcing the Guaranty.

WHEREFORE, plaintiff Petra Fund REIT Corp. respectfully requests that this Court enter judgment in its favor and against Lance W. Kupisch on this Count II in the amount of the Indebtedness, or such amount for which he is liable under his Guaranty, and all other costs, fees and expenses incurred by Petra, together with any other relief the Court deems just and proper.

Respectfully submitted,


PETRA FUND REIT CORP.


By: ___/s/ Lawrence M. Benjamin_____
                                 One of Its Attorneys

Lawrence M. Benjamin, Esq.
Tonya Newman, Esq.
NEAL, GERBER & EISENBERG, LLP
Two North LaSalle Street
Chicago, IL  60602-3801
(312) 269-8000

# *EXHIBIT A*

Portofino Bay

THIS LOAN AND SECURITY AGREEMENT (the "Security Instrument") is made as of the 30th day of April, 2007, between J. JIREH'S CORPORATION, an Illinois corporation, having its chief executive office at 201 North Church Road, Bensenville, Illinois 60106 (hereinafter referred to as "Borrower"), and PETRA MORTGAGE CAPITAL CORP. LLC, having an address at 1370 Avenue of the Americas, 23rd Floor, New York, New York 10019 (hereinafter referred to as "Lender").

### W I T N E S S E T H :

WHEREAS, Lender has authorized a loan (hereinafter referred to as the "Loan") to Borrower in the maximum principal sum of THIRTY-THREE MILLION SIX HUNDRED FORTY-FIVE THOUSAND AND NO/100 DOLLARS ($33,645,000.00) (hereinafter referred to as the "Loan Amount"), which Loan is evidenced by that certain promissory note, dated the date hereof (together with any supplements, amendments, modifications or extensions thereof, hereinafter referred to as the "Note") given by Borrower, as maker, to Lender, as payee;

WHEREAS, in consideration of the Loan, Borrower has agreed to make payments in amounts sufficient to pay and redeem, and provide for the payment and redemption of the principal of, premium, if any, and interest on the Note when due;

WHEREAS, Borrower desires by this Security Instrument to provide for, among other things, the issuance of the Note and for the deposit, deed and pledge by Borrower with, and the creation of a security interest in favor of, Lender, as security for Borrower's obligations to Lender from time to time pursuant to the Note and the other Loan Documents;

WHEREAS, Borrower and Lender intend these recitals to be a material part of this Security Instrument; and

WHEREAS, all things necessary to make this Security Instrument the valid and legally binding obligation of Borrower in accordance with its terms, for the uses and purposes herein set forth, have been done and performed.

NOW THEREFORE, for ten dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, Borrower and Lender do hereby agree as follows:

### ARTICLE I: DEFINITIONS

Section 1.01.  Certain Definitions.

For all purposes of this Security Instrument, except as otherwise expressly provided or unless the context clearly indicates a contrary intent:

(i)  the capitalized terms defined in this Section have the meanings assigned to them in this Section, and include the plural as well as the singular;

(ii)     all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP; and

(iii)     the words "herein", "hereof", and "hereunder" and other words of similar import refer to this Security Instrument as a whole and not to any particular Section or other subdivision.

"Adjusted Net Cash Flow" shall mean Pro-Forma Net Operating Income projected over the twelve (12)-month period subsequent to the date of calculation less extraordinary capital improvements projected by Lender, in its reasonable discretion, for the subsequent twelve (12) month period. The Adjusted Net Cash Flow shall be calculated by Borrower and shall be subject to the reasonable review and approval of Lender.

"Affiliate" of any specified Person shall mean any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such specified Person.

"Annual Budget" shall mean an annual budget submitted by Borrower to Lender in accordance with the terms of Section 2.09 hereof.

"Appraisal" shall mean the appraisal of the Property and all supplemental reports or updates thereto previously delivered to Lender in connection with the Loan.

"Appraiser" shall mean the Person who prepared the Appraisal.

"Approved Annual Budget" shall mean each Annual Budget approved by Lender in accordance with the terms hereof.

"Approved Manager Standard" shall mean the standard of business operations, practices and procedures customarily employed by entities having a senior executive with at least seven (7) years' experience in the management of properties similar in size and type to the Property.

"Architect" shall have the meaning set forth in Section 3.04(b)(i) hereof.

"Assignment" shall mean the Assignment of Leases and Rents and Security Deposits of even date herewith relating to the Property given by Borrower to Lender, as the same may be modified, amended or supplemented from time to time.

"Bank" shall mean the bank, trust company, savings and loan association or savings bank designated by Lender, in its sole and absolute discretion, in which the Central Account shall be located.

"Bankruptcy Code" shall mean 11 U.S.C. §101 et seq., as amended from time to time.

"Basic Carrying Costs" shall mean the sum of the following costs associated with the Property: (a) Impositions and (b) insurance premiums.

2

"Basic Carrying Costs Escrow Account" shall mean the Escrow Account maintained pursuant to Section 5.06 hereof.

"Borrower" shall mean Borrower named herein and any successor to the obligations of Borrower.

"Business Day" shall mean any day other than (a) a Saturday or Sunday, or (b) a day on which banking and savings and loan institutions in the State of New York or the State of North Carolina are authorized or obligated by law or executive order to be closed, or at any time during which the Loan is an asset of a Securitization, the cities, states and/or commonwealths used in the comparable definition of "Business Day" in the Securitization documents.

"Capital Expenditures" shall mean for any period, the amount expended for items capitalized under GAAP including expenditures for building improvements or major repairs, leasing commissions and tenant improvements.

"Cash Reserve Deposit" shall equal the amount set forth on Exhibit B attached hereto and made a part hereof.

"Cash Reserve Escrow Account" shall mean an Escrow Account established and maintained pursuant to Section 5.14 hereof.

"Central Account" shall mean an Eligible Account, maintained at the Bank, in the name of Lender or its successors or assigns (as secured party) as may be designated by Lender.

"Closing Date" shall mean the date of the Note.

"Code" shall mean the Internal Revenue Code of 1986, as amended and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto.

"Condemnation Proceeds" shall mean all of the proceeds in respect of any Taking or purchase in lieu thereof.

"Contractual Obligation" shall mean, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or undertaking to which such Person is a party or by which it or any of the property owned by it is bound.

"Control" means, when used with respect to any specific Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person whether through ownership of voting securities, beneficial interests, by contract or otherwise.  The definition is to be construed to apply equally to variations of the word "Control" including "Controlled," "Controlling" or "Controlled by."

"CPI" shall mean "The Consumer Price Index (New Series) (Base Period 1982-84=100) (all items for all urban consumers)" issued by the Bureau of Labor Statistics of the United States Department of Labor (the "Bureau").  If the CPI ceases to use the 1982-84 average equaling 100

3

as the basis of calculation, or if a change is made in the term, components or number of items contained in said index, or if the index is altered, modified, converted or revised in any other way, then the index shall be adjusted to the figure that would have been arrived at had the change in the manner of computing the index in effect at the date of this Security Instrument not been made.  If at any time during the term of this Security Instrument the CPI shall no longer be published by the Bureau, then any comparable index issued by the Bureau or similar agency of the United States issuing similar indices shall be used in lieu of the CPI.

"<u>Debt</u>" shall mean the principal of, prepayment premium (if any) and interest on the Note and all other obligations, liabilities or sums due or to become due under this Agreement, the Note or any other Loan Document, including, without limitation, interest on said obligations, liabilities or sums.

"<u>Debt Service</u>" shall mean the amount of interest and principal payments due and payable in accordance with the Note during an applicable period.

"<u>Debt Service Reserve Escrow Account</u>" shall mean an Escrow Account established and maintained pursuant to Section 5.11 hereof.

"<u>Default</u>" shall mean any Event of Default or event which would constitute an Event of Default if all requirements in connection therewith for the giving of notice, the lapse of time, and the happening of any further condition, event or act, had been satisfied.

"<u>Default Rate</u>" shall mean the lesser of (a) the highest rate allowable at law and (b) five percent (5%) above the interest rate set forth in the Note.

"<u>Default Rate Interest</u>" shall mean, to the extent the Default Rate becomes applicable, interest in excess of the interest which would have accrued on (a) the Principal Amount and (b) any accrued but unpaid interest, if the Default Rate was not applicable.

"<u>Development Laws</u>" shall mean all applicable subdivision, zoning, environmental protection, wetlands protection, or land use laws or ordinances, and any and all applicable rules and regulations of any Governmental Authority promulgated thereunder or related thereto.

"<u>Disclosure Document</u>" shall mean a prospectus, prospectus supplement, private placement memorandum, or similar offering memorandum or offering circular, in each case in preliminary or final form, used to offer securities in connection with a Securitization.

"<u>Dollar</u>" and the sign "$" shall mean lawful money of the United States of America.

"<u>Eligible Account</u>" shall mean a segregated account which is either (a) an account or accounts maintained with a federal or state chartered depository institution or trust company the long term unsecured debt obligations of which are rated by each of the Rating Agencies (or, if not rated by Fitch, Inc. ("<u>Fitch</u>"), otherwise acceptable to Fitch, as confirmed in writing that such account would not, in and of itself, result in a downgrade, qualification or withdrawal of the then current ratings assigned to any certificates issued in connection with a Securitization) in its highest rating category at all times (or, in the case of the Basic Carrying Costs Escrow Account,

4

the long term unsecured debt obligations of which are rated at least "AA" (or its equivalent)) by each of the Rating Agencies (or, if not rated by Fitch, otherwise acceptable to Fitch, as confirmed in writing that such account would not, in and of itself, result in a downgrade, qualification or withdrawal of the then current ratings assigned to any certificates issued in connection with a Securitization) or, if the funds in such account are to be held in such account for less than thirty (30) days, the short term obligations of which are rated by each of the Rating Agencies (or, if not rated by Fitch, otherwise acceptable to Fitch, as confirmed in writing that such account would not, in and of itself, result in a downgrade, qualification or withdrawal of the then current ratings assigned to any certificates issued in connection with a Securitization) in its highest rating category at all times or (b) a segregated trust account or accounts maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution is subject to regulations substantially similar to 12 C.F.R. § 9.10(b), having in either case a combined capital and surplus of at least $100,000,000 and subject to supervision or examination by federal and state authority, or otherwise acceptable (as evidenced by a written confirmation from each Rating Agency that such account would not, in and of itself, cause a downgrade, qualification or withdrawal of the then current ratings assigned to any certificates issued in connection with a Securitization) to each Rating Agency, which may be an account maintained by Lender or its agents. Eligible Accounts may bear interest. The title of each Eligible Account shall indicate that the funds held therein are held in trust for the uses and purposes set forth herein.

"Engineer" shall have the meaning set forth in Section 3.04(b)(i) hereof.

"Engineering Escrow Account" shall mean an Escrow Account established and maintained pursuant to Section 5.12 hereof relating to payments for any Required Engineering Work.

"Environmental Problem" shall mean any of the following:

   (a)   the presence of any Hazardous Material on, in, under, or above all or any portion of the Property;

   (b)   the release or threatened release of any Hazardous Material from or onto the Property;

   (c)   the violation or threatened violation of any Environmental Statute with respect to the Property; or

   (d)   the failure to obtain or to abide by the terms or conditions of any permit or approval required under any Environmental Statute with respect to the Property.

A condition described above shall be an Environmental Problem regardless of whether or not any Governmental Authority has taken any action in connection with the condition and regardless of whether that condition was in existence on or before the date hereof.

"Environmental Report" shall mean the environmental audit report for the Property and any supplements or updates thereto, previously delivered to Lender in connection with the Loan.

5

"Environmental Statute" shall mean any federal, state or local statute, ordinance, rule or regulation, any judicial or administrative order (whether or not on consent) or judgment applicable to Borrower or the Property including, without limitation, any judgment or settlement based on common law theories, and any provisions or conditions of any permit, license or other authorization binding on Borrower relating to (a) the protection of the environment, the safety and health of persons (including employees) or the public welfare from actual or potential exposure (or effects of exposure) to any actual or potential release, discharge, disposal or emission (whether past or present) of any Hazardous Materials or (b) the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of any Hazardous Materials, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §9601 et seq., the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Solid and Hazardous Waste Amendments of 1984, 42 U.S.C. §6901 et seq., the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977, 33 U.S.C. §1251 et seq., the Toxic Substances Control Act of 1976, 15 U.S.C. §2601 et seq., the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §1101 et seq., the Clean Air Act of 1966, as amended, 42 U.S.C. §7401 et seq., the National Environmental Policy Act of 1975, 42 U.S.C. §4321, the Rivers and Harbors Act of 1899, 33 U.S.C. §401 et seq., the Endangered Species Act of 1973, as amended, 16 U.S.C. §1531 et seq., the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §651 et seq., and the Safe Drinking Water Act of 1974, as amended, 42 U.S.C. §300(f) et seq., and all rules, regulations and guidance documents promulgated or published thereunder.

"Equipment" shall have the meaning set forth in the Mortgage.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated thereunder. Section references to ERISA are to ERISA, as in effect at the date of this Security Instrument and, as of the relevant date, any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"ERISA Affiliate" shall mean any corporation or trade or business that is a member of any group of organizations (a) described in Section 414(b) or (c) of the Code of which Borrower or Guarantor is a member and (b) solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the lien created under Section 302(f) of ERISA and Section 412(n) of the Code, described in Section 414(m) or (o) of the Code of which Borrower or Guarantor is a member.

"Escrow Account" shall mean each of the Engineering Escrow Account, Basic Carrying Costs Escrow Account, and Cash Reserve Escrow Account each of which shall be an Eligible Account or book entry sub-account of an Eligible Account.

"Event of Default" shall have the meaning set forth in Section 13.01 hereof.

"Exit Fee" shall have the meaning set forth in Section 15.02 hereof.

6

"Extraordinary Expense" shall mean an extraordinary operating expense or capital expense not set forth in the Approved Annual Budget.

"Fiscal Year" shall mean the twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of this Security Instrument, or such other fiscal year of Borrower as Borrower may select from time to time with the prior written consent of Lender.

"Fixtures" shall have the meaning set forth in the Mortgage.

"GAAP" shall mean generally accepted accounting principles in the United States of America, as of the date of the applicable financial report, consistently applied.

"General Partner" shall mean, if Borrower is a partnership, each general partner of Borrower and, if Borrower is a limited liability company, each managing member of Borrower and in each case, if applicable, each general partner or managing member of such general partner or managing member. In the event that Borrower or any General Partner is a single member limited liability company, the term "General Partner" shall include such single member.

"Governmental Authority" shall mean, with respect to any Person, any federal or State government or other political subdivision thereof and any entity, including any regulatory or administrative authority or court, exercising executive, legislative, judicial, regulatory or administrative or quasi-administrative functions of or pertaining to government, and any arbitration board or tribunal, in each case having jurisdiction over such applicable Person or such Person's property and any stock exchange on which shares of capital stock of such Person are listed or admitted for trading.

"Guarantor" shall mean any Person guaranteeing, in whole or in part, the obligations of Borrower under the Loan Documents.

"Hazardous Material" shall mean any flammable, explosive or radioactive materials, hazardous materials or wastes, hazardous or toxic substances, pollutants or related materials, asbestos or any material containing asbestos, molds, spores and fungus which may pose a risk to human health or the environment or any other substance or material as defined in or regulated by any Environmental Statutes.

"Impositions" shall mean all taxes (including, without limitation, all real estate, ad valorem, sales (including those imposed on lease rentals), use, single business, gross receipts, value added, intangible, transaction, privilege or license or similar taxes), assessments (including, without limitation, all assessments for public improvements or benefits, whether or not commenced or completed prior to the date hereof and whether or not commenced or completed within the term of this Security Instrument), ground rents, water, sewer or other rents and charges, excises, levies, fees (including, without limitation, license, permit, inspection, authorization and similar fees), and all other governmental charges, in each case whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character in respect of the Property and/or any Rent (including all interest and penalties thereon), which at any time

7

prior to, during or in respect of the term hereof may be assessed or imposed on or in respect of or be a lien upon (a) Borrower (including, without limitation, all franchise, single business or other taxes imposed on Borrower for the privilege of doing business in the jurisdiction in which the Property or any other collateral delivered or pledged to Lender in connection with the Loan is located) or Lender, (b) the Property or any part thereof or any Rents therefrom or any estate, right, title or interest therein, or (c) any occupancy, operation, use or possession of, or sales from, or activity conducted on, or in connection with the Property, or any part thereof, or the leasing or use of the Property, or any part thereof, or the acquisition or financing of the acquisition of the Property, or any part thereof, by Borrower.

"Improvements" shall have the meaning set forth in the Mortgage.

"Indemnified Parties" shall have the meaning set forth in Section 12.01 hereof.

"Independent" shall mean, when used with respect to any Person, a Person who (a) is in fact independent, (b) does not have any direct financial interest or any material indirect financial interest in Borrower, or in any Affiliate of Borrower or any constituent partner, shareholder, member or beneficiary of Borrower, (c) is not connected with Borrower or any Affiliate of Borrower or any constituent partner, shareholder, member or beneficiary of Borrower as an officer, employee, promoter, underwriter, trustee, partner, director or person performing similar functions and (d) is not a member of the immediate family of a Person defined in (b) or (c) above.  Whenever it is herein provided that any Independent Person's opinion or certificate shall be provided, such opinion or certificate shall state that the Person executing the same has read this definition and is Independent within the meaning hereof.

"Initial Debt Service Reserve Deposit" shall equal the amount set forth on **Exhibit B** attached hereto and made a part hereof.

"Initial Engineering Deposit" shall equal the amount set forth on **Exhibit B** attached hereto and made a part hereof.

"Institutional Lender" shall mean any of the following Persons:  (a) any bank, savings and loan association, savings institution, trust company or national banking association, acting for its own account or in a fiduciary capacity, (b) any charitable foundation, (c) any insurance company or pension and/or annuity company, (d) any fraternal benefit society, (e) any pension, retirement or profit sharing trust or fund within the meaning of Title I of ERISA or for which any bank, trust company, national banking association or investment adviser registered under the Investment Advisers Act of 1940, as amended, is acting as trustee or agent, (f) any investment company or business development company, as defined in the Investment Company Act of 1940, as amended, (g) any small business investment company licensed under the Small Business Investment Act of 1958, as amended, (h) any broker or dealer registered under the Securities Exchange Act of 1934, as amended, or any investment adviser registered under the Investment Adviser Act of 1940, as amended, (i) any government, any public employees' pension or retirement system, or any other government agency supervising the investment of public funds, or (j) any other entity all of the equity owners of which are Institutional Lenders; provided that each of said Persons shall have net assets in excess of $1,000,000,000 and a net worth in excess

8

of $500,000,000, be in the business of making commercial mortgage loans, secured by properties of like type, size and value as the Property and have a long term credit rating which is not less than "BBB-" (or its equivalent) from each Rating Agency.

"Insurance Proceeds" shall mean all of the proceeds received under the insurance policies required to be maintained by Borrower pursuant to Article III hereof.

"Insurance Requirements" shall mean all terms of any insurance policy required by this Security Instrument, all requirements of the issuer of any such policy, and all regulations and then current standards applicable to or affecting the Property or any use or condition thereof, which may, at any time, be recommended by the Board of Fire Underwriters, if any, having jurisdiction over the Property, or such other Person exercising similar functions.

"Interest Accrual Period" shall have the meaning set forth in the Note.

"Interest Rate" shall have the meaning set forth in the Note.

"Interest Shortfall" shall mean any shortfall in the amount of interest required to be paid with respect to the Loan Amount on any Payment Date.

"Late Charge" shall have the meaning set forth in Section 13.09 hereof.

"Leases" shall have the meaning set forth in the Mortgage.

"Legal Requirement" shall mean as to any Person, the certificate of incorporation, by-laws, certificate of limited partnership, agreement of limited partnership or other organization or governing documents of such Person, and any law, statute, order, ordinance, judgement, decree, injunction, treaty, rule or regulation (including, without limitation, Environmental Statutes, Development Laws and Use Requirements) or determination of an arbitrator or a court or other Governmental Authority and all covenants, agreements, restrictions and encumbrances contained in any instruments, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Lender" shall mean the Lender named herein and its successors or assigns.

"LIBOR Margin" shall have the meaning set forth in the Note.

"LIBOR Rate" shall have the meaning set forth in the Note.

"Loan" shall have the meaning set forth in the Recitals hereto.

"Loan Amount" shall have the meaning set forth in the Recitals hereto.

"Loan Documents" shall mean this Security Instrument, the Mortgage, the Note, the Assignment and any and all other agreements, instruments, certificates or documents executed and delivered by Borrower or any Affiliate of Borrower in connection with the Loan together with any supplements, amendments, modifications or extensions thereof.

9

"Loan Year" shall mean each 365 day period (or 366 day period if the month of February in a leap year is included) commencing on the first day of the month following the Closing Date (provided, however, that the first Loan Year shall also include the period from the Closing Date to the end of the month in which the Closing Date occurs).

"Loss Proceeds" shall mean, collectively, all Insurance Proceeds and all Condemnation Proceeds.

"Major Space Lease" shall mean any Space Lease of a tenant or Affiliate of such tenant where such tenant or such Affiliate leases, in the aggregate, five percent (5%) or more of the Total GLA.

"Management Agreement" shall have the meaning set forth in Section 7.02 hereof.

"Manager" shall mean the Person, other than Borrower, which manages the Property on behalf of Borrower.

"Material Adverse Effect" shall mean any event or condition that has a material adverse effect on (a) the Property, (b) the business, prospects, profits, management, operations or condition (financial or otherwise) of Borrower, (c) the enforceability, validity, perfection or priority of the lien of any Loan Document or (d) the ability of Borrower to perform any obligations under any Loan Document.

"Maturity", when used with respect to the Note, shall mean the Maturity Date set forth in the Note or such other date pursuant to the Note on which the final payment of principal, and premium, if any, on the Note becomes due and payable as therein or herein provided, whether at Stated Maturity or by declaration of acceleration, or otherwise.

"Maturity Date" shall mean the Maturity Date set forth in the Note, as the same may be extended from time to time pursuant to the terms of the Note.

"Monthly Debt Service Payment" shall mean a monthly payment of principal and interest in an amount equal to that which is required pursuant to the Note.

"Mortgage" shall mean that certain mortgage or deed of trust or deed to secure debt or similar security document executed by Borrower of even date herewith encumbering the Premises, in the original principal sum of the Loan Amount.

"Multiemployer Plan" shall mean a multiemployer plan defined as such in Section 3(37) of ERISA to which contributions have been, or were required to have been, made by Borrower, Guarantor or any ERISA Affiliate and which is covered by Title IV of ERISA.

"Net Capital Expenditures" shall mean for any period the amount by which Capital Expenditures during such period exceed reimbursements for such items during such period from any fund established pursuant to the Loan Documents.

Current/9423275

"<u>Net Operating Income</u>" shall mean in each Fiscal Year or portion thereof during the term hereof, Operating Income less Operating Expenses.

"<u>Net Proceeds</u>" shall mean the excess of (a)(i) the purchase price (at foreclosure or otherwise) actually received by Lender with respect to the Property as a result of the exercise by Lender of its rights, powers, privileges and other remedies after the occurrence of an Event of Default, or (ii) in the event that Lender (or Lender's nominee) is the purchaser at foreclosure by credit bid, then the amount of such credit bid, in either case, over (b) all costs and expenses, including, without limitation, all attorneys' fees and disbursements and any brokerage fees, if applicable, incurred by Lender in connection with the exercise of such remedies, including the sale of such Property after a foreclosure against the Property.

"<u>Note</u>" shall have the meaning set forth in the Recitals hereto.

"<u>OFAC List</u>" shall mean the list of specially designated nationals and blocked persons subject to financial sanctions that is maintained by the U.S. Treasury Department, Office of Foreign Assets Control and accessible through the internet website www.treas.gov/ofac/t11sdn.pdf.

"<u>Officer's Certificate</u>" shall mean a certificate delivered to Lender by Borrower which is signed on behalf of Borrower by an authorized representative of Borrower which states that the items set forth in such certificate are true, accurate and complete in all respects.

"<u>Operating Expenses</u>" shall mean, in each Fiscal Year or portion thereof during the term hereof, all expenses directly attributable to the operation, repair and/or maintenance of the Property including, without limitation, (a) Impositions, (b) insurance premiums, (c) management fees, whether or not actually paid, equal to the greater of the actual management fees and four percent (4%) of annual "base" or "fixed" Rent due under the Leases and (d) costs attributable to the operation, repair and maintenance of the systems for heating, ventilating and air conditioning the Improvements and actually paid for by Borrower. Operating Expenses shall not include interest, principal and premium, if any, due under the Note or otherwise in connection with the Debt, income taxes, extraordinary capital improvement costs, any non-cash charge or expense such as depreciation or amortization or any item of expense otherwise includable in Operating Expenses which is paid directly by any tenant except real estate taxes paid directly to any taxing authority by any tenant.

"<u>Operating Income</u>" shall mean, in each Fiscal Year or portion thereof during the term hereof, all revenue derived by Borrower arising from the Property including, without limitation, rental revenues (whether denominated as basic rent, additional rent, escalation payments, electrical payments or otherwise) and other fees and charges payable pursuant to Leases or otherwise in connection with the Property, and business interruption, rent or other similar insurance proceeds. Operating Income shall not include (a) Insurance Proceeds (other than proceeds of rent, business interruption or other similar insurance allocable to the applicable period) and Condemnation Proceeds (other than Condemnation Proceeds arising from a temporary taking or the use and occupancy of all or part of the applicable Property allocable to the applicable period), or interest accrued on such Condemnation Proceeds, (b) proceeds of any

11

financing, (c) proceeds of any sale, exchange or transfer of the Property or any part thereof or interest therein, (d) capital contributions or loans to Borrower or an Affiliate of Borrower, (e) any item of income otherwise includable in Operating Income but paid directly by any tenant to a Person other than Borrower except for real estate taxes paid directly to any taxing authority by any tenant, (f) any other extraordinary, non-recurring revenues, (g) Rent paid by or on behalf of any lessee under a Space Lease which is the subject of any proceeding or action relating to its bankruptcy, reorganization or other arrangement pursuant to the Bankruptcy Code or any similar federal or state law or which has been adjudicated a bankrupt or insolvent unless such Space Lease has been affirmed by the trustee in such proceeding or action, (h) Rent paid by or on behalf of any lessee under a Space Lease the demised premises of which are not occupied either by such lessee or by a sublessee thereof, (i) Rent paid by or on behalf of any lessee under a Space Lease in whole or partial consideration for the termination of any Space Lease, or (j) sales tax rebates from any Governmental Authority.

"Payment Date" shall have the meaning set forth in the Note.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established under ERISA, or any successor thereto.

"Permitted Encumbrances" shall have the meaning set forth in Section 2.05(a) hereof.

"Permitted Investments" shall mean any one or more of the following obligations or securities acquired at a purchase price of not greater than par, including, without limitation, those issued by Lender, the trustee or servicer under any Securitization or any of their respective Affiliates, payable on demand or having a scheduled maturity on or before the Business Day preceding the date upon which funds in the Central Account are required to be drawn, and having at all times the required ratings, if any, provided for in this definition:

      (a)    obligations of, or obligations fully guaranteed as to payment of principal and interest by, the United States of America or any agency or instrumentality thereof provided such obligations are backed by the full faith and credit of the United States of America including, without limitation, obligations of: the U.S. Treasury (all direct or fully guaranteed obligations), the Farmers Home Administration (certificates of beneficial ownership), the General Services Administration (participation certificates), the U.S. Maritime Administration (guaranteed Title XI financing), the Small Business Administration (guaranteed participation certificates and guaranteed pool certificates), the U.S. Department of Housing and Urban Development (local authority bonds) and the Washington Metropolitan Area Transit Authority (guaranteed transit bonds); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by Standard & Poor's, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

      (b)    Federal Housing Administration debentures;

12

(c)    obligations of the following United States of America government sponsored agencies: Federal Home Loan Mortgage Corp. (debt obligations), the Farm Credit System (consolidated systemwide bonds and notes), the Federal Home Loan Banks (consolidated debt obligations), the Federal National Mortgage Association (debt obligations), the Student Loan Marketing Association (debt obligations), the Financing Corp. (debt obligations), and the Resolution Funding Corp. (debt obligations); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by Standard & Poor's, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(d)    federal funds, unsecured certificates of deposit, time deposits, bankers' acceptances and repurchase agreements with maturities of not more than 365 days of any bank, the short term obligations of which at all times are rated in the highest short term rating category by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency in the highest short term rating category and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not in and of itself, result in a downgrade, qualification or withdrawal of the then current ratings assigned to any certificates issued in connection with a Securitization); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by Standard & Poor's, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(e)    fully Federal Deposit Insurance Corporation-insured demand and time deposits in, or certificates of deposit of, or bankers' acceptances issued by, any bank or trust company, savings and loan association or savings bank, the short term obligations of which at all times are rated in the highest short term rating category by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency in the highest short term rating category and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the then current ratings assigned to any certificates issued in connection with a Securitization); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by Standard & Poor's, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(f)    debt obligations with maturities of not more than 365 days and at all times rated by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one

Current/9423275

Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the then current ratings assigned to any certificates issued in connection with a Securitization) in its highest long-term unsecured rating category; provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by Standard & Poor's, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(g)    commercial paper (including both non-interest-bearing discount obligations and interest-bearing obligations payable on demand or on a specified date not more than one year after the date of issuance thereof) with maturities of not more than 365 days and that at all times is rated by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the then current ratings assigned to any certificates issued in connection with a Securitization) in its highest short-term unsecured debt rating; provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by Standard & Poor's, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity

(h)    units of taxable money market funds, which funds are regulated investment companies, seek to maintain a constant net asset value per share and invest solely in obligations backed by the full faith and credit of the United States, which funds have the highest rating available from each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the then current ratings assigned to any certificates issued in connection with a Securitization) for money market funds;

(i)    money market funds so long as the money market funds are rated "AAA" (or its equivalent) by each Rating Agency (or, if not rated by all of the Rating Agencies, rated by at least one Rating Agency in one of the foregoing rating categories and otherwise acceptable to each other Rating Agency, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the then current ratings assigned to any certificates issued in connection with a Securitization); and

(j)    any other security, obligation or investment which has been approved as a Permitted Investment in writing by (a) Lender prior to Securitization and (b) after

14

Securitization, each Rating Agency, as evidenced by a written confirmation that the designation of such security, obligation or investment as a Permitted Investment will not, in and of itself, result in a downgrade, qualification or withdrawal of the then current ratings assigned to any certificates issued in connection with a Securitization by such Rating Agency;

provided, however, that, in the judgment of Lender, such instrument continues to qualify as a "cash flow investment" pursuant to Section 860G(a)(6) of the Code earning a passive return in the nature of interest and that no obligation or security shall be a Permitted Investment if (i) such obligation or security evidences a right to receive only interest payments, (ii) the right to receive principal and interest payments on such obligation or security are derived from an underlying investment that provides a yield to maturity in excess of 120% of the yield to maturity at par of such underlying investment or (iii) such instrument is not an instrument suitable for the investment of escrows and reserves established in connection with mortgage loans included in a Securitization in which some or all of the securities issued in connection therewith are rated "AAA" (or its equivalent) by each Rating Agency, as the standards therefor are established from time to time.

"Person" shall mean any individual, corporation, limited liability company, partnership, joint venture, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Plan" shall mean an employee benefit or other plan established or maintained by Borrower, Guarantor or any ERISA Affiliate during the five-year period ended prior to the date of this Security Instrument or to which Borrower, Guarantor or any ERISA Affiliate makes, is obligated to make or has, within the five year period ended prior to the date of this Security Instrument, been required to make contributions (whether or not covered by Title IV of ERISA or Section 302 of ERISA or Section 401(a) or 412 of the Code), other than a Multiemployer Plan.

"Premises" shall mean the plot(s), piece(s) or parcel(s) of real property described in Exhibit A attached hereto and made a part hereof.

"Principal Amount" shall mean the Loan Amount as such amount may be reduced from time to time pursuant to the terms of this Security Instrument, the Note or the other Loan Documents.

"Principal Payments" shall mean all payments of principal made pursuant to the terms of the Note.

"Pro-Forma Net Operating Income" shall mean Pro-Forma Operating Income less Pro-Forma Operating Expenses.

"Pro-Forma Operating Expenses" shall mean projected annualized Operating Expenses based on a trailing twelve (12)-month period adjusted upwards (but not downwards) by CPI as

15

reasonably adjusted by Lender to take into account, among other things, anticipated increases in Operating Expenses.

"Pro-Forma Operating Income" shall mean projected annualized Operating Income based on the most recent rent roll and such other information as is required to be delivered by Borrower pursuant to Section 2.09 hereof excluding rent relating to tenants under Space Leases (pursuant to the most recent rent roll) that are more than thirty (30) days old as reasonably adjusted by Lender to take into account, among other things, a vacancy factor equal to the greater of (a) anticipated vacancies and (b) market vacancies for the market in which the Property is located.

"Prohibited Person" shall mean any Person and/or any Affiliate thereof identified on the OFAC List or any other Person or foreign country or agency thereof with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"Property" shall mean the Premises, the Improvements, the Equipment, the Fixtures, the Leases, the Sub-Account, the Escrow Accounts and all other assets of Borrower, including without limitation, all other collateral of whatever nature granted to Lender as security for the Loan pursuant to the Mortgage and each other Loan Document, together with all proceeds, products, substitutions and accessories (including claims and demands therefor) of each of the foregoing.

"Property Agreements" shall mean all agreements, grants of easements and/or rights-of-way, reciprocal easement agreements, permits, declarations of covenants, conditions and restrictions, disposition and development agreements, planned unit development agreements, parking agreements, party wall agreements or other instruments affecting the Property, but not including any brokerage agreements, management agreements, service contracts, Space Leases or the Loan Documents.

"Rate Cap Agreement" shall mean that certain interest rate protection agreement (together with the confirmation and schedules relating thereto) with a notional amount which shall not at any time be less than the Principal Amount and a LIBOR Rate strike price equal to 5.5% entered into by Borrower in accordance with the terms hereof or of the other Loan Documents and any similar interest rate cap or collar agreements subsequently entered into in replacement or substitution therefor by Borrower with respect to the Loan, including, without limitation, the Replacement Rate Cap Agreement.

"Rating Agency" shall mean each of Standard & Poor's Ratings Services, a division of The McGraw-Hill Company, Inc. ("Standard & Poor's"), Fitch, Inc., and Moody's Investors Service, Inc. ("Moody's") and any successor to any of them; provided, however, that at any time after a Securitization, "Rating Agency" shall mean those of the foregoing rating agencies that from time to time rate the securities issued in connection with such Securitization.

"Realty" shall have the meaning set forth in Section 2.05(b) hereof.

16

"Regulation AB" shall mean Regulation AB under the Securities Act and the Securities Exchange Act of 1934 (as amended).

"Rent Roll" shall have the meaning set forth in Section 2.05 (o) hereof.

"Rents" shall have the meaning set forth in the Mortgage.

"Required Debt Service Payment" shall mean, as of any Payment Date, (a) the amount of interest and principal then due and payable pursuant to the Note, together with any other sums due thereunder, including, without limitation, any prepayments required to be made or for which notice has been given under this Security Instrument, Default Rate Interest and premium, if any, paid in accordance therewith plus (b) reasonable out-of-pocket fees incurred by Lender in connection with its administration and servicing of the Central Account.

"Required Engineering Work" shall mean the immediate engineering and/or environmental remediation work set forth on **Exhibit D** attached hereto and made a part hereof.

"Retention Amount" shall have the meaning set forth in Section 3.04(b)(vii) hereof.

"Securities Act" shall mean the Securities Act of 1933, as the same shall be amended from time to time.

"Securitization" shall mean a public or private offering of securities by Lender or any of its Affiliates or their respective successors and assigns which are collateralized, in whole or in part, by this Security Instrument.

"Security Deposit Account" shall have the meaning set forth in Section 5.01 hereof.

"Security Instrument" shall mean this Security Instrument as originally executed or as it may hereafter from time to time be supplemented, amended, modified or extended by one or more indentures supplemental hereto.

"Significant Obligor" shall have the meaning set forth in Item 1101(k) of Regulation AB.

"Single Purpose Entity" shall mean a corporation, partnership, joint venture, limited liability company, trust or unincorporated association, which is formed or organized solely for the purpose of holding, directly, an ownership interest in the Property or, with respect to General Partner, holding an ownership interest in and managing a Person which holds an ownership interest in the Property, does not engage in any business unrelated to, with respect to Borrower, the Property and, with respect to General Partner, its interest in Borrower, does not have any assets other than those related to, with respect to Borrower, its interest in the Property and, with respect to General Partner, its interest in Borrower, or any indebtedness other than as permitted by this Security Instrument or the other Loan Documents, has its own separate books and records and has its own accounts, in each case which are separate and apart from the books and records and accounts of any other Person, holds itself out as being a Person separate and apart from any other Person and which otherwise satisfies the criteria of the Rating Agency, as in effect on the Closing Date, for a special-purpose bankruptcy-remote entity.

17

"Solvent" shall mean, as to any Person, that (a) the sum of the assets of such Person, at a fair valuation, exceeds its liabilities, including contingent liabilities, (b) such Person has sufficient capital with which to conduct its business as presently conducted and as proposed to be conducted and (c) such Person has not incurred debts, and does not intend to incur debts, beyond its ability to pay such debts as they mature.  For purposes of this definition, "debt" means any liability on a claim, and "claim" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.  With respect to any such contingent liabilities, such liabilities shall be computed in accordance with GAAP at the amount which, in light of all the facts and circumstances existing at the time, represents the amount which can reasonably be expected to become an actual or matured liability.

"Space Leases" shall mean any Lease or sublease thereunder (including, without limitation, any Major Space Lease) or any other agreement providing for the use and occupancy of a portion of the Property together with any supplements, renewals, amendments, modifications or extensions thereof.

"State" shall mean any of the states which are members of the United States of America.

"Stated Maturity" when used with respect to the Note or any installment of interest and/or principal payment thereunder, shall mean the date specified in the Note as the fixed date on which a payment of all or any portion of principal and/or interest is due and payable, as such date may be extended from time to time pursuant to the terms of the Note.

"Sub-Account" shall have the meaning set forth in Section 5.02 hereof.

"Substantial Casualty" shall have the meaning set forth in Section 3.04 hereof.

"Taking" shall mean a condemnation or taking pursuant to the lawful exercise of the power of eminent domain.

"Total GLA" shall mean the total gross leasable area of the Property, including all Space Leases.

"Transfer" shall mean the conveyance, assignment, sale, mortgaging, encumbrance, pledging, hypothecation, granting of a security interest in, granting of options with respect to, or other disposition of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) all or any portion of any legal or beneficial interest (a) in all or any portion of the Property; (b) if Borrower is a corporation or, if Borrower is a partnership and any General Partner is a corporation, in the stock of Borrower or any General Partner; (c) in Borrower (or any trust of which Borrower is a trustee); or (d) if Borrower is a limited or general partnership, joint venture, limited liability company, trust, nominee trust, tenancy in common or other unincorporated form of business association or form

18

of ownership interest, in any Person having a legal or beneficial ownership in Borrower, excluding any legal or beneficial interest in any constituent limited partner, if Borrower is a limited partnership, or in any non-managing member, if Borrower is a limited liability company, unless such interest would, or together with all other direct or indirect interests in Borrower which were previously transferred, aggregate 49% or more of the partnership or membership, as applicable, interest in Borrower or would result in any Person who, as of the Closing Date, did not own, directly or indirectly, 49% or more of the partnership or membership, as applicable, interest in Borrower, owning, directly or indirectly, 49% or more of the partnership or membership, as applicable, interest in Borrower and excluding any legal or beneficial interest in any General Partner unless such interest would, or together with all other direct or indirect interest in the General Partner which were previously transferred, aggregate 49% or more of the partnership or membership, as applicable, interest in the General Partner (or result in a change in control of the management of the General Partner from the individuals exercising such control immediately prior to the conveyance or other disposition of such legal or beneficial interest) and shall also include, without limitation to the foregoing, the following:  an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof or any interest therein for a price to be paid in installments; an agreement by Borrower leasing all or substantially all of the Property to one or more Persons pursuant to a single or related transactions, or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rent; any instrument subjecting the Property to a condominium regime or transferring ownership to a cooperative corporation; and the dissolution or termination of Borrower or the merger or consolidation of Borrower with any other Person.

"UCC" shall mean the Uniform Commercial Code as in effect on the date hereof in the State in which the Realty is located; provided, however, that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection or priority of the security interest in any item or portion of the collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State in which the Realty is located ("Other UCC State"), "UCC" means the Uniform Commercial Code as in effect in such Other UCC State for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or priority.

"Unscheduled Payments" shall mean (a) all Loss Proceeds that Borrower has elected or is required to apply to the repayment of the Debt pursuant to this Security Instrument, the Note or any other Loan Documents, (b) any funds representing a voluntary or involuntary principal prepayment other than scheduled Principal Payments and (c) any Net Proceeds.

"Use Requirements" shall mean any and all building codes, permits, certificates of occupancy or compliance, laws, regulations, or ordinances (including, without limitation, health, pollution, fire protection, medical and day-care facilities, waste product and sewage disposal regulations), restrictions of record, easements, reciprocal easements, declarations or other agreements affecting the use of the Property or any part thereof.

19

"Welfare Plan" shall mean an employee welfare benefit plan as defined in Section 3(1) of ERISA established or maintained by Borrower, Guarantor or any ERISA Affiliate or that covers any current or former employee of Borrower, Guarantor or any ERISA Affiliate.

"Work" shall have the meaning set forth in Section 3.04(a)(i) hereof.

## ARTICLE II: REPRESENTATIONS, WARRANTIES AND COVENANTS OF BORROWER

Section 2.01. <u>Payment of Debt</u>. Borrower will pay the Debt at the time and in the manner provided in the Note and the other Loan Documents, all in lawful money of the United States of America in immediately available funds.

Section 2.02. <u>Representations, Warranties and Covenants of Borrower</u>. Borrower represents and warrants to and covenants with Lender:

(a)    <u>Organization and Authority</u>. Borrower (i) is a limited liability company, general partnership, limited partnership or corporation, as the case may be, duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, (ii) has all requisite power and authority and all necessary licenses and permits to own and operate the Property and to carry on its business as now conducted and as presently proposed to be conducted and (iii) is duly qualified, authorized to do business and in good standing in the jurisdiction where the Property is located and in each other jurisdiction where the conduct of its business or the nature of its activities makes such qualification necessary. If Borrower is a limited liability company, limited partnership or general partnership, each general partner or managing member, as applicable, of Borrower which is a corporation is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation.

(b)    <u>Power</u>. Borrower and, if applicable, each General Partner has full power and authority to execute, deliver and perform, as applicable, the Loan Documents to which it is a party, to make the borrowings thereunder, to execute and deliver the Note and to grant to Lender a first, prior, perfected and continuing lien on and security interest in the Property, subject only to the Permitted Encumbrances.

(c)    <u>Authorization of Borrowing</u>. The execution, delivery and performance of the Loan Documents to which Borrower is a party, the making of the borrowings thereunder, the execution and delivery of the Note, the grant of the liens on the Property pursuant to the Loan Documents to which Borrower is a party and the consummation of the Loan are within the powers of Borrower and have been duly authorized by Borrower and, if applicable, the General Partners, by all requisite action (and Borrower hereby represents that no approval or action of any member, limited partner or shareholder, as applicable, of Borrower is required to authorize any of the Loan Documents to which Borrower is a party) and will constitute the legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with their terms, except as enforcement may be stayed or limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (whether considered in proceedings at law or in equity) and will not (i) violate any provision of

Current/9423275

its partnership agreement or partnership certificate or certificate of incorporation or by-laws, or operating agreement, certificate of formation or articles of organization, as applicable, or, to its knowledge, any law, judgment, order, rule or regulation of any court, arbitration panel or other Governmental Authority, domestic or foreign, or other Person affecting or binding upon Borrower or the Property, or (ii) violate any provision of any indenture, agreement, mortgage, deed of trust, contract or other instrument to which Borrower or, if applicable, any General Partner is a party or by which any of their respective property, assets or revenues are bound, or be in conflict with, result in an acceleration of any obligation or a breach of or constitute (with notice or lapse of time or both) a default or require any payment or prepayment under, any such indenture, agreement, mortgage, deed of trust, contract or other instrument, or (iii) result in the creation or imposition of any lien, except those in favor of Lender as provided in the Loan Documents to which it is a party.

        (d)    <u>Consent</u>. Neither Borrower nor, if applicable, any General Partner, is required to obtain any consent, approval or authorization from, or to file any declaration or statement with, any Governmental Authority or other agency in connection with or as a condition to the execution, delivery or performance of this Security Instrument, the Note or the other Loan Documents which has not been so obtained or filed.

        (e)    <u>Interest Rate</u>. The rate of interest paid under the Note and the method and manner of the calculation thereof do not violate any usury or other law or applicable Legal Requirement.

        (f)    <u>Other Agreements</u>. Borrower is not a party to nor is otherwise bound by any agreements or instruments which, individually or in the aggregate, are reasonably likely to have a Material Adverse Effect. Neither Borrower nor, if applicable, any General Partner, is in violation of its organizational documents or other restriction or any agreement or instrument by which it is bound, or any judgment, decree, writ, injunction, order or award of any arbitrator, court or Governmental Authority, or any Legal Requirement, in each case, applicable to Borrower or the Property, except for such violations that would not, individually or in the aggregate, have a Material Adverse Effect.

        (g)    <u>Maintenance of Existence</u>. (i) Borrower is familiar with the criteria of the Rating Agency required to qualify as a special-purpose bankruptcy-remote entity and Borrower and, if applicable, each General Partner at all times since their formation have been duly formed and existing at all times and at all times have preserved and shall preserve and has kept and shall keep in full force and effect their existence as a Single Purpose Entity.

        (ii)    Borrower and, if applicable, each General Partner, at all times since their organization have complied, and will continue to comply, with the provisions of its certificate of limited partnership and agreement of limited partnership or certificate of incorporation and by-laws or articles of organization, certificate of formation and operating agreement, as applicable, and the laws of its jurisdiction of organization relating to partnerships, corporations or limited liability companies, as applicable.

(iii)    Borrower and, if applicable, each General Partner have done or caused to be done and will do all things necessary to observe organizational formalities and preserve their existence and Borrower and, if applicable, each General Partner will not amend, modify or otherwise change the certificate of limited partnership and agreement of limited partnership or certificate of incorporation and by-laws or articles of organization, certificate of formation and operating agreement, as applicable, or other organizational documents of Borrower and, if applicable, each General Partner.

(iv)    Borrower and, if applicable, each General Partner, have at all times accurately maintained, and will continue to accurately maintain, their respective financial statements, accounting records and other partnership, company or corporate documents separate from those of any other Person and Borrower and/or, if applicable, General Partner, have filed and will file its own tax returns or, if Borrower and/or, if applicable, General Partner is part of a consolidated group for purposes of filing tax returns, Borrower and, General Partner, as applicable, have been shown and will be shown as separate members of such group. Borrower and, if applicable, each General Partner have not at any time since their formation commingled, and will not commingle, their respective assets with those of any other Person and each has maintained and will maintain their assets in such a manner such that it will not be costly or difficult to segregate, ascertain or identify their individual assets from those of any other Person. Borrower and, if applicable, each General Partner has not permitted and will not permit any Affiliate independent access to their bank accounts. Borrower and, if applicable, each General Partner have at all times since their formation accurately maintained and utilized, and will continue to accurately maintain and utilize, their own separate bank accounts, payroll and separate books of account, stationery, invoices and checks.

(v)    Borrower and, if applicable, each General Partner, have at all times paid, and will continue to pay, their own liabilities from their own separate assets and each has allocated and charged and shall each allocate and charge fairly and reasonably any overhead which Borrower and, if applicable, any General Partner, shares with any other Person, including, without limitation, for office space and services performed by any employee of another Person.

(vi)    Borrower and, if applicable, each General Partner, have at all times identified themselves, and will continue to identify themselves, in all dealings with the public, under their own names and as separate and distinct entities and have corrected and shall correct any known misunderstanding regarding their status as separate and distinct entities. Borrower and, if applicable, each General Partner, have not at any time identified themselves, and will not identify themselves, as being a division of any other Person.

(vii)    Borrower and, if applicable, each General Partner, have been at all times, and will continue to be, adequately capitalized in light of the nature of their respective businesses.

22

(viii)   Borrower and, if applicable, each General Partner, (A) have not owned, do not own and will not own any assets or property other than, with respect to Borrower, the Property and any incidental personal property necessary for the ownership, management or operation of the Property and, with respect to General Partner, if applicable, its interest in Borrower, (B) have not engaged and will not engage in any business other than the ownership, management and operation of the Property or, with respect to General Partner, if applicable, its interest in Borrower, (C) have not incurred and will not incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than, with respect to Borrower, (X) the Loan and (Y) unsecured trade and operational debt which (1) is not evidenced by a note, (2) is incurred in the ordinary course of the operation of the Property, (3) does not exceed in the aggregate two percent (2%) of the Loan Amount and (4) is, unless being contested in accordance with the terms of this Security Instrument, paid prior to the earlier to occur of the thirtieth (30th) day after the date incurred and the date when due, (D) have not pledged and will not pledge their assets for the benefit of any other Person, and (E) have not made and will not make any loans or advances to any Person (including any Affiliate).

(ix)   Neither Borrower nor, if applicable, any General Partner will change its name or principal place of business.

(x)   Neither Borrower nor, if applicable, any General Partner has, and neither of such Persons will have, any subsidiaries (other than, with respect to General Partner, Borrower).

(xi)   Borrower has preserved and maintained and will preserve and maintain its existence as a corporation and all material rights, privileges, tradenames and franchises.

(xii)   Neither Borrower, nor, if applicable, any General Partner, has merged or consolidated with, and neither will merge or consolidate with, and neither has sold all or substantially all of its respective assets to any Person, and neither will sell all or substantially all of its respective assets to any Person, and neither has liquidated, wound up or dissolved itself (or suffered any liquidation, winding up or dissolution) and neither will liquidate, wind up or dissolve itself (or suffer any liquidation, winding up or dissolution).  Neither Borrower, nor, if applicable, any General Partner has acquired nor will acquire any business or assets from, or capital stock or other ownership interest of, or be a party to any acquisition of, any Person.

(xiii)   Borrower and, if applicable, each General Partner, have not at any time since their formation assumed, guaranteed or held themselves out to be responsible for, and will not assume, guarantee or hold themselves out to be responsible for the liabilities or the decisions or actions respecting the daily business affairs of their partners, shareholders or members or any predecessor company, corporation or partnership, each as applicable, any Affiliates, or any other Persons.  Borrower and, if applicable, each General Partner, have not at any time since their formation acquired, and will not acquire, obligations or securities of its partners or shareholders, members or any predecessor company, corporation or partnership, each as applicable, or any Affiliates (other than,

with respect to General Partner, its interest in Borrower). Borrower and, if applicable, each General Partner, have not at any time since their formation made, and will not make, loans to its partners, members or shareholders or any predecessor company, corporation or partnership, each as applicable, or any Affiliates of any of such Persons. Borrower and, if applicable, each General Partner, have no known contingent liabilities nor do they have any material financial liabilities under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which such Person is a party or by which it is otherwise bound other than under the Loan Documents.

(xiv)   Borrower and, if applicable, each General Partner, have not at any time since their formation entered into and was not a party to, and, will not enter into or be a party to, any transaction with its Affiliates, members, partners or shareholders, as applicable, or any Affiliates thereof except in the ordinary course of business of such Person on terms which are no less favorable to such Person than would be obtained in a comparable arm's length transaction with an unrelated third party.

(xv)   If Borrower is a limited partnership or a limited liability company, the General Partner shall be a corporation or limited liability company whose sole asset is its interest in Borrower and the General Partner will at all times comply, and will cause Borrower to comply, with each of the representations, warranties, and covenants contained in this Section 2.02(g) as if such representation, warranty or covenant was made directly by such General Partner.

(xvi)   Borrower shall at all times cause there to be at least two duly appointed members of the board of directors or board of managers or other governing board or body, as applicable (each, an "Independent Director"), of, if Borrower is a corporation, Borrower, if Borrower is a limited partnership, of the General Partner, and if Borrower is a limited liability company, of the General Partner or of Borrower, reasonably satisfactory to Lender who shall not have been at the time of such individual's appointment, and may not be or have been at any time (A) a shareholder, officer, director, attorney, counsel, partner, member or employee of Borrower or any of the foregoing Persons or Affiliates thereof, (B) a customer or creditor of, or supplier or service provider to, Borrower or any of its shareholders, partners, members or their Affiliates, (C) a member of the immediate family of any Person referred to in (A) or (B) above or (D) a Person Controlling, Controlled by or under common Control with any Person referred to in (A) through (C) above.

(xvii)   Borrower and, if applicable, each General Partner, shall not cause or permit the board of directors or board of managers or other governing board or body, as applicable, of Borrower or, if applicable, each General Partner, to take any action which, under the terms of any certificate of incorporation, by-laws, limited liability company agreement, operating agreement, certificate of formation or articles of organization requires a vote of the board of directors or board of managers or other governing board or body of Borrower, or, if applicable, the General Partner, unless at the time of such action there shall be at least two members who are Independent Directors.

24

(xviii)  Borrower and, if applicable, each General Partner has paid and shall pay the salaries of their own employees and has maintained and shall maintain a sufficient number of employees in light of their contemplated business operations.

(xix)  Borrower shall, and shall cause its Affiliates to, and Borrower has and has caused its Affiliates to, conduct its business so that the assumptions made with respect to Borrower and, if applicable, each General Partner, in that certain opinion letter relating to substantive non-consolidation dated the date hereof (the "Insolvency Opinion") delivered in connection with the Loan has been and shall be true and correct in all respects.

Notwithstanding anything to the contrary contained in this Section 2.02(g), provided Borrower is a Delaware single member limited liability company which satisfies the single purpose bankruptcy remote entity requirements of each Rating Agency for a single member limited liability company, the foregoing provisions of this Section 2.02(g) shall not apply to the General Partner.

(h)    No Defaults.  No Default or Event of Default has occurred and is continuing or would occur as a result of the consummation of the transactions contemplated by the Loan Documents.  Borrower is not in default in the payment or performance of any of its Contractual Obligations in any respect.

(i)    Consents and Approvals.  Borrower and, if applicable, each General Partner, have obtained or made all necessary (i) consents, approvals and authorizations, and registrations and filings of or with all Governmental Authorities and (ii) consents, approvals, waivers and notifications of partners, stockholders, members, creditors, lessors and other nongovernmental Persons, in each case, which are required to be obtained or made by Borrower or, if applicable, the General Partner, in connection with the execution and delivery of, and the performance by Borrower of its obligations under, the Loan Documents.

(j)    Investment Company Act Status, etc.  Borrower is not (i) an "investment company," or a company "controlled" by an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended, (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended, or (iii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

(k)    Compliance with Law.  Borrower is in compliance in all material respects with all Legal Requirements to which it or the Property is subject, including, without limitation, all Environmental Statutes, the Occupational Safety and Health Act of 1970, the Americans with Disabilities Act and ERISA.  No portion of the Property has been or will be purchased, improved, fixtured, equipped or furnished with proceeds of any illegal activity and, to the best of Borrower's knowledge, no illegal activities are being conducted at or from the Property.

(l)    Financial Information.  All financial data that has been delivered by Borrower to Lender (i) is true, complete and correct in all material respects, (ii) accurately represents the

25

financial condition and results of operations of the Persons covered thereby as of the date on which the same shall have been furnished, and (iii) has been prepared in accordance with GAAP (or such other accounting basis as is reasonably acceptable to Lender) throughout the periods covered thereby.  As of the date hereof, neither Borrower nor, if applicable, any General Partner, has any contingent liability, liability for taxes or other unusual or forward commitment not reflected in such financial statements delivered to Lender.  Since the date of the last financial statements delivered by Borrower to Lender except as otherwise disclosed in such financial statements or notes thereto, there has been no change in the assets, liabilities or financial position of Borrower nor, if applicable, any General Partner, or in the results of operations of Borrower which would have a Material Adverse Effect.  Neither Borrower nor, if applicable, any General Partner, has incurred any obligation or liability, contingent or otherwise not reflected in such financial statements which would have a Material Adverse Effect.

(m)    Transaction Brokerage Fees.  Borrower has not dealt with any financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Security Instrument.  All brokerage fees, commissions and other expenses payable in connection with the transactions contemplated by the Loan Documents have been paid in full by Borrower contemporaneously with the execution of the Loan Documents and the funding of the Loan.  Borrower hereby agrees to indemnify and hold Lender harmless for, from and against any and all claims, liabilities, costs and expenses of any kind in any way relating to or arising from (i) a claim by any Person that such Person acted on behalf of Borrower in connection with the transactions contemplated herein or (ii) any breach of the foregoing representation.  The provisions of this subsection (m) shall survive the repayment of the Debt.

(n)    Federal Reserve Regulations.  No part of the proceeds of the Loan will be used for the purpose of "purchasing" or "carrying" any "margin stock" within the meaning of Regulations T, U or X of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulations T, U or X or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of the Loan Documents.

(o)    Pending Litigation.  There are no actions, suits or proceedings pending or, to the best knowledge of Borrower, threatened against or affecting Borrower or the Property in any court or before any Governmental Authority which if adversely determined either individually or collectively has or is reasonably likely to have a Material Adverse Effect.

(p)    Solvency; No Bankruptcy.  Each of Borrower and, if applicable, the General Partner, (i) is and has at all times been Solvent and will remain Solvent immediately upon the consummation of the transactions contemplated by the Loan Documents and (ii) is free from bankruptcy, reorganization or arrangement proceedings or a general assignment for the benefit of creditors and is not contemplating the filing of a petition under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of such Person's assets or property and Borrower has no knowledge of any Person contemplating the filing of any such petition against it or, if applicable, the General Partner.  None of the transactions contemplated hereby will be or have been made with an intent to hinder, delay or defraud any present or future creditors of Borrower and Borrower has received reasonably equivalent value in exchange for its

26

obligations under the Loan Documents.  Borrower's assets do not, and immediately upon consummation of the transaction contemplated in the Loan Documents will not, constitute unreasonably small capital to carry out its business as presently conducted or as proposed to be conducted.  Borrower does not intend to, nor believes that it will, incur debts and liabilities beyond its ability to pay such debts as they may mature.

(q)    Use of Proceeds.  The proceeds of the Loan shall be applied by Borrower to, inter alia, (i) satisfy certain mortgage loans presently encumbering all or a part of the Property and (ii) pay certain transaction costs incurred by Borrower in connection with the Loan.  No portion of the proceeds of the Loan will be used for family, personal, agricultural or household use.

(r)    Tax Filings.  Borrower and, if applicable, each General Partner, have filed all federal, state and local tax returns required to be filed and have paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by Borrower and, if applicable, the General Partners.  Borrower and, if applicable, the General Partners, believe that their respective tax returns properly reflect the income and taxes of Borrower and said General Partner, if any, for the periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable tax authority upon audit.

(s)    Not Foreign Person.  Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the Code.

(t)    ERISA. (i) The assets of Borrower and Guarantor are not and will not become treated as "plan assets", whether by operation of law or under regulations promulgated under ERISA.  If any Person having a legal or beneficial ownership interest in Borrower is using (or is deemed under ERISA to be using) "plan assets", Borrower will qualify as a "real estate operating company" within the meaning of 29 C.F.R. §2510.3-101(e) at all times that the Loan is outstanding.  Each Plan and Welfare Plan and, to the knowledge of Borrower, each Multiemployer Plan, is in compliance in all material respects with, and has been administered in all material respects in compliance with, its terms and the applicable provisions of ERISA, the Code and any other applicable Legal Requirement, and no event or condition has occurred and is continuing as to which Borrower would be under an obligation to furnish a report to Lender under clause (ii)(A) of this Section.  Other than an application for a favorable determination letter with respect to a Plan, there are no pending issues or claims before the Internal Revenue Service, the United States Department of Labor or any court of competent jurisdiction related to any Plan or Welfare Plan under which Borrower, Guarantor or any ERISA Affiliate, directly or indirectly (through an indemnification agreement or otherwise), could be subject to any material risk of liability under Section 409 or 502(i) of ERISA or Section 4975 of the Code.  No Welfare Plan provides or will provide benefits, including, without limitation, death or medical benefits (whether or not insured) with respect to any current or former employee of Borrower, Guarantor or any ERISA Affiliate beyond his or her retirement or other termination of service other than (A) coverage mandated by applicable law, (B) death or disability benefits that have been fully provided for by fully paid up insurance or (C) severance benefits.

(ii)     Borrower will furnish to Lender as soon as possible, and in any event within ten (10) days after Borrower knows or has reason to believe that any of the events or conditions specified below with respect to any Plan, Welfare Plan or Multiemployer Plan has occurred or exists, an Officer's Certificate setting forth details respecting such event or condition and the action, if any, that Borrower or its ERISA Affiliate proposes to take with respect thereto (and a copy of any report or notice required to be filed with or given to PBGC (or any other relevant Governmental Authority) by Borrower or an ERISA Affiliate with respect to such event or condition, if such report or notice is required to be filed with the PBGC or any other relevant Governmental Authority:

(A)     any reportable event, as defined in Section 4043 of ERISA and the regulations issued thereunder, with respect to a Plan, as to which PBGC has not by regulation waived the requirement of Section 4043(a) of ERISA that it be notified within thirty (30) days of the occurrence of such event (provided that a failure to meet the minimum funding standard of Section 412 of the Code and of Section 302 of ERISA, including, without limitation, the failure to make on or before its due date a required installment under Section 412(m) of the Code and of Section 302(e) of ERISA, shall be a reportable event regardless of the issuance of any waivers in accordance with Section 412(d) of the Code), and any request for a waiver under Section 412(d) of the Code for any Plan;

(B)     the distribution under Section 4041 of ERISA of a notice of intent to terminate any Plan or any action taken by Borrower or an ERISA Affiliate to terminate any Plan;

(C)     the institution by PBGC of proceedings under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or the receipt by Borrower or any ERISA Affiliate of a notice from a Multiemployer Plan that such action has been taken by PBGC with respect to such Multiemployer Plan;

(D)     the complete or partial withdrawal from a Multiemployer Plan by Borrower or any ERISA Affiliate that results in liability under Section 4201 or 4204 of ERISA (including the obligation to satisfy secondary liability as a result of a purchaser default) or the receipt by Borrower or any ERISA Affiliate of notice from a Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA or that it intends to terminate or has terminated under Section 4041A of ERISA;

(E)     the institution of a proceeding by a fiduciary of any Multiemployer Plan against Borrower or any ERISA Affiliate to enforce Section 515 of ERISA, which proceeding is not dismissed within thirty (30) days;

(F)     the adoption of an amendment to any Plan that, pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA, would result in the loss of tax-exempt status of the trust of which such Plan is a part if Borrower or an

28

ERISA Affiliate fails to timely provide security to the Plan in accordance with the provisions of said Sections; or

(G)    the imposition of a lien or a security interest in connection with a Plan.

(iii)    Borrower shall not knowingly engage in or permit any transaction in connection with which Borrower, Guarantor or any ERISA Affiliate could be subject to either a civil penalty or tax assessed pursuant to Section 502(i) or 502(l) of ERISA or Section 4975 of the Code, permit any Welfare Plan to provide benefits, including without limitation, medical benefits (whether or not insured), with respect to any current or former employee of Borrower, Guarantor or any ERISA Affiliate beyond his or her retirement or other termination of service other than (A) coverage mandated by applicable law, (B) death or disability benefits that have been fully provided for by paid up insurance or otherwise or (C) severance benefits, permit the assets of Borrower or Guarantor to become "plan assets", whether by operation of law or under regulations promulgated under ERISA or adopt, amend (except as may be required by applicable law) or increase the amount of any benefit or amount payable under, or permit any ERISA Affiliate to adopt, amend (except as may be required by applicable law) or increase the amount of any benefit or amount payable under, any employee benefit plan (including, without limitation, any employee welfare benefit plan) or other plan, policy or arrangement, except for normal increases in the ordinary course of business consistent with past practice that, in the aggregate, do not result in a material increase in benefits expense to Borrower, Guarantor or any ERISA Affiliate.

(u)    <u>Labor Matters</u>.  No organized work stoppage or labor strike is pending or threatened by employees or other laborers at the Property and neither Borrower nor Manager (i) is involved in or threatened with any labor dispute, grievance or litigation relating to labor matters involving any employees and other laborers at the Property, including, without limitation, violation of any federal, state or local labor, safety or employment laws (domestic or foreign) and/or charges of unfair labor practices or discrimination complaints; (ii) has engaged in any unfair labor practices within the meaning of the National Labor Relations Act or the Railway Labor Act; or (iii) is a party to, or bound by, any collective bargaining agreement or union contract with respect to employees and other laborers at the Property and no such agreement or contract is currently being negotiated by Borrower, Manager or any of their Affiliates.

(v)    <u>Borrower's Legal Status</u>.  Borrower's exact legal name that is indicated on the signature page hereto, organizational identification number and place of business or, if more than one, its chief executive office, as well as Borrower's mailing address, if different, which were identified by Borrower to Lender and contained in this Security Instrument, are true, accurate and complete.  Borrower (i) will not change its name, its place of business or, if more than one place of business, its chief executive office, or its mailing address or organizational identification number if it has one without giving Lender at least thirty (30) days prior written notice of such change, (ii) if Borrower does not have an organizational identification number and later obtains one, Borrower shall promptly notify Lender of such organizational identification number and (iii) will not change its type of organization, jurisdiction of organization or other legal structure.

29

(w)   Compliance with Anti-Terrorism, Embargo and Anti-Money Laundering Laws.
(i) None of Borrower, General Partner, any Guarantor, or any Person who owns any equity
interest in or Controls Borrower, General Partner or any Guarantor currently is identified on the
OFAC List or otherwise qualifies as a Prohibited Person, and Borrower has implemented
procedures, approved by Borrower and, if applicable, General Partner, to ensure that no Person
who now or hereafter owns an equity interest in Borrower or General Partner is a Prohibited
Person or Controlled by a Prohibited Person, (ii) no proceeds of the Loan will be used to fund
any operations in, finance any investments or activities in or make any payments to, Prohibited
Persons, and (iii) none of Borrower, General Partner, or any Guarantor is in violation of any
Legal Requirements relating to anti-money laundering or anti-terrorism, including, without
limitation, Legal Requirements related to transacting business with Prohibited Persons or the
requirements of the Uniting and Strengthening America by Providing Appropriate Tools
Required to Intercept and Obstruct Terrorism Act of 2001, U.S. Public Law 107-56, and the
related regulations issued thereunder, including temporary regulations, all as amended from time
to time. No tenant at the Property currently is identified on the OFAC List or otherwise qualifies
as a Prohibited Person, and, to the best of Borrower's knowledge, no tenant at the Property is
owned or Controlled by a Prohibited Person. Borrower has determined that Manager has
implemented procedures, approved by Borrower, to ensure that no tenant at the Property is a
Prohibited Person or owned or Controlled by a Prohibited Person.

Section 2.03.   Further Acts, etc. Borrower will, at the cost of Borrower, and without
expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds,
conveyances, mortgages or deeds of trust, as applicable, assignments, notices of assignments,
transfers and assurances as Lender shall, from time to time, reasonably require for the better
assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights
hereby mortgaged, given, granted, bargained, sold, alienated, enfeoffed, conveyed, confirmed,
pledged, assigned and hypothecated, or which Borrower may be or may hereafter become bound
to convey or assign to Lender, or for carrying out or facilitating the performance of the terms of
this Security Instrument or for filing, registering or recording this Security Instrument and, on
demand, will execute and deliver and hereby authorizes Lender to execute in the name of
Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or
more financing statements, chattel mortgages or comparable security instruments to evidence
more effectively the lien hereof upon the Property. Borrower grants to Lender an irrevocable
power of attorney coupled with an interest for the purpose of protecting, perfecting, preserving
and realizing upon the interests granted pursuant to this Security Instrument and to effect the
intent hereof, all as fully and effectually as Borrower might or could do; and Borrower hereby
ratifies all that Lender shall lawfully do or cause to be done by virtue hereof. Upon receipt of an
affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any
other Loan Document which is not of public record, and, in the case of any such mutilation, upon
surrender and cancellation of such Note or other applicable Loan Document, Borrower will
issue, in lieu thereof, a replacement Note or other applicable Loan Document, dated the date of
such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal
amount thereof and otherwise of like tenor.

Section 2.04.   Recording of Security Instrument, etc. Borrower forthwith upon the
execution and delivery of this Security Instrument and thereafter, from time to time, will cause

this Security Instrument, and any security instrument creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully protect the lien or security interest hereof upon, and the interest of Lender in, the Property.  Borrower will pay all filing, registration or recording fees, and all expenses incident to the preparation, execution and acknowledgment of this Security Instrument, any mortgage or deed of trust, as applicable, supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and all federal, state, county and municipal, taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Security Instrument, any mortgage or deed of trust, as applicable, supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, except where prohibited by law to do so, in which event Lender may declare the Debt to be immediately due and payable.  Borrower shall hold harmless and indemnify Lender and its successors and assigns, against any liability incurred as a result of the imposition of any tax on the making and recording of this Security Instrument.

Section 2.05.  <u>Representations, Warranties and Covenants Relating to the Property</u>. Borrower represents and warrants to and covenants with Lender with respect to the Property as follows:

(a)     <u>Lien Priority</u>.  The Mortgage is a valid and enforceable first lien on the portion of the Property which constitutes real property and this Security Instrument creates a valid and enforceable lien on the balance of the Property, in each case free and clear of all encumbrances and liens having priority over the lien of this Security Instrument or the Mortgage, as applicable, except for the items set forth as exceptions to or subordinate matters in the title insurance policy insuring the lien of the Mortgage, none of which, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by this Security Instrument or the Mortgage, materially affect the value or marketability of the Property, impair the use or operation of the Property for the use currently being made thereof or impair Borrower's ability to pay its obligations in a timely manner (such items being the "<u>Permitted Encumbrances</u>").

(b)     <u>Title</u>.  Borrower has, subject only to the Permitted Encumbrances, good, insurable and marketable fee simple title to the Premises, Improvements and Fixtures (collectively, the "<u>Realty</u>") and to all easements and rights benefiting the Realty and has the right, power and authority to mortgage, encumber, give, grant, bargain, sell, alien, enfeoff, convey, confirm, pledge, assign, and hypothecate the Property.  Borrower will preserve its interest in and title to the Property and will forever warrant and defend the same to Lender against any and all claims made by, through or under Borrower and will forever warrant and defend the validity and priority of the lien and security interest created herein against the claims of all Persons whomsoever claiming by, through or under Borrower.  The foregoing warranty of title shall survive the foreclosure of this Security Instrument and the Mortgage and shall inure to the benefit of and be enforceable by Lender in the event Lender acquires title to the Property pursuant to any foreclosure.  In addition, there are no outstanding options or rights of first refusal to purchase the Property or Borrower's ownership thereof.

31

(c)    <u>Taxes and Impositions</u>.  All taxes and other Impositions and governmental assessments due and owing in respect of, and affecting, the Property have been paid.  Borrower has paid all Impositions which constitute special governmental assessments in full, except for those assessments which are permitted by applicable Legal Requirements to be paid in installments, in which case all installments which are due and payable have been paid in full. There are no pending, or to Borrower's best knowledge, proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

(d)    <u>Casualty; Flood Zone</u>.  The Realty is in good repair and free and clear of any damage, destruction or casualty (whether or not covered by insurance) that would materially affect the value of the Realty or the use for which the Realty was intended, there exists no structural or other material defects or damages in or to the Property and Borrower has not received any written notice from any insurance company or bonding company of any material defect or inadequacies in the Property, or any part thereof, which would materially and adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.  No portion of the Premises is located in an "area of special flood hazard," as that term is defined in the regulations of the Federal Insurance Administration, Department of Housing and Urban Development, under the National Flood Insurance Act of 1968, as amended (24 CFR § 1909.1) or Borrower has obtained the flood insurance required by Section 3.01(a)(vi) hereof. The Premises either does not lie in a 100 year flood plain that has been identified by the Secretary of Housing and Urban Development or any other Governmental Authority or, if it does, Borrower has obtained the flood insurance required by Section 3.01(a)(vi) hereof.

(e)    <u>Completion; Encroachment</u>.  All Improvements necessary for the efficient use and operation of the Premises, including, without limitation, all Improvements which were included for purposes of determining the appraised value of the Property in the Appraisal, have been completed and none of said Improvements lie outside the boundaries and building restriction lines of the Premises.  Except as set forth in the title insurance policy insuring the lien of the Mortgage, no improvements on adjoining properties encroach upon the Premises.

(f)    <u>Separate Lot</u>.  The Premises are taxed separately without regard to any other real estate and constitute a legally subdivided lot under all applicable Legal Requirements (or, if not subdivided, no subdivision or platting of the Premises is required under applicable Legal Requirements), and for all purposes may be mortgaged, encumbered, conveyed or otherwise dealt with as an independent parcel.  The Property does not benefit from any tax abatement or exemption.

(g)    <u>Use</u>.  The existence of all Improvements, the present use and operation thereof and the access of the Premises and the Improvements to all of the utilities and other items referred to in paragraph (k) below are in compliance in all material respects with all Leases affecting the Property and all applicable Legal Requirements, including, without limitation, Environmental Statutes, Development Laws and Use Requirements.  Borrower has not received any notice from any Governmental Authority alleging any uncured violation relating to the Property of any applicable Legal Requirements.

32

     (h)   <u>Licenses and Permits</u>.  Borrower currently holds and will continue to hold all certificates of occupancy, licenses, registrations, permits, consents, franchises and approvals of any Governmental Authority or any other Person which are material for the lawful occupancy and operation of the Realty or which are material to the ownership or operation of the Property or the conduct of Borrower's business.  All such certificates of occupancy, licenses, registrations, permits, consents, franchises and approvals are current and in full force and effect.

     (i)   <u>Environmental Matters</u>.  Borrower has received and reviewed the Environmental Report and has no reason to believe that the Environmental Report contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein or herein, in light of the circumstances under which such statements were made, not misleading.

     (j)   <u>Property Proceedings</u>.  There are no actions, suits or proceedings pending or threatened in any court or before any Governmental Authority or arbitration board or tribunal (i) relating to (A) the zoning of the Premises or any part thereof, (B) any certificates of occupancy, licenses, registrations, permits, consents or approvals issued with respect to the Property or any part thereof, (C) the condemnation of the Property or any part thereof, or (D) the condemnation or relocation of any roadways abutting the Premises required for access or the denial or limitation of access to the Premises or any part thereof from any point of access to the Premises, (ii) asserting that (A) any such zoning, certificates of occupancy, licenses, registrations, permits, consents and/or approvals do not permit the operation of any material portion of the Realty as presently being conducted, (B) any material improvements located on the Property or any part thereof cannot be located thereon or operated with their intended use or (C) the operation of the Property or any part thereof is in violation in any material respect of any Environmental Statutes, Development Laws or other Legal Requirements or Space Leases or Property Agreements or (iii) which might (A) affect the validity or priority of any Loan Document or (B) have a Material Adverse Effect.  Borrower is not aware of any facts or circumstances which may give rise to any actions, suits or proceedings described in the preceding sentence.

     (k)   <u>Utilities</u>.  The Premises has all necessary legal access to water, gas and electrical supply, storm and sanitary sewerage facilities, other required public utilities (with respect to each of the aforementioned items, by means of either a direct connection to the source of such utilities or through connections available on publicly dedicated roadways directly abutting the Premises or through permanent insurable easements benefiting the Premises), fire and police protection, parking, and means of direct access between the Premises and public highways over recognized curb cuts (or such access to public highways is through private roadways which may be used for ingress and egress pursuant to permanent insurable easements).

     (l)   <u>Mechanics' Liens</u>.  The Property is free and clear of any mechanics' liens or liens in the nature thereof, and no rights are outstanding that under law could give rise to any such liens, any of which liens are or may be prior to, or equal with, the lien of this Security Instrument and the Mortgage, except those which are insured against by the title insurance policy insuring the lien of the Mortgage.

Current/9423275

(m)    Title Insurance.  Lender has received a lender's title insurance policy insuring the Mortgage as a first lien on the Realty subject only to Permitted Encumbrances.

(n)    Insurance.  The Property is insured in accordance with the requirements set forth in Article III hereof.

(o)    Space Leases.  There are no Space Leases.

(p)    Property Agreements.

(i)    Borrower has delivered to Lender true, correct and complete copies of all Property Agreements.

(ii)    No Property Agreement provides any party with the right to obtain a lien or encumbrance upon the Property superior to the lien of this Security Instrument or the Mortgage.

(iii)    No default exists or with the passing of time or the giving of notice or both would exist under any Property Agreement which would, individually or in the aggregate, have a Material Adverse Effect.

(iv)    Borrower has not received or given any written communication which alleges that a default exists or, with the giving of notice or the lapse of time, or both, would exist under the provisions of any Property Agreement.

(v)    No condition exists whereby Borrower or any future owner of the Property may be required to purchase any other parcel of land which is subject to any Property Agreement or which gives any Person a right to purchase, or right of first refusal with respect to, the Property.

(vi)    To the best knowledge of Borrower, no offset or any right of offset exists respecting continued contributions to be made by any party to any Property Agreement except as expressly set forth therein. Except as previously disclosed to Lender in writing, no material exclusions or restrictions on the utilization, leasing or improvement of the Property (including non-compete agreements) exists in any Property Agreement.

(vii)    All "pre-opening" requirements contained in all Property Agreements (including, but not limited to, all off-site and on-site construction requirements), if any, have been fulfilled, and, to the best of Borrower's knowledge, no condition now exists whereby any party to any such Property Agreement could refuse to honor its obligations thereunder.

(viii)    All work, if any, to be performed by Borrower under each of the Property Agreements has been substantially performed, all contributions to be made by Borrower to any party to such Property Agreements have been made, and all other conditions to such party's obligations thereunder have been satisfied.

34

(q)    Personal Property.  Borrower has delivered to Lender a true, correct and complete schedule of all personal property, if any, owned by Borrower and located upon the Property or used in connection with the use or operation of the Realty and Borrower represents that it has good and marketable title to all such personal property, free and clear of any liens, except for liens created under the Loan Documents and liens which describe the equipment and other personal property owned by tenants.

(r)    Leasing Brokerage and Management Fees.  Except as previously disclosed to Lender in writing, there are no brokerage fees or commissions payable by Borrower with respect to the leasing of space at the Property and there are no management fees payable by Borrower with respect to the management of the Property.

(s)    Security Deposits.  All security deposits with respect to the Property on the date hereof have been transferred to the Security Deposit Account on the date hereof, and Borrower is in compliance with all Legal Requirements relating to such security deposits as to which failure to comply might, individually or in the aggregate, have a Material Adverse Effect.

(t)    Loan to Value Ratio.  To the best knowledge of Borrower, based on the substantial real estate expertise of Borrower, Borrower's familiarity with the Property, and the Appraisal (which Borrower believes to contain a reasonable assessment of the fair market value of the Property), the Loan Amount does not exceed one hundred twenty-five percent (125%) of the fair market value of the Property.  For the purposes of this clause (t), the term "fair market value" shall be reduced by (i) the amount of any indebtedness secured by a lien affecting the Property that is prior to, or on a parity with, the lien of this Security Instrument or the Mortgage, and (ii) the value of any property that is not "real property" within the meaning of Treas. Reg. §§ 1.860G-2 and 1.856-3(d).

(u)    Representations Generally.  The representations and warranties contained in this Security Instrument, and the review and inquiry made on behalf of Borrower therefor, have all been made by Persons having the requisite expertise and knowledge to provide such representations and warranties.  No representation, warranty or statement of fact made by or on behalf of Borrower in this Security Instrument or in any certificate, document or schedule furnished to Lender pursuant hereto, contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein or herein not misleading (which may be to Borrower's best knowledge where so provided herein).  There are no facts presently known to Borrower which have not been disclosed to Lender which would, individually or in the aggregate, have a Material Adverse Effect nor as far as Borrower can foresee might, individually or in the aggregate, have a Material Adverse Effect.

Section 2.06.  Removal of Lien.  (a) Borrower shall, at its expense, maintain this Security Instrument and the Mortgage as a first lien on the Property and shall keep the Property free and clear of all liens and encumbrances of any kind and nature other than the Permitted Encumbrances.  Borrower shall, within ten (10) days following the filing thereof, promptly discharge of record, by bond or otherwise, any such liens and, promptly upon request by Lender, shall deliver to Lender evidence reasonably satisfactory to Lender of the discharge thereof.

(b)    Without limitation to the provisions of Section 2.06(a) hereof, Borrower shall (i) pay, from time to time when the same shall become due, all claims and demands of mechanics, materialmen, laborers, and others which, if unpaid, might result in, or permit the creation of, a lien on the Property or any part thereof, (ii) cause to be removed of record (by payment or posting of bond or settlement or otherwise) any mechanics', materialmens', laborers' or other lien on the Property, or any part thereof, or on the revenues, rents, issues, income or profit arising therefrom, and (iii) in general, do or cause to be done, without expense to Lender, everything reasonably necessary to preserve in full the lien of this Security Instrument and the Mortgage.  If Borrower fails to comply with the requirements of this Section 2.06(b), then, upon five (5) Business Days' prior notice to Borrower, Lender may, but shall not be obligated to, pay any such lien, and Borrower shall, within five (5) Business Days after Lender's demand therefor, reimburse Lender for all sums so expended, together with interest thereon at the Default Rate from the date advanced, all of which shall be deemed part of the Debt.  Nothing contained herein shall be deemed a consent or request of Lender, express or implied, by inference or otherwise, to the performance of any alteration, repair or other work by any contractor, subcontractor or laborer or the furnishing of any materials by any materialmen in connection therewith.

(c)    Notwithstanding the foregoing, Borrower may contest any lien (other than a lien relating to non-payment of Impositions, the contest of which shall be governed by Section 4.04 hereof) of the type set forth in subparagraph (b)(ii) of this Section 2.06 provided that, following prior notice to Lender (i) Borrower is contesting the validity of such lien with due diligence and in good faith and by appropriate proceedings, without cost or expense to Lender or any of its agents, employees, officers, or directors, (ii) Borrower shall preclude the collection of, or other realization upon, any contested amount from the Property or any revenues from or interest in the Property, (iii) neither the Property nor any part thereof nor interest therein, shall be in any danger of being sold, forfeited or lost by reason of such contest by Borrower, (iv) such contest by Borrower shall not affect the ownership, use or occupancy of the Property, (v) such contest by Borrower shall not subject Lender or Borrower to the risk of civil or criminal liability (other than the civil liability of Borrower for the amount of the lien in question), (vi) such lien is subordinate to the lien of this Security Instrument and the Mortgage, (vii) Borrower has not consented to such lien, (viii) Borrower has given Lender prompt notice of the filing of such lien and the bonding thereof by Borrower and, upon request by Lender from time to time, notice of the status of such contest by Borrower and/or confirmation of the continuing satisfaction of the conditions set forth in this Section 2.06(c), (ix) Borrower shall promptly pay the obligation secured by such lien upon a final determination of Borrower's liability therefor, and (x) Borrower shall deliver to Lender cash, a bond or other security acceptable to Lender equal to 125% of the contested amount pursuant to collateral arrangements reasonably satisfactory to Lender.

Section 2.07.  <u>Cost of Defending and Upholding this Security Instrument Lien</u>.  If any action or proceeding is commenced to which Lender is made a party relating to the Loan Documents and/or the Property or Lender's interest therein or in which it becomes necessary to defend or uphold the lien of this Security Instrument or any other Loan Document, Borrower shall, on demand, reimburse Lender for all expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred by Lender in connection therewith, and such sum, together with interest thereon at the Default Rate from and after such demand until fully paid, shall constitute a part of the Debt.

36

Section 2.08.  Use of the Property.  Borrower will use, or cause to be used, the Property for such use as is permitted pursuant to applicable Legal Requirements including, without limitation, under the certificate of occupancy applicable to the Property, and which is required by the Loan Documents.  Borrower shall not suffer or permit the Property or any portion thereof to be used by the public, any tenant, or any Person not subject to a Lease, in a manner as is reasonably likely to impair Borrower's title to the Property, or in such manner as may give rise to a claim or claims of adverse usage or adverse possession by the public, or of implied dedication of the Property or any part thereof.

Section 2.09.  Financial Reports.  (a)  Borrower will keep and maintain or will cause to be kept and maintained on a Fiscal Year basis, in accordance with GAAP (or such other accounting basis reasonably acceptable to Lender) consistently applied, proper and accurate books, tax returns, records and accounts reflecting (i) all of the financial affairs of Borrower and Guarantor and (ii) all items of income and expense in connection with the operation of the Property or in connection with any services, equipment or furnishings provided in connection with the operation thereof, whether such income or expense may be realized by Borrower or by any other Person whatsoever, excepting lessees unrelated to and unaffiliated with Borrower who have leased from Borrower portions of the Premises for the purpose of occupying the same.  Lender shall have the right from time to time at all times during normal business hours upon reasonable notice to examine such books, tax returns, records and accounts at the office of Borrower or other Person maintaining such books, tax returns, records and accounts and to make such copies or extracts thereof as Lender shall desire.  After the occurrence of an Event of Default, Borrower shall pay any costs and expenses incurred by Lender to examine Borrower's and Guarantor's accounting records with respect to the Property, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(b)    Borrower will furnish Lender (i) annually, within one hundred twenty (120) days following the end of each Fiscal Year of Borrower and (ii) on a quarterly basis, within forty-five (45) days following the end of each fiscal quarter of Borrower, with a complete copy of Borrower's financial statement consistently applied covering (i) all of the financial affairs of Borrower and (ii) the operation of the Property for such Fiscal Year or fiscal quarters, as applicable, and containing a statement of revenues and expenses, a statement of assets and liabilities and a statement of Borrower's equity.  Each annual financial statement shall be audited by a nationally recognized Independent certified public accountant that is acceptable to Lender in accordance with GAAP (or such other accounting basis reasonably acceptable to Lender).  Together with the financial statements required to be furnished pursuant to this Section 2.09(b), Borrower shall furnish to Lender (A) an Officer's Certificate certifying as of the date thereof (1) that the financial statements accurately represent the results of operations and financial condition of Borrower and the Property all in accordance with GAAP (or such other accounting basis reasonably acceptable to Lender) consistently applied, and (2) whether there exists a Default under the Note or any other Loan Document executed and delivered by Borrower and, if such event or circumstance exists, the nature thereof, the period of time it has existed and the action then being taken to remedy such event or circumstance and (B) together with the financial statements delivered pursuant to Section 2.09(b)(ii) above, a statement showing Pro-Forma Net Operating Income for the subsequent twelve (12) month period adjusted to reflect the Adjusted Net Cash Flow (subject to verification by Lender in its reasonable discretion).

37

(c)     When requested by Lender, Borrower will furnish Lender monthly, within twenty (20) days following the end of each month, with a true, complete and correct cash flow statement with respect to the Property in the form attached hereto as **Exhibit C** and made a part hereof, showing (i) all cash receipts of any kind whatsoever and all cash payments and disbursements, (ii) year-to-date summaries of such cash receipts, payments and disbursements, and (iii) Pro-Forma Net Operating Income for the subsequent twelve (12) month period adjusted to reflect the Adjusted Net Cash Flow (subject to the verification by Lender in its reasonable discretion), together with a certification of Manager stating that such cash flow statement is true, complete and correct and a list of all litigation and proceedings affecting Borrower or the Property in which the amount involved is $250,000 or more, if not covered by insurance (or $1,000,000 or more whether or not covered by insurance).

(d)     Intentionally omitted.

(e)     Borrower will furnish Lender annually, within twenty (20) days following the end of each year and within twenty (20) days following receipt of such request therefor, with a true, complete and correct rent roll for the Property, including a list of which tenants are in default under their respective Leases, dated as of the date of Lender's request, identifying each tenant, the monthly rent and additional rent, if any, payable by such tenant, the expiration date of such tenant's Lease, the security deposit, if any, held by Borrower under the Lease, the space covered by the Lease, each tenant that has filed a bankruptcy, insolvency, or reorganization proceeding since delivery of the last such rent roll, and the arrearages for such tenant, if any, and, if requested by Lender, a summary of the material terms of the Leases, including, without limitation, the dates of occupancy, the dates of expiration, any Rent concessions, work obligations or other inducements granted to the tenants thereunder, and any renewal options, and such rent roll shall be accompanied by an Officer's Certificate, dated as of the date of the delivery of such rent roll, certifying that such rent roll is true, correct and complete in all material respects as of its date.

(f)     Borrower shall furnish to Lender, within thirty (30) days after Lender's request therefor, with such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender.

(g)     Borrower shall cause Manager to furnish to Lender, within twenty (20) days following the end of each month, a schedule of tenant security deposits showing any activity in the Security Deposit Account for such month, together with a certification of Manager as to the balance in such Security Deposit Account and that such tenant security deposits are being held in accordance with all Legal Requirements.

(h)     Borrower will furnish Lender annually, within ninety (90) days after the end of each Fiscal Year, with a report setting forth (i) the Net Operating Income for such Fiscal Year, (ii) the average occupancy rate of the Property during such Fiscal Year, (iii) the capital repairs, replacements and improvements performed at the Property during such Fiscal Year, and (iv) the balance contained in each of the Escrow Accounts as of the end of such Fiscal Year (which balance Lender shall provide upon Borrower's written request therefor).

38

(i)    Borrower shall and shall cause Guarantor to furnish to Lender annually, within thirty (30) days of filing its respective tax return, a copy of such tax return and within ninety (90) days after the end of each Fiscal Year, a statement of net worth of the Guarantor.

(j)    Borrower shall submit to Lender for Lender's written approval an Annual Budget not later than sixty (60) days prior to the commencement of each Fiscal Year or, with respect to the Fiscal Year in which the Closing Date occurs, within sixty (60) days of the Closing Date, in form satisfactory to Lender setting forth in reasonable detail budgeted monthly operating income and monthly operating capital and other expenses for the Property. Each Annual Budget shall contain, among other things, management fees, third party service fees, and other expenses as Borrower may reasonably determine. Lender shall have the right to approve such Annual Budget which approval shall not be unreasonably withheld, and in the event that Lender objects to the proposed Annual Budget submitted by Borrower, Lender shall advise Borrower of such objections within fifteen (15) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall, within three (3) days after receipt of notice of any such objections, revise such Annual Budget and resubmit the same to Lender. Lender shall advise Borrower of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall revise the same in accordance with the process described herein until Lender approves an Annual Budget, provided, however, that if Lender shall not advise Borrower of its objections to any proposed Annual Budget within the applicable time period set forth in this Section, then such proposed Annual Budget shall be deemed approved by Lender. Until such time that Lender approves a proposed Annual Budget, the most recently Approved Annual Budget shall apply; provided that, such Approved Annual Budget shall be adjusted to reflect actual increases in Basic Carrying Costs and utilities expenses and to delete any non-recurring expenses. In the event that Borrower must incur an Extraordinary Expense, then Borrower shall promptly deliver to Lender a reasonably detailed explanation of such proposed Extraordinary Expense for Lender's approval, which approval may be granted or denied in Lender's sole and absolute discretion.

(k)    In the event that Borrower fails to deliver any of the financial statements, reports or other information required to be delivered to Lender pursuant to this Section 2.09 on or prior to their due dates, if any such failure shall continue for ten (10) days following notice thereof from Lender, Borrower shall pay to Lender on each Payment Date for each month or portion thereof that any such financial statement, report or other information remains undelivered, an administrative fee in the amount of Five Thousand Dollars ($5,000) multiplied by the number of undelivered statements, reports or other items. Borrower agrees that such administrative fee (i) is a fair and reasonable fee necessary to compensate Lender for its additional administrative costs and increased costs relating to Borrower's failure to deliver the aforementioned statements, reports or other items as and when required hereunder and (ii) is not a penalty.

Section 2.10.  Litigation.  Borrower will give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened (in writing) against Borrower which might have a Material Adverse Effect.

Current/9423275

Section 2.11. <u>Updates of Representations</u>.  Borrower shall deliver to Lender within ten (10) days of the request of Lender an Officer's Certificate updating all of the representations and warranties contained in this Security Instrument and the other Loan Documents and certifying that all of the representations and warranties contained in this Security Instrument and the other Loan Documents, as updated pursuant to such Officer's Certificate, are true, accurate and complete as of the date of such Officer's Certificate.

## ARTICLE III:  INSURANCE AND CASUALTY RESTORATION

Section 3.01. <u>Insurance Coverage</u>.  Borrower shall, at its expense, maintain the following insurance coverages with respect to the Property during the term of this Security Instrument:

(a)      (i)      Insurance against loss or damage by fire, casualty and other hazards included in an "all-risk" coverage endorsement or its equivalent (which, in the case of insurance during the time of any construction work ("<u>Construction</u>") shall be in "builder's risk completed value non-reporting form" together with rents, earnings and extra expense insurance covering loss due to delay in completion of the Improvements), with such endorsements as Lender may from time to time reasonably require and which are customarily required by Institutional Lenders of similar properties similarly situated, including, without limitation, if the Property constitutes a legal non-conforming use, an ordinance of law coverage endorsement which contains "Demolition Cost", "Loss Due to Operation of Law" and "Increased Cost of Construction" coverages, covering the Property in an amount not less than the greater of (A) 100% of the insurable replacement value of the Property (exclusive of the Premises and footings and foundations) and (B) such other amount as is necessary to prevent any reduction in such policy by reason of and to prevent Borrower, Lender or any other insured thereunder from being deemed to be a co-insurer.  Not less frequently than once every three (3) years, Borrower, at its option, shall either (A) have the Appraisal updated or obtain a new appraisal of the Property, (B) have a valuation of the Property made by or for its insurance carrier conducted by an appraiser experienced in valuing properties of similar type to that of the Property which are in the geographical area in which the Property is located or (C) provide such other evidence as will, in Lender's sole judgment, enable Lender to determine whether there shall have been an increase in the insurable value of the Property and Borrower shall deliver such updated Appraisal, new appraisal, insurance valuation or other evidence acceptable to Lender, as the case may be, and, if such updated Appraisal, new appraisal, insurance valuation, or other evidence acceptable to Lender reflects an increase in the insurable value of the Property, the amount of insurance required hereunder shall be increased accordingly and Borrower shall deliver evidence satisfactory to Lender that such policy has been so increased.

(ii)      Commercial general liability insurance against claims for personal and bodily injury and/or death to one or more persons or property damage, occurring on, in or about the Property (including the adjoining streets, sidewalks and passageways therein) in such amounts as Lender may from time to time reasonably require (but in no event shall Lender's requirements be increased more frequently than once during each twelve (12) month period) and which are customarily required by Institutional Lenders for similar properties similarly situated, but not less than $1,000,000 per occurrence and $2,000,000 general aggregate on a per location basis and, in addition thereto, not less than

40

$75,000,000 excess and/or umbrella liability insurance shall be maintained for any and all claims.

(iii)    Business interruption, rent loss or other similar insurance with an unlimited indemnity period (A) with loss payable to Lender, (B) covering all risks required to be covered by the insurance provided for in Section 3.01(a)(i) hereof and (C) in an amount not less than 100% of the projected fixed or base rent plus percentage rent for the succeeding twenty-four (24) month period based on an occupancy rate of 100%. The amount of such insurance shall be determined upon the execution of this Security Instrument, and not more frequently than once each calendar year thereafter based on Borrower's reasonable estimate of projected fixed or base rent plus percentage rent, from the Property for the next succeeding twenty-four (24) months together with a six (6) month extended period of indemnity.  In the event the Property shall be damaged or destroyed, Borrower shall and hereby does assign to Lender all payment of claims under the policies of such insurance, and all amounts payable thereunder, and all net amounts, shall be collected by Lender under such policies and shall be applied in accordance with this Security Instrument; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to timely pay all amounts due under the Loan Documents.

(iv)    War risk insurance when such insurance is obtainable from the United States of America or any agency or instrumentality thereof at reasonable rates (for the maximum amount of insurance obtainable) and if requested by Lender, and such insurance is then customarily required by Institutional Lenders of similar properties similarly situated.

(v)    Insurance against loss or damages from (A) leakage of sprinkler systems and (B) explosion of steam boilers, air conditioning equipment, pressure vessels or similar apparatus now or hereafter installed at the Property, in such amounts as Lender may from time to time reasonably require and which are then customarily required by Institutional Lenders of similar properties similarly situated.

(vi)    Flood insurance in an amount equal to the full insurable value of the Property or the maximum amount available, whichever is less, if the Improvements are located in an area designated by the Secretary of Housing and Urban Development as being "an area of special flood hazard" under the National Flood Insurance Program (i.e., having a one percent or greater chance of flooding), and if flood insurance is available under the National Flood Insurance Act.

(vii)    Worker's compensation insurance or other similar insurance which may be required by Governmental Authorities or Legal Requirements.

(viii)    Insurance against loss resulting from mold, spores or fungus on or about the Premises.

41

(ix)    Insurance against damage resulting from acts of terrorism, or an insurance policy without an exclusion for damages resulting from terrorism, on terms consistent with the commercial property insurance policy required under subsections (i) (ii) and (iii) above.

(x)    At all times during Construction, contractor's liability insurance to a limit of not less than $25,000,000 on a per occurrence basis covering each contractor's construction operation at the Premises.

(xi)    Such other insurance as may from time to time be required by Lender and which is then customarily required by Institutional Lenders for similar properties similarly situated, against other insurable hazards, including, but not limited to, malicious mischief, vandalism, sinkhole and mine subsidence, acts of terrorism, windstorm and/or earthquake, due regard to be given to the size and type of the Premises, Improvements, Fixtures and Equipment and their location, construction and use. Additionally, Borrower shall carry such insurance coverage as Lender may from time to time require if the failure to carry such insurance may result in a downgrade, qualification or withdrawal of any class of securities issued in connection with a Securitization or, if the Loan is not yet part of a Securitization, would result in an increase in the subordination levels of any class of securities anticipated to be issued in connection with a proposed Securitization.

(b)    Borrower shall cause any Manager of the Property to maintain fidelity insurance in an amount equal to or greater than the Operating Income of the Property for the six (6) month period immediately preceding the date on which the premium for such insurance is due and payable or such lesser amount as Lender shall approve.

Section 3.02. Policy Terms. (a) All insurance required by this Article III shall be in the form (other than with respect to Sections 3.01(a)(vi) and (vii) above when insurance in those two sub-sections is placed with a governmental agency or instrumentality on such agency's forms) and amount and with deductibles as, from time to time, shall be reasonably acceptable to Lender, under valid and enforceable policies issued by financially responsible insurers authorized to do business in the State where the Property is located, with a general policyholder's service rating of not less than A and a financial rating of not less than XIII as rated in the most currently available Best's Insurance Reports (or the equivalent, if such rating system shall hereafter be altered or replaced) and shall have a claims paying ability rating and/or financial strength rating, as applicable, of not less than "AA" (or its equivalent), or such lower claims paying ability rating and/or financial strength rating, as applicable, as Lender shall, in its sole and absolute discretion, consent to, from a Rating Agency (one of which after a Securitization in which Standard & Poor's rates any securities issued in connection with such Securitization, shall be Standard & Poor's). Originals or certified copies of all insurance policies shall be delivered to and held by Lender. All such policies (except policies for worker's compensation) shall name Lender, its successors and/or assigns as an additional named insured or, with respect to the insurance required pursuant to Section 3.01(a)(iii) above, shall provide for loss payable to Lender, its successors and/or assigns and shall contain (or have attached): (i) standard "non-contributory mortgagee" endorsement or its equivalent relating, inter alia, to recovery by Lender notwithstanding the negligent or willful acts or omissions of Borrower; (ii) a waiver of

42

subrogation endorsement as to Lender; (iii) an endorsement indicating that neither Lender nor Borrower shall be or be deemed to be a co-insurer with respect to any casualty risk insured by such policies and shall provide for a deductible per loss of an amount not more than $25,000 and (iv) a provision that such policies shall not be canceled, terminated, denied renewal or amended, including, without limitation, any amendment reducing the scope or limits of coverage, without at least thirty (30) days' prior written notice to Lender in each instance. Not less than thirty (30) days prior to the expiration dates of the insurance policies obtained pursuant to this Security Instrument, originals or certified copies of renewals of such policies (or certificates evidencing such renewals) bearing notations evidencing the payment of premiums or accompanied by other reasonable evidence of such payment (which premiums shall not be paid by Borrower through or by any financing arrangement which would entitle an insurer to terminate a policy) shall be delivered by Borrower to Lender. Borrower shall not carry separate insurance, concurrent in kind or form or contributing in the event of loss, with any insurance required under this Article III.

(b)     If Borrower fails to maintain and deliver to Lender the original policies or certificates of insurance required by this Security Instrument, or if there are insufficient funds in the Basic Carrying Costs Escrow Account to pay the premiums for same, Lender may, at its option, procure such insurance, and Borrower shall pay, or as the case may be, reimburse Lender for, all premiums thereon promptly, upon demand by Lender, with interest thereon at the Default Rate from the date paid by Lender to the date of repayment and such sum shall constitute a part of the Debt.

(c)     Borrower shall notify Lender of the renewal premium of each insurance policy and Lender shall be entitled to pay such amount on behalf of Borrower from the Basic Carrying Costs Escrow Account.

(d)     The insurance required by this Security Instrument may, at the option of Borrower, be effected by blanket and/or umbrella policies issued to Borrower covering the Property provided that, in each case, the policies otherwise comply with the provisions of this Security Instrument and allocate to the Property, from time to time (but in no event less than once a year), the coverage specified by this Security Instrument, without possibility of reduction or coinsurance by reason of, or damage to, any other property (real or personal) named therein. If the insurance required by this Security Instrument shall be effected by any such blanket or umbrella policies, Borrower shall furnish to Lender (i) original policies or certified copies thereof, or an original certificate of insurance together with reasonable access to the original of such policy to review such policy's coverage of the Property, with schedules attached thereto showing the amount of the insurance provided under such policies applicable to the Property and (ii) an Officer's Certificate setting forth (A) the number of properties covered by such policy, (B) the location by city (if available, otherwise, county) and state of the properties, (C) the average square footage of the properties, (D) a brief description of the typical construction type included in the blanket policy and (E) such other information as Lender may reasonably request.

Section 3.03.  Assignment of Policies.  (a) Borrower hereby assigns to Lender the proceeds of all insurance (other than worker's compensation and liability insurance) obtained pursuant to this Security Instrument, all of which proceeds shall be payable to Lender as

43

collateral and further security for the payment of the Debt and the performance of Borrower's obligations hereunder and under the other Loan Documents, and Borrower hereby authorizes and directs the issuer of any such insurance to make payment of such proceeds directly to Lender. Except as otherwise expressly provided in Section 3.04 or elsewhere in this Article III, Lender shall have the option, in its discretion, and without regard to the adequacy of its security, to apply all or any part of the proceeds it may receive pursuant to this Article in such manner as Lender may elect to any one or more of the following: (i) the payment of the Debt, whether or not then due, in any proportion or priority as Lender, in its discretion, may elect, (ii) the repair or restoration of the Property, (iii) the cure of any Default or (iv) the reimbursement of the costs and expenses of Lender incurred pursuant to the terms hereof in connection with the recovery of the Insurance Proceeds. Nothing herein contained shall be deemed to excuse Borrower from repairing or maintaining the Property as provided in this Security Instrument or restoring all damage or destruction to the Property, regardless of the sufficiency of the Insurance Proceeds, and the application or release by Lender of any Insurance Proceeds shall not cure or waive any Default or notice of Default.

(b)    In the event of the foreclosure of this Security Instrument or the Mortgage or any other transfer of title or assignment of all or any part of the Property in extinguishment, in whole or in part, of the Debt, all right, title and interest of Borrower in and to all policies of insurance required by this Security Instrument shall inure to the benefit of the successor in interest to Borrower or the purchaser of the Property. If, prior to the receipt by Lender of any proceeds, the Property or any portion thereof shall have been sold on foreclosure of this Security Instrument or the Mortgage or by deed in lieu thereof or otherwise, or any claim under such insurance policy arising during the term of this Security Instrument is not paid until after the extinguishment of the Debt, and Lender shall not have received the entire amount of the Debt outstanding at the time of such extinguishment, whether or not a deficiency judgment on this Security Instrument or the Mortgage shall have been sought or recovered or denied, then, the proceeds of any such insurance to the extent of the amount of the Debt not so received, shall be paid to and be the property of Lender, together with interest thereon at the Default Rate, and the reasonable attorney's fees, costs and disbursements incurred by Lender in connection with the collection of the proceeds which shall be paid to Lender and Borrower hereby assigns, transfers and sets over to Lender all of Borrower's right, title and interest in and to such proceeds. Notwithstanding any provisions of this Security Instrument to the contrary, Lender shall not be deemed to be a trustee or other fiduciary with respect to its receipt of any such proceeds, which may be commingled with any other monies of Lender; provided, however, that Lender shall use such proceeds for the purposes and in the manner permitted by this Security Instrument. Any proceeds deposited with Lender shall be held by Lender in an interest-bearing account, but Lender makes no representation or warranty as to the rate or amount of interest, if any, which may accrue on such deposit and shall have no liability in connection therewith. Interest accrued, if any, on the proceeds shall be deemed to constitute a part of the proceeds for purposes of this Security Instrument. The provisions of this Section 3.03(b) shall survive the termination of this Security Instrument by foreclosure, deed in lieu thereof or otherwise as a consequence of the exercise of the rights and remedies of Lender hereunder after a Default.

Section 3.04. <u>Casualty Restoration</u>. (a) (i) In the event of any damage to or destruction of the Property, Borrower shall give prompt written notice to Lender (which notice shall set forth

44

Borrower's good faith estimate of the cost of repairing or restoring such damage or destruction, or if Borrower cannot reasonably estimate the anticipated cost of restoration, Borrower shall nonetheless give Lender prompt notice of the occurrence of such damage or destruction, and will diligently proceed to obtain estimates to enable Borrower to quantify the anticipated cost and time required for such restoration, whereupon Borrower shall promptly notify Lender of such good faith estimate) and, provided that restoration does not violate any Legal Requirements, Borrower shall promptly commence and diligently prosecute to completion the repair, restoration or rebuilding of the Property so damaged or destroyed to a condition such that the Property shall be at least equal in value to that immediately prior to the damage to the extent practicable, in full compliance with all Legal Requirements and the provisions of all Leases, and in accordance with Section 3.04(b) below. Such repair, restoration or rebuilding of the Property are sometimes hereinafter collectively referred to as the "Work".

(ii)    Borrower shall not adjust, compromise or settle any claim for Insurance Proceeds without the prior written consent of Lender, which shall not be unreasonably withheld or delayed and Lender shall have the right, at Borrower's sole cost and expense, to participate in any settlement or adjustment of Insurance Proceeds; provided, however, that, except during the continuance of an Event of Default, Lender's consent shall not be required with respect to the adjustment, compromising or settlement of any claim for Insurance Proceeds in an amount less than $25,000.

(iii)    Subject to Section 3.04(a)(iv), Lender shall apply any Insurance Proceeds which it may receive towards the Work in accordance with Section 3.04(b) and the other applicable sections of this Article III.

(iv)    If (A) a Default shall have occurred, (B) more than thirty percent (30%) of the reasonably estimated fair market value of the Property is damaged or destroyed, (C) Lender is not reasonably satisfied that the Work can be completed three (3) months prior to Maturity or (D) Lender is not reasonably satisfied that the Work can be completed within twelve (12) months of the damage to or destruction of the Property (each, a "Substantial Casualty"), Lender shall have the option, in its sole discretion to apply any Insurance Proceeds it may receive pursuant to this Security Instrument (less any cost to Lender of recovering and paying out such proceeds incurred pursuant to the terms hereof and not otherwise reimbursed to Lender, including, without limitation, reasonable attorneys' fees and expenses) to the payment of the Debt, without any prepayment fee or charge of any kind other than the Exit Fee, or to allow such proceeds to be used for the Work pursuant to the terms and subject to the conditions of Section 3.04(b) hereof and the other applicable sections of this Article III.

(v)    In the event that Lender elects or is obligated hereunder to allow Insurance Proceeds to be used for the Work, any excess proceeds remaining after completion of such Work shall be applied to the payment of the Debt without any prepayment fee or charge of any kind other than the Exit Fee.

(b)    If any Condemnation Proceeds in accordance with Section 6.01(a), or any Insurance Proceeds in accordance with Section 3.04(a), are to be applied to the repair, restoration

45

or rebuilding of the Property, then such proceeds shall be deposited into a segregated interest-bearing bank account at the Bank, which shall be an Eligible Account, held by Lender and shall be paid out from time to time to Borrower as the Work progresses (less any cost to Lender of recovering and paying out such proceeds, including, without limitation, reasonable attorneys' fees and costs allocable to inspecting the Work and the plans and specifications therefor) subject to Section 5.13 hereof and to all of the following conditions:

(i)     An Independent architect or engineer selected by Borrower and reasonably acceptable to Lender (an "Architect" or "Engineer") or a Person otherwise reasonably acceptable to Lender, shall have delivered to Lender a certificate estimating the cost of completing the Work, and, if the amount set forth therein is more than the sum of the amount of Insurance Proceeds then being held by Lender in connection with a casualty and amounts agreed to be paid as part of a final settlement under the insurance policy upon or before completion of the Work, Borrower shall have delivered to Lender (A) cash collateral in an amount equal to such excess, (B) an unconditional, irrevocable, clean sight draft letter of credit, in form, substance and issued by a bank reasonably acceptable to Lender, in the amount of such excess and draws on such letter of credit shall be made by Lender to make payments pursuant to this Article III following exhaustion of the Insurance Proceeds therefor or (C) a completion bond in form, substance and issued by a surety company reasonably acceptable to Lender.

(ii)    If the cost of the Work is reasonably estimated by an Architect or Engineer in a certification reasonably acceptable to Lender to be equal to or exceed five percent (5%) of the Loan Amount, such Work shall be performed under the supervision of an Architect or Engineer, it being understood that the plans and specifications with respect thereto shall provide for Work so that, upon completion thereof, the Property shall be at least equal in replacement value and general utility to the Property prior to the damage or destruction.

(iii)   Each request for payment shall be made on not less than ten (10) days' prior notice to Lender and shall be accompanied by a certificate of an Architect or Engineer, or, if the Work is not required to be supervised by an Architect or Engineer, by an Officer's Certificate stating (A) that payment is for Work completed in compliance with the plans and specifications, if required under clause (ii) above, (B) that the sum requested is required to reimburse Borrower for payments by Borrower to date, or is due to the contractors, subcontractors, materialmen, laborers, engineers, architects or other Persons rendering services or materials for the Work (giving a brief description of such services and materials), and that when added to all sums previously paid out by Lender does not exceed the value of the Work done to the date of such certificate, (C) if the sum requested is to cover payment relating to repair and restoration of personal property required or relating to the Property, that title to the personal property items covered by the request for payment is vested in Borrower (unless Borrower is lessee of such personal property), and (D) that the Insurance Proceeds and other amounts deposited by Borrower held by Lender after such payment is more than the estimated remaining cost to complete such Work; provided, however, that if such certificate is given by an Architect or Engineer, such Architect or Engineer shall certify as to clause (A) above, and such

46

Officer's Certificate shall certify as to the remaining clauses above, and provided, further, that Lender shall not be obligated to disburse such funds if Lender determines, in Lender's reasonable discretion, that Borrower shall not be in compliance with this Section 3.04(b). Additionally, each request for payment shall contain a statement signed by Borrower stating that the requested payment is for Work satisfactorily done to date.

(iv) Each request for payment shall be accompanied by waivers of lien, in customary form and substance, covering that part of the Work for which payment or reimbursement is being requested and, if required by Lender, a search prepared by a title company or licensed abstractor, or by other evidence reasonably satisfactory to Lender that there has not been filed with respect to the Property any mechanic's or other lien or instrument for retention of title relating to any part of the Work not discharged of record. Additionally, as to any personal property covered by the request for payment, Lender shall be furnished with evidence of Borrower having incurred a payment obligation therefor and such further evidence reasonably satisfactory to assure Lender that UCC filings therefor provide a valid first lien on the personal property.

(v) Lender shall have the right to inspect the Work at all reasonable times upon reasonable prior notice and may condition any disbursement of Insurance Proceeds upon satisfactory compliance by Borrower with the provisions hereof. Neither the approval by Lender of any required plans and specifications for the Work nor the inspection by Lender of the Work shall make Lender responsible for the preparation of such plans and specifications, or the compliance of such plans and specifications of the Work, with any applicable law, regulation, ordinance, covenant or agreement.

(vi) Insurance Proceeds shall not be disbursed more frequently than once every thirty (30) days.

(vii) Until such time as the Work has been substantially completed, Lender shall not be obligated to disburse up to ten percent (10%) of the cost of the Work (the "Retention Amount") to Borrower. Upon substantial completion of the Work, Borrower shall send notice thereof to Lender and, subject to the conditions of Section 3.04(b)(i)-(iv), Lender shall disburse one-half of the Retention Amount to Borrower; provided, however, that the remaining one-half of the Retention Amount shall be disbursed to Borrower when Lender shall have received copies of any and all final certificates of occupancy or other certificates, licenses and permits required for the ownership, occupancy and operation of the Property in accordance with all Legal Requirements. Borrower hereby covenants to diligently seek to obtain any such certificates, licenses and permits.

(viii) Upon failure on the part of Borrower promptly to commence the Work or to proceed diligently and continuously to completion of the Work, which failure shall continue after notice for thirty (30) days, Lender may apply any Insurance Proceeds or Condemnation Proceeds it then or thereafter holds to the payment of the Debt in accordance with the provisions of the Note; provided, however, that Lender shall be entitled to apply at any time all or any portion of the Insurance Proceeds or

47

Condemnation Proceeds it then holds to the extent necessary to cure any Event of Default.

(c)      If Borrower (i) within ninety (90) days after the occurrence of any damage to the Property or any portion thereof (or such shorter period as may be required under any Major Space Lease) shall fail to submit to Lender for approval plans and specifications for the Work (approved by the Architect and by all Governmental Authorities whose approval is required), (ii) after any such plans and specifications are approved by all Governmental Authorities, the Architect and Lender, shall fail to promptly commence such Work or (iii) shall fail to diligently prosecute such Work to completion, then, in addition to all other rights available hereunder, at law or in equity, Lender, or any receiver of the Property or any portion thereof, upon five (5) days' prior notice to Borrower (except in the event of emergency in which case no notice shall be required), may (but shall have no obligation to) perform or cause to be performed such Work, and may take such other steps as it reasonably deems advisable. Borrower hereby waives, for Borrower, any claim, other than for gross negligence or willful misconduct, against Lender and any receiver arising out of any act or omission of Lender or such receiver pursuant hereto, and Lender may apply all or any portion of the Insurance Proceeds (without the need to fulfill any other requirements of this Section 3.04) to reimburse Lender and such receiver, for all costs not reimbursed to Lender or such receiver upon demand together with interest thereon at the Default Rate from the date such amounts are advanced until the same are paid to Lender or the receiver.

(d)      Borrower hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, to collect and receive any Insurance Proceeds paid with respect to any portion of the Property or the insurance policies required to be maintained hereunder, and to endorse any checks, drafts or other instruments representing any Insurance Proceeds whether payable by reason of loss thereunder or otherwise.

Section 3.05.  Compliance with Insurance Requirements.  Borrower promptly shall comply with, and shall cause the Property to comply with, all Insurance Requirements, even if such compliance requires structural changes or improvements or would result in interference with the use or enjoyment of the Property or any portion thereof provided Borrower shall have a right to contest in good faith and with diligence such Insurance Requirements provided (a) no Default shall exist during such contest and such contest shall not subject the Property or any portion thereof to any lien or affect the priority of the lien of this Security Instrument or the Mortgage, (b) failure to comply with such Insurance Requirements will not subject Lender or any of its agents, employees, officers or directors to any civil or criminal liability, (c) such contest will not cause any reduction in insurance coverage, (d) such contest shall not affect the ownership, use or occupancy of the Property, (e) the Property or any part thereof or any interest therein shall not be in any danger of being sold, forfeited or lost by reason of such contest by Borrower, (f) Borrower has given Lender prompt notice of such contest and, upon request by Lender from time to time, notice of the status of such contest by Borrower and/or information of the continuing satisfaction of the conditions set forth in clauses (a) through (e) of this Section 3.05, (g) upon a final determination of such contest, Borrower shall promptly comply with the requirements thereof, and (h) prior to and during such contest, Borrower shall furnish to Lender security satisfactory to Lender, in its reasonable discretion, against loss or injury by reason of such contest or the non-compliance with such Insurance Requirement (and if such security is

48

cash, Lender shall deposit the same in an interest-bearing account and interest accrued thereon, if any, shall be deemed to constitute a part of such security for purposes of this Security Instrument, but Lender (i) makes no representation or warranty as to the rate or amount of interest, if any, which may accrue thereon and shall have no liability in connection therewith and (ii) shall not be deemed to be a trustee or fiduciary with respect to its receipt of any such security and any such security may be commingled with other monies of Lender). If Borrower shall use the Property or any portion thereof in any manner which could permit the insurer to cancel any insurance required to be provided hereunder, Borrower immediately shall obtain a substitute policy which shall satisfy the requirements of this Security Instrument and which shall be effective on or prior to the date on which any such other insurance policy shall be canceled. Borrower shall not by any action or omission invalidate any insurance policy required to be carried hereunder unless such policy is replaced as aforesaid, or materially increase the premiums on any such policy above the normal premium charged for such policy. Borrower shall cooperate with Lender in obtaining for Lender the benefits of any Insurance Proceeds lawfully or equitably payable to Lender in connection with the transaction contemplated hereby.

Section 3.06. <u>Event of Default During Restoration</u>.   Notwithstanding anything to the contrary contained in this Security Instrument including, without limitation, the provisions of this Article III, if, at the time of any casualty affecting the Property or any part thereof, or at any time during any Work, or at any time that Lender is holding or is entitled to receive any Insurance Proceeds pursuant to this Security Instrument, a Default exists and is continuing (whether or not it constitutes an Event of Default), Lender shall then have no obligation to make such proceeds available for Work and Lender shall have the right and option, to be exercised in its sole and absolute discretion and election, with respect to the Insurance Proceeds, either to retain and apply such proceeds in reimbursement for the actual costs, fees and expenses incurred by Lender in accordance with the terms hereof in connection with the adjustment of the loss and any balance toward payment of the Debt in such priority and proportions as Lender, in its sole discretion, shall deem proper, or towards the Work, upon such terms and conditions as Lender shall determine, or to cure such Default, or to any one or more of the foregoing as Lender, in its sole and absolute discretion, may determine. If Lender shall receive and retain such Insurance Proceeds, the lien of this Security Instrument and the Mortgage shall be reduced only by the amount thereof received, after reimbursement to Lender of expenses of collection, and actually applied by Lender in reduction of the principal sum payable under the Note in accordance with the Note.

Section 3.07. <u>Application of Proceeds to Debt Reduction</u>.  (a) No damage to the Property, or any part thereof, by fire or other casualty whatsoever, whether such damage be partial or total, shall relieve Borrower from its liability to pay in full the Debt and to perform its obligations under this Security Instrument and the other Loan Documents.

(b)      If any Insurance Proceeds are applied to reduce the Debt, Lender shall apply the same in accordance with the provisions of the Note.

49

## ARTICLE IV: IMPOSITIONS

Section 4.01. <u>Payment of Impositions, Utilities and Taxes, etc.</u> (a) Borrower shall pay or cause to be paid all Impositions at least five (5) days prior to the date upon which any fine, penalty, interest or cost for nonpayment is imposed, and furnish to Lender, upon request, receipted bills of the appropriate taxing authority or other documentation reasonably satisfactory to Lender evidencing the payment thereof. If Borrower shall fail to pay any Imposition in accordance with this Section and is not contesting or causing a contesting of such Imposition in accordance with Section 4.04 hereof, or if there are insufficient funds in the Basic Carrying Costs Escrow Account to pay any Imposition, Lender shall have the right, but shall not be obligated, to pay that Imposition, and Borrower shall repay to Lender, on demand, any amount paid by Lender, with interest thereon at the Default Rate from the date of the advance thereof to the date of repayment, and such amount shall constitute a portion of the Debt secured by this Security Instrument and the Mortgage.

(b)    Borrower shall, prior to the date upon which any fine, penalty, interest or cost for the nonpayment is imposed, pay or cause to be paid all charges for electricity, power, gas, water and other services and utilities in connection with the Property, and shall, upon request, deliver to Lender receipts or other documentation reasonably satisfactory to Lender evidencing payment thereof. If Borrower shall fail to pay any amount required to be paid by Borrower pursuant to this Section 4.01 and is not contesting such charges in accordance with Section 4.04 hereof, Lender shall have the right, but shall not be obligated, to pay that amount, and Borrower will repay to Lender, on demand, any amount paid by Lender with interest thereon at the Default Rate from the date of the advance thereof to the date of repayment, and such amount shall constitute a portion of the Debt secured by this Security Instrument and the Mortgage.

(c)    Borrower shall pay all taxes, charges, filing, registration and recording fees, excises and levies imposed upon Lender by reason of or in connection with its ownership of any Loan Document or any other instrument related thereto, or resulting from the execution, delivery and recording of, or the lien created by, or the obligation evidenced by, any of them, other than income, franchise and other similar taxes imposed on Lender and shall pay all corporate stamp taxes, if any, and other taxes, required to be paid on the Loan Documents. If Borrower shall fail to make any such payment within ten (10) days after written notice thereof from Lender, Lender shall have the right, but shall not be obligated, to pay the amount due, and Borrower shall reimburse Lender therefor, on demand, with interest thereon at the Default Rate from the date of the advance thereof to the date of repayment, and such amount shall constitute a portion of the Debt secured by this Security Instrument and the Mortgage.

Section 4.02. <u>Deduction from Value.</u> In the event of the passage after the date of this Security Instrument of any Legal Requirement deducting from the value of the Property for the purpose of taxation, any lien thereon or changing in any way the Legal Requirements now in force for the taxation of this Security Instrument and/or the Debt for federal, state or local purposes, or the manner of the operation of any such taxes so as to adversely affect the interest of Lender, or imposing any tax or other charge on any Loan Document, then Borrower will pay such tax, with interest and penalties thereon, if any, within the statutory period. In the event the payment of such tax or interest and penalties by Borrower would be unlawful, or taxable to

50

JUDGE GOTTSCHALL
MAGISTRATE JUDGE SCHENKIER

# _EXHIBIT A-1_

Lender or unenforceable or provide the basis for a defense of usury, then in any such event, Lender shall have the option, by written notice of not less than thirty (30) days, to declare the Debt immediately due and payable, with no prepayment fee or charge of any kind.

Section 4.03. <u>No Joint Assessment</u>. Borrower shall not consent to or initiate the joint assessment of the Premises or the Improvements (a) with any other real property constituting a separate tax lot and Borrower represents and covenants that the Premises and the Improvements are and shall remain a separate tax lot or (b) with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property as a single lien.

Section 4.04. <u>Right to Contest</u>. Borrower shall have the right, after prior notice to Lender, at its sole expense, to contest by appropriate legal proceedings diligently conducted in good faith, without cost or expense to Lender or any of its agents, employees, officers or directors, the validity, amount or application of any Imposition or any charge described in Section 4.01(b), provided that (a) no Default or Event of Default shall exist during such proceedings and such contest shall not (unless Borrower shall comply with clause (d) of this Section 4.04) subject the Property or any portion thereof to any lien or affect the priority of the lien of this Security Instrument or the Mortgage, (b) failure to pay such Imposition or charge will not subject Lender or any of its agents, employees, officers or directors to any civil or criminal liability, (c) the contest suspends enforcement of the Imposition or charge (unless Borrower first pays the Imposition or charge), (d) prior to and during such contest, Borrower shall furnish to Lender security satisfactory to Lender, in its reasonable discretion, against loss or injury by reason of such contest or the non-payment of such Imposition or charge (and if such security is cash, Lender may deposit the same in an interest-bearing account and interest accrued thereon, if any, shall be deemed to constitute a part of such security for purposes of this Security Instrument, but Lender (i) makes no representation or warranty as to the rate or amount of interest, if any, which may accrue thereon and shall have no liability in connection therewith and (ii) shall not be deemed to be a trustee or fiduciary with respect to its receipt of any such security and any such security may be commingled with other monies of Lender), (e) such contest shall not affect the ownership, use or occupancy of the Property, (f) the Property or any part thereof or any interest therein shall not be in any danger of being sold, forfeited or lost by reason of such contest by Borrower, (g) Borrower has given Lender notice of the commencement of such contest and upon request by Lender, from time to time, notice of the status of such contest by Borrower and/or confirmation of the continuing satisfaction of clauses (a) through (f) of this Section 4.04, and (h) upon a final determination of such contest, Borrower shall promptly comply with the requirements thereof. Upon completion of any contest, Borrower shall immediately pay the amount due, if any, and deliver to Lender proof of the completion of the contest and payment of the amount due, if any, following which Lender shall return the security, if any, deposited with Lender pursuant to clause (d) of this Section 4.04. Borrower shall not pay any Imposition in installments unless permitted by applicable Legal Requirements, and shall, upon the request of Lender, deliver copies of all notices and bills relating to any Imposition or other charge covered by this Article IV to Lender.

51

Section 4.05.  <u>No Credits on Account of the Debt</u>.  Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Impositions assessed against the Property or any part thereof and no deduction shall otherwise be made or claimed from the taxable value of the Property, or any part thereof, by reason of this Security Instrument or the Debt.  In the event such claim, credit or deduction shall be required by Legal Requirements, Lender shall have the option, by written notice of not less than thirty (30) days, to declare the Debt immediately due and payable, and Borrower hereby agrees to pay such amounts not later than thirty (30) days after such notice.

Section 4.06.  <u>Documentary Stamps</u>.  If, at any time, the United States of America, any State or Commonwealth thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, this Security Instrument or any other Loan Document, or impose any other tax or charges on the same, Borrower will pay the same, with interest and penalties thereon, if any.

<u>ARTICLE V:  CENTRAL CASH MANAGEMENT</u>

Section 5.01.  <u>Cash Flow</u>.  Borrower hereby acknowledges and agrees that the Rents (which for the purposes of this Section 5.01 shall not include security deposits from tenants under Leases held by Borrower and not applied towards Rent) derived from the Property, all proceeds from the Rate Cap Agreement and Loss Proceeds shall be utilized to fund the Debt Service Payment Sub-Account.  Lender may elect to change the financial institution in which the Central Account shall be maintained; <u>however</u>, Lender shall give Borrower not fewer than five (5) Business Days' prior notice of such change.  All fees and charges of the bank(s) in which the Central Account is located shall be paid by Borrower.

Section 5.02.  <u>Establishment of Accounts</u>.  Lender has established the Escrow Accounts and the Central Account in the name of Lender.  The Escrow Accounts and the Central Account shall be under the sole dominion and control of Lender and funds held therein shall not constitute trust funds.  Borrower hereby irrevocably directs and authorizes Lender to withdraw funds from the Central Account and the Escrow Accounts, all in accordance with the terms and conditions of this Security Instrument.  Borrower shall have no right of withdrawal in respect of the Central Account or the Escrow Accounts except as specifically provided herein.  Each transfer of funds to be made hereunder shall be made only to the extent that funds are on deposit in the Central Account or the affected Escrow Account, and Lender shall have no responsibility to make additional funds available in the event that funds on deposit are insufficient.  The Central Account shall contain the Debt Service Payment Sub-Account which account shall be an Eligible Account or book-entry sub-accounts of an Eligible Account (the "<u>Sub-Account</u>") to which certain funds shall be allocated and from which disbursements shall be made pursuant to the terms of this Security Instrument.  Sums held in the Sub-Account and the Escrow Accounts may be commingled with other monies held by Lender.

Section 5.03.  <u>Permitted Investments</u>.  Upon the written request of Borrower, Lender shall direct the Bank to invest and reinvest any balance in the Escrow Accounts from time to time in Permitted Investments as instructed by Borrower (which instruction may be made no more than one time per month), <u>provided</u> that (a) if Borrower fails to so instruct Lender, or upon

52

the occurrence of a Default, Lender may direct the Bank to invest and reinvest such balance in Permitted Investments as Lender shall determine in its sole discretion, (b) the maturities of the Permitted Investments on deposit in the Escrow Accounts shall, to the extent such dates are ascertainable, be selected and coordinated to become due not later than the day before any disbursements from the applicable Escrow Accounts must be made, (c) all such Permitted Investments shall be held in the name and be under the sole dominion and control of Lender, as secured party, and (d) no Permitted Investment shall be made unless Lender shall retain a perfected first priority lien in such Permitted Investment securing the Debt and all filings and other actions necessary to ensure the validity, perfection, and priority of such lien have been taken.  It is the intention of the parties hereto that the entire amounts deposited in the Escrow Accounts (or as much thereof as Lender may reasonably arrange to invest) shall at all times be invested in Permitted Investments, and that the Escrow Accounts shall be a so-called "zero balance" account.  All funds in the Escrow Accounts that are invested in a Permitted Investment are deemed to be held in the Escrow Accounts for all purposes of this Security Instrument and the other Loan Documents.  Lender shall not have any liability for any loss in investments of funds in the Escrow Accounts that are invested in Permitted Investments whether Borrower or Lender selected such Permitted Investment in accordance herewith and no such loss shall affect Borrower's obligation to fund, or liability for funding, the Escrow Accounts.  Borrower agrees that Borrower shall include all such earnings on the Escrow Accounts as income of Borrower (and, if Borrower is a partnership, limited liability company or other pass-through entity, the partners, members or beneficiaries of Borrower, as the case may be) for federal and applicable state and local tax purposes.

Section 5.04.  <u>Servicing Fees</u>.  At the option of Lender, the Loan may be serviced by a servicer (the "<u>Servicer</u>") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Security Instrument to the Servicer.  Borrower shall pay all servicing fees of Servicer, if any, charged in connection with any disbursement of funds from the Escrow Accounts pursuant to the Servicer's then standard conditions and rates.

Section 5.05.  <u>Monthly Funding of Sub-Account and Escrow Accounts</u>.  (a) On or before each Payment Date during the term of the Loan, commencing on the first (1st) Payment Date occurring after the month in which the Loan is initially funded, Borrower shall pay or cause to be paid to the Central Account all sums required to be deposited in the Sub-Account pursuant to this Section 5.05(a) and all funds transferred or deposited into the Central Account shall be allocated to the Debt Service Payment Sub-Account, until an amount equal to the Required Debt Service Payment for such Payment Date has been allocated to the Debt Service Payment Sub-Account.

(b)     On each Payment Date, sums held in the Debt Service Payment Sub-Account, together with any amounts deposited into the Central Account that are either (x) Loss Proceeds that Lender has elected to apply to reduce the Debt in accordance with the terms of Article III hereof or (y) excess Loss Proceeds remaining after the completion of any restoration required hereunder, shall be transferred to Lender to be applied towards the Required Debt Service Payment.

Section 5.06.  <u>Payment of Basic Carrying Costs</u>.  Borrower hereby agrees to pay all Basic Carrying Costs (without regard to the amount of money in the Basic Carrying Costs Escrow

53

Account).  At least ten (10) Business Days prior to the due date of any Basic Carrying Costs, and not more frequently than once each month, Borrower may notify Lender in writing and request that Lender pay such Basic Carrying Costs on behalf of Borrower on or prior to the due date thereof, and, provided that no Event of Default has occurred and that there are sufficient funds available in the Basic Carrying Costs Escrow Account, Lender shall make such payments out of the Basic Carrying Costs Escrow Account before same shall be delinquent.  Together with each such request, Borrower shall furnish Lender with bills and all other documents necessary, as reasonably determined by Lender, for the payment of the Basic Carrying Costs which are the subject of such request. Borrower's obligation to pay (or cause Lender to pay) Basic Carrying Costs pursuant to this Security Instrument shall include, to the extent permitted by applicable law, Impositions resulting from future changes in law which impose upon Lender an obligation to pay any property taxes or other Impositions or which otherwise adversely affect Lender's interests.

Provided that no Event of Default shall have occurred, all funds deposited into the Basic Carrying Costs Escrow Account shall be held by Lender pursuant to the provisions of this Security Instrument and shall be applied in payment of Basic Carrying Costs in accordance with the terms hereof.  Should an Event of Default occur, the sums on deposit in the Basic Carrying Costs Escrow Account may be applied by Lender in payment of any Basic Carrying Costs or may be applied to the payment of the Debt or any other charges affecting all or any portion of the Property as Lender in its sole discretion may determine; provided, however, that no such application shall be deemed to have been made by operation of law or otherwise until actually made by Lender as herein provided.

Section 5.07.  Intentionally Omitted.

Section 5.08.  Intentionally Omitted.

Section 5.09.  Intentionally Omitted.

Section 5.10.  Rate Cap Agreement.  Borrower shall maintain the Rate Cap Agreement at all times during the term of the Loan and pay all fees, charges and expenses incurred in connection therewith.  Borrower shall comply with all of its obligations under the terms of the Rate Cap Agreement.  All amounts paid by the issuer of the Rate Cap Agreement (the "Counterparty") to Borrower or Lender shall be deposited immediately into the Central Account. Borrower shall take all actions reasonably requested by Lender to enforce Lender's rights under the Rate Cap Agreement in the event of a default by the Counterparty.  In the event that (a) the long-term unsecured debt obligations of the Counterparty are downgraded by the Rating Agency below "A+" or its equivalent or (b) the Counterparty shall default in any of its obligations under the Rate Cap Agreement, Borrower shall, at the request of Lender, promptly but in all events within five (5) Business Days, replace the Rate Cap Agreement with an agreement having identical payment terms and maturity as the Rate Cap Agreement and which is otherwise in form and substance substantially similar to the Rate Cap Agreement and otherwise acceptable to Lender with a cap provider, the long-term unsecured debt of which is rated at least "AA-" (or its equivalent) by each Rating Agency, or which will allow each Rating Agency to reaffirm their then current ratings of all rated certificates issued in connection with the Securitization.  In the

54

event that Borrower fails to maintain the Rate Cap Agreement as provided in this Section 5.10, Lender may purchase the Rate Cap Agreement and the cost incurred by Lender in connection therewith shall be paid by Borrower to Lender with interest thereon at the Default Rate from the date such cost is incurred until such cost is paid by Borrower to Lender.

Section 5.11. <u>Debt Service Reserve Escrow Account</u>. Borrower has deposited with Lender on the Closing Date an amount equal to the Initial Debt Service Reserve Deposit. Provided that no Event of Default has occurred and is continuing, commencing on the Payment Date occurring in June, 2007 and on each Payment Date thereafter, an amount equal to the Required Debt Service Payment for such Payment Date shall be transferred from the Debt Service Reserve Escrow Account to the Debt Service Payment Sub-Account. Borrower shall pay to Lender the Exit Fee in connection with any such partial prepayment of the Loan. Should an Event of Default occur, sums on deposit in the Debt Service Reserve Escrow Account may be applied by Lender to the payment of the Debt or any other charges affecting all or any portion of the Property as Lender in its sole discretion may determine; provided, however, that no such application shall be deemed to have been made by operation of law or otherwise until actually made by Lender as herein provided.

Section 5.12. <u>Performance of Engineering Work</u>. (a) Borrower shall promptly commence and diligently thereafter pursue to completion (without regard to the amount of money then available in the Engineering Escrow Account) the Required Engineering Work prior to the date, if any, set forth on **Exhibit D** hereto. After Borrower completes an item of Required Engineering Work, Borrower may submit to Lender an invoice therefor with lien waivers and a statement from the Engineer, reasonably acceptable to Lender, indicating that the portion of the Required Engineering Work in question has been completed in compliance with all Legal Requirements, and Lender shall, within twenty (20) days thereafter, although in no event more frequently than once each month, reimburse such amount to Borrower from the Engineering Escrow Account; <u>provided</u>, <u>however</u>, that Borrower shall not be reimbursed more than the amount set forth on **Exhibit D** hereto as the amount allocated to the portion of the Required Engineering Work for which reimbursement is sought.

(b)   From and after the date all of the Required Engineering Work is completed, Borrower may submit a written request, which request shall be delivered together with final lien waivers and a statement from the Engineer, as the case may be, reasonably acceptable to Lender, indicating that all of the Required Engineering Work has been completed in compliance with all Legal Requirements, and Lender shall, within twenty (20) days thereafter, disburse any balance of the Engineering Escrow Account to Borrower. Should an Event of Default occur, the sums on deposit in the Engineering Escrow Account may be applied by Lender in payment of any Required Engineering Work or may be applied to the payment of the Debt or any other charges affecting all or any portion of the Property, as Lender in its sole discretion may determine; <u>provided</u>, <u>however</u>, that no such application shall be deemed to have been made by operation of law or otherwise until actually made by Lender as herein provided.

Section 5.13. <u>Loss Proceeds</u>. In the event of a casualty to the Property, unless Lender elects, or is required pursuant to Article III hereof to make all of the Insurance Proceeds available to Borrower for restoration, Lender and Borrower shall cause all such Insurance

Current/9423275

Proceeds to be paid by the insurer directly to the Central Account, whereupon Lender shall, after deducting Lender's costs of recovering and paying out such Insurance Proceeds, including without limitation, reasonable attorneys' fees, apply same to reduce the Debt in accordance with the terms of the Note; provided, however, that if Lender elects, or is deemed to have elected, to make the Insurance Proceeds available for restoration, all Insurance Proceeds in respect of rent loss, business interruption or similar coverage shall be maintained in the Central Account, to be applied by Lender in the same manner as Rent received with respect to the operation of the Property; provided, further, however, that in the event that the Insurance Proceeds with respect to such rent loss, business interruption or similar insurance policy are paid in a lump sum in advance, Lender shall hold such Insurance Proceeds in a segregated interest-bearing escrow account, which shall be an Eligible Account, shall estimate, in Lender's reasonable discretion, the number of months required for Borrower to restore the damage caused by the casualty, shall divide the aggregate rent loss, business interruption or similar Insurance Proceeds by such number of months, and shall disburse from such bank account into the Central Account each month during the performance of such restoration such monthly installment of said Insurance Proceeds. In the event that Insurance Proceeds are to be applied toward restoration, Lender shall hold such funds in a segregated bank account at the Bank, which shall be an Eligible Account, and shall disburse same in accordance with the provisions of Section 3.04 hereof. Unless Lender elects, or is required pursuant to Section 6.01 hereof to make all of the Condemnation Proceeds available to Borrower for restoration, Lender and Borrower shall cause all such Condemnation Proceeds to be paid to the Central Account, whereupon Lender shall, after deducting Lender's costs of recovering and paying out such Condemnation Proceeds, including without limitation, reasonable attorneys' fees, apply same to reduce the Debt in accordance with the terms of the Note; provided, however, that any Condemnation Proceeds received in connection with a temporary Taking shall be maintained in the Central Account, to be applied by Lender in the same manner as Rent received with respect to the operation of the Property; provided, further, however, that in the event that the Condemnation Proceeds of any such temporary Taking are paid in a lump sum in advance, Lender shall hold such Condemnation Proceeds in a segregated interest-bearing bank account, which shall be an Eligible Account, shall estimate, in Lender's reasonable discretion, the number of months that the Property shall be affected by such temporary Taking, shall divide the aggregate Condemnation Proceeds in connection with such temporary Taking by such number of months, and shall disburse from such bank account into the Central Account each month during the pendency of such temporary Taking such monthly installment of said Condemnation Proceeds. In the event that Condemnation Proceeds are to be applied toward restoration, Lender shall hold such funds in a segregated bank account at the Bank, which shall be an Eligible Account, and shall disburse same in accordance with the provisions of Section 3.04 hereof. If any Loss Proceeds are received by Borrower, such Loss Proceeds shall be received in trust for Lender, shall be segregated from other funds of Borrower, and shall be forthwith paid into the Central Account, or paid to Lender to hold in a segregated bank account at the Bank, in each case to be applied or disbursed in accordance with the foregoing. Any Loss Proceeds made available to Borrower for restoration in accordance herewith, to the extent not used by Borrower in connection with, or to the extent they exceed the cost of, such restoration, shall be deposited into the Central Account, whereupon Lender shall apply the same to reduce the Debt in accordance with the terms of the Note.

56

Section 5.14. <u>Cash Reserve Escrow Account</u>. Borrower has deposited with Lender on the Closing Date an amount equal to the Cash Reserve Deposit as a deposit to the Cash Reserve Escrow Account. Such funds shall be held and disbursed in accordance with and subject to the terms of this Agreement. Provided that no Event of Default has occurred, in connection with the potential purchase of any real property by Borrower's Affiliate(s), Borrower may request in writing that Lender disburse to Borrower all or a portion of the funds on deposit in the Cash Reserve Escrow Account to be distributed by Borrower to its principals for use solely by its principals (or Affiliates) as an earnest money deposit under a written contract for the acquisition of such property. If Lender elects, in its sole and absolute discretion, to disburse all or any portion of the funds on deposit in the Cash Reserve Escrow Account, Borrower shall distribute such funds to its principals and cause its principals to use such funds solely for such purposes. Lender shall have no obligation to release any funds on deposit in the Cash Reserve Escrow Account for any purpose and may condition the release of such funds on satisfaction of any conditions it requires in its sole and absolute discretion. Should an Event of Default occur, sums on deposit in the Cash Reserve Escrow Account may be applied by Lender to the payment of the Debt or any other charges affecting all or any portion of the Property as Lender in its sole discretion may determine; provided, however, that no such application shall be deemed to have been made by operation of law or otherwise until actually made by Lender as herein provided.

Provided that no Event of Default has occurred and is continuing, upon receipt of request from Borrower, Lender will disburse any sums earned as a result of investing sums on deposit in the Cash Reserve Escrow Account in Permitted Investments to Borrower.

<u>ARTICLE VI:  CONDEMNATION</u>

Section 6.01. <u>Condemnation</u>. (a) Borrower shall notify Lender promptly of the commencement or threat of any Taking of the Property or any portion thereof. Lender is hereby irrevocably appointed as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain the proceeds of any such Taking and to make any compromise or settlement in connection with such proceedings (subject to Borrower's reasonable approval, except after the occurrence of an Event of Default, in which event Borrower's approval shall not be required), subject to the provisions of this Security Instrument; provided, however, that Borrower may participate in any such proceedings and shall be authorized and entitled to compromise or settle any such proceeding with respect to Condemnation Proceeds in an amount less than five percent (5%) of the Loan Amount. Borrower shall execute and deliver to Lender any and all instruments reasonably required in connection with any such proceeding promptly after request therefor by Lender. Except as set forth above, Borrower shall not adjust, compromise, settle or enter into any agreement with respect to such proceedings without the prior consent of Lender. All Condemnation Proceeds are hereby assigned to and shall be paid to Lender. With respect to Condemnation Proceeds in an amount in excess of five percent (5%) of the Loan Amount, Borrower hereby authorizes Lender to compromise, settle, collect and receive such Condemnation Proceeds, and to give proper receipts and acquittance therefor. Lender shall have the option, in Lender's sole discretion, to apply such Condemnation Proceeds (less any cost to Lender of recovering and paying out such proceeds, including, without limitation, reasonable attorneys' fees and disbursements and costs allocable to inspecting any repair, restoration or rebuilding work and the plans and specifications

57

therefor) toward the payment of the Debt or to allow such proceeds to be used for the Work. In the event Lender elects to make Condemnation Proceeds available to be used toward the restoration or rebuilding of the Property to a usable whole, such Condemnation Proceeds shall be disbursed in the manner and subject to the conditions set forth in Section 3.04(b) hereof. Any excess proceeds remaining after completion of such restoration or rebuilding shall be applied to the repayment of the Debt. If the Condemnation Proceeds are used to reduce the Debt, they shall be applied in accordance with the provisions of the Note with no prepayment fee or charge of any kind other than the Exit Fee. Borrower shall promptly execute and deliver all instruments requested by Lender for the purpose of confirming the assignment of the Condemnation Proceeds to Lender.

(b)    Application of all or any part of the Condemnation Proceeds to the Debt shall be made in accordance with the provisions of Sections 3.06 and 3.07 hereof. No application of the Condemnation Proceeds to the reduction of the Debt shall have the effect of releasing the lien of this Security Instrument until the remainder of the Debt has been paid in full. In the case of any Taking, Lender, to the extent that Lender has not been reimbursed by Borrower, shall be entitled, as a first priority out of any Condemnation Proceeds, to reimbursement for all costs, fees and expenses reasonably incurred in the determination and collection of any Condemnation Proceeds. All Condemnation Proceeds deposited with Lender pursuant to this Section, until expended or applied as provided herein, shall be held in accordance with Section 3.04(b) hereof and shall constitute additional security for the payment of the Debt and the payment and performance of Borrower's obligations, but Lender shall not be deemed a trustee or other fiduciary with respect to its receipt of such Condemnation Proceeds or any part thereof. All awards so deposited with Lender shall be held by Lender in an Eligible Account but Lender makes no representation or warranty as to the rate or amount of interest, if any, which may accrue on any such deposit and shall have no liability in connection therewith. For purposes hereof, any reference to the award shall be deemed to include interest, if any, which has accrued thereon.

## ARTICLE VII: LEASES AND RENTS

Section 7.01. Assignment. (a) Borrower does hereby bargain, sell, assign and set over unto Lender, all of Borrower's interest in the Leases and Rents. The assignment of Leases and Rents in this Section 7.01 is an absolute, unconditional and present assignment from Borrower to Lender and not an assignment for security and the existence or exercise of Borrower's revocable license to collect Rent shall not operate to subordinate this assignment to any subsequent assignment. The exercise by Lender of any of its rights or remedies pursuant to this Section 7.01 shall not be deemed to make Lender a mortgagee-in-possession. In addition to the provisions of this Article VII, Borrower shall comply with all terms, provisions and conditions of the Assignment.

(b)    So long as there shall exist and be continuing no Event of Default, Borrower shall have a revocable license to take all actions with respect to all Leases and Rents, present and future, including the right to collect and use the Rents, subject to the terms of this Security Instrument, the Mortgage and the Assignment.

(c)     In a separate instrument Borrower shall, as requested from time to time by Lender, assign to Lender or its nominee by specific or general assignment, any and all Leases, such assignments to be in form and content reasonably acceptable to Lender, but subject to the provisions of Section 7.01(a) and (b) hereof.  Borrower agrees to deliver to Lender, within thirty (30) days after Lender's request, a true and complete copy of every Lease.

(d)     The rights of Lender contained in this Article VII, the Assignment or any other assignment of any Lease shall not result in any obligation or liability of Lender to Borrower or any lessee under a Lease or any party claiming through any such lessee.

(e)     At any time after an Event of Default, the license granted hereinabove may be revoked by Lender, and Lender or a receiver appointed in accordance with this Security Instrument may enter upon the Property, and collect, retain and apply the Rents toward payment of the Debt in such priority and proportions as Lender in its sole discretion shall deem proper.

(f)     In addition to the rights which Lender may have herein, upon the occurrence of any Event of Default, Lender, at its option, may require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be used and occupied by Borrower and may require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise.

Section 7.02.  <u>Management of Property</u>.  (a) Borrower shall manage the Property or cause the Property to be managed in a manner which is consistent with the Approved Manager Standard.  All Space Leases shall provide for rental rates comparable to then existing local market rates and terms and conditions which constitute good and prudent business practice and are consistent with prevailing market terms and conditions, and shall be arms-length transactions. All Leases shall be on a form previously approved by Lender and shall provide that they are subordinate to this Security Instrument and the Mortgage and that the lessees thereunder attorn to Lender.  Borrower shall deliver copies of all Leases, amendments, modifications and renewals thereof to Lender. All proposed Leases for the Property shall be subject to the prior written approval of Lender, provided, however that Borrower may enter into new leases with unrelated third parties without obtaining the prior consent of Lender provided that: (i) the proposed leases conform with the requirements of this Section 7.02; (ii) the space to be leased pursuant to such proposed lease together with any space leased or to be leased to an Affiliate of the tenant thereunder does not exceed 5,000 square feet; and (iii) the term of the proposed lease inclusive of all extensions and renewals, does not exceed one (1) year.

(b)     Borrower (i) shall observe and perform all of its material obligations under the Leases pursuant to applicable Legal Requirements and shall not do or permit to be done anything to impair the value of the Leases as security for the Debt; (ii) shall promptly send copies to Lender of all notices of default which Borrower shall receive under the Leases; (iii) shall, consistent with the Approved Manager Standard, enforce all of the terms, covenants and conditions contained in the Leases to be observed or performed; (iv) shall not collect any of the Rents under the Leases more than one (1) month in advance (except that Borrower may collect in advance such security deposits as are permitted pursuant to applicable Legal Requirements and

59

are commercially reasonable in the prevailing market); (v) shall not execute any other assignment of lessor's interest in the Leases or the Rents except as otherwise expressly permitted pursuant to this Security Instrument; (vi) shall not cancel or terminate any of the Leases or accept a surrender thereof in any manner inconsistent with the Approved Manager Standard; (vii) shall not convey, transfer or suffer or permit a conveyance or transfer of all or any part of the Premises or the Improvements or of any interest therein so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees thereunder; (viii) shall not alter, modify or change the terms of any guaranty of any Major Space Lease or cancel or terminate any such guaranty; (ix) shall, in accordance with the Approved Manager Standard, make all reasonable efforts to seek lessees for space as it becomes vacant and enter into Leases in accordance with the terms hereof; (x) shall not cancel or terminate or materially modify, alter or amend any Major Space Lease or Property Agreement without Lender's consent, which consent will not be unreasonably withheld or delayed; and (xi) shall, without limitation to any other provision hereof, execute and deliver at the request of Lender all such further assurances, confirmations and assignments in connection with the Property as are required herein and as Lender shall from time to time reasonably require.

(c)    All security deposits of lessees, whether held in cash or any other form, shall be treated by Borrower as trust funds, shall not be commingled with any other funds of Borrower and, if cash, shall be deposited by Borrower in the Security Deposit Account. Any bond or other instrument which Borrower is permitted to hold in lieu of cash security deposits under applicable Legal Requirements shall be maintained in full force and effect unless replaced by cash deposits as hereinabove described, shall be issued by a Person reasonably satisfactory to Lender, shall, if permitted pursuant to Legal Requirements, at Lender's option, name Lender as payee or mortgagee thereunder or be fully assignable to Lender and shall, in all respects, comply with applicable Legal Requirements and otherwise be reasonably satisfactory to Lender. Borrower shall, upon request, provide Lender with evidence reasonably satisfactory to Lender of Borrower's compliance with the foregoing. Following the occurrence and during the continuance of any Event of Default, Borrower shall, upon Lender's request, if permitted by applicable Legal Requirements, turn over the security deposits (and any interest thereon) to Lender to be held by Lender in accordance with the terms of the Leases and all Legal Requirements.

(d)    If requested by Lender, Borrower shall furnish, or shall cause the applicable lessee to furnish, to Lender financial data and/or financial statements in accordance with Regulation AB for any lessee of the Property if, in connection with a Securitization, Lender expects there to be, with respect to such lessee or any group of affiliated lessees, a concentration within all of the mortgage loans included or expected to be included, as applicable, in such Securitization such that such lessee or group of affiliated lessees would constitute a Significant Obligor; provided, however, that in the event the related Space Lease does not require the related lessee to provide the foregoing information, Borrower shall use commercially reasonable efforts to cause the applicable lessee to furnish such information.

(e)    Borrower covenants and agrees with Lender that (i) the Property will be managed at all times by Manager pursuant to the management agreement approved by Lender (the "Management Agreement") and (ii) the Management Agreement may be terminated by Lender at

60

any time for cause (including, but not limited to, Manager's gross negligence, misappropriation of funds, willful misconduct or fraud) or at any time following the occurrence of an Event of Default and a substitute managing agent shall be appointed by Borrower, subject to Lender's prior written approval, which may be given or withheld in Lender's sole discretion and which may be conditioned on, inter alia, a letter from each Rating Agency confirming that any rating issued by the Rating Agency in connection with a Securitization will not, as a result of the proposed change of Manager, be downgraded from the then current ratings thereof, qualified or withdrawn. Borrower may from time to time appoint a successor manager to manage the Property with Lender's prior written consent which consent shall not be unreasonably withheld or delayed, provided that any such successor manager shall be a reputable management company which meets the Approved Manager Standard and each Rating Agency shall have confirmed in writing that any rating issued by the Rating Agency in connection with a Securitization will not, as a result of the proposed change of Manager, be downgraded from the then current ratings thereof, qualified or withdrawn. Borrower further covenants and agrees that Borrower shall require Manager (or any successor managers) to maintain at all times during the term of the Loan worker's compensation insurance as required by Governmental Authorities.

## ARTICLE VIII: MAINTENANCE AND REPAIR

Section 8.01. Maintenance and Repair of the Property; Alterations; Replacement of Equipment. Borrower hereby covenants and agrees:

(a) Borrower shall not (i) desert or abandon the Property, (ii) change the use of the Property or cause or permit the use or occupancy of any part of the Property to be discontinued if such discontinuance or use change would violate any zoning or other law, ordinance or regulation; (iii) consent to or seek any lowering of the zoning classification, or greater zoning restriction affecting the Property; or (iv) take any steps whatsoever to convert the Property, or any portion thereof, to a condominium or cooperative form of ownership.

(b) Borrower shall, at its expense, (i) take good care of the Property including grounds generally, and utility systems and sidewalks, roads, alleys, and curbs therein, and shall keep the same in good, safe and insurable condition and in compliance with all applicable Legal Requirements, (ii) promptly make all repairs to the Property, above grade and below grade, interior and exterior, structural and nonstructural, ordinary and extraordinary, unforeseen and foreseen, and maintain the Property in a manner appropriate for the facility and (iii) not commit or suffer to be committed any waste of the Property or do or suffer to be done anything which will increase the risk of fire or other hazard to the Property or impair the value thereof. Borrower shall keep the sidewalks, vaults, gutters and curbs comprising, or adjacent to, the Property, clean and free from dirt, snow, ice, rubbish and obstructions. All repairs made by Borrower shall be made with first-class materials, in a good and workmanlike manner, shall be equal or better in quality and class to the original work and shall comply with all applicable Legal Requirements and Insurance Requirements. To the extent any of the above obligations are obligations of tenants under Space Leases or other Persons under Property Agreements, Borrower may fulfill its obligations hereunder by causing such tenants or other Persons, as the case may be, to perform their obligations thereunder. As used herein, the terms "repair" and "repairs" shall be deemed to include all necessary replacements.

Current/9423275

(c)     Borrower shall not demolish, remove, construct, or, except as otherwise expressly provided herein, restore, or alter the Property or any portion thereof; nor consent to or permit any such demolition, removal, construction, restoration, addition or alteration which would diminish the value of the Property without Lender's prior written consent in each instance, which consent shall not be unreasonably withheld or delayed.

(d)     Borrower represents and warrants to Lender that (i) there are no fixtures, machinery, apparatus, tools, equipment or articles of personal property attached or appurtenant to, or located on, or used in connection with the management, operation or maintenance of the Property, except for the Equipment and equipment leased by Borrower for the management, operation or maintenance of the Property in accordance with the Loan Documents; (ii) the Equipment and the leased equipment constitute all of the fixtures, machinery, apparatus, tools, equipment and articles of personal property necessary to the proper operation and maintenance of the Property; and (iii) all of the Equipment is free and clear of all liens, except for the lien of this Security Instrument and the Permitted Encumbrances.  All right, title and interest of Borrower in and to all extensions, improvements, betterments, renewals and appurtenances to the Property hereafter acquired by, or released to, Borrower or constructed, assembled or placed by Borrower in the Property, and all changes and substitutions of the security constituted thereby, shall be and, in each such case, without any further mortgage, encumbrance, conveyance, assignment or other act by Lender or Borrower, shall become subject to the lien and security interest of this Security Instrument and the Mortgage as fully and completely, and with the same effect, as though now owned by Borrower and specifically described in this Security Instrument, but at any and all times Borrower shall execute and deliver to Lender any documents Lender may reasonably deem necessary or appropriate for the purpose of specifically subjecting the same to the lien and security interest of this Security Instrument and the Mortgage.

(e)     Notwithstanding the provisions of this Security Instrument to the contrary, Borrower shall have the right, at any time and from time to time, to remove and dispose of Equipment which may have become obsolete or unfit for use or which is no longer useful in the management, operation or maintenance of the Property.  Borrower shall promptly replace any such Equipment so disposed of or removed with other Equipment of equal value and utility, free of any security interest or superior title, liens or claims; except that, if by reason of technological or other developments, replacement of the Equipment so removed or disposed of is not necessary or desirable for the proper management, operation or maintenance of the Property, Borrower shall not be required to replace the same.  All such replacements or additional equipment shall be deemed to constitute "Equipment" and shall be covered by the security interest herein granted.

## ARTICLE IX:  TRANSFER OR ENCUMBRANCE OF THE PROPERTY

Section 9.01.  Other Encumbrances.  Borrower shall not further encumber or permit the further encumbrance in any manner (whether by grant of a pledge, security interest or otherwise) of the Property or any part thereof or interest therein, including, without limitation, of the Rents therefrom.  In addition, Borrower shall not further encumber and shall not permit the further encumbrance in any manner (whether by grant of a pledge, security interest or otherwise) of Borrower or any direct or indirect interest in Borrower except as expressly permitted pursuant to this Security Instrument.

62

Section 9.02.  <u>No Transfer</u>.  Borrower acknowledges that Lender has examined and relied on the expertise of Borrower and, if applicable, each General Partner, in owning and operating properties such as the Property in agreeing to make the Loan and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for repayment of the Debt and Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property.  Borrower shall not Transfer, nor permit any Transfer, without the prior written consent of Lender, which consent Lender may withhold in its sole and absolute discretion.  Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Transfer without Lender's consent.  This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer.

Section 9.03.  <u>Due on Sale</u>.  Lender may declare the Debt immediately due and payable upon any Transfer or further encumbrance without Lender's consent without regard to whether any impairment of its security or any increased risk of default hereunder can be demonstrated. This provision shall apply to every Transfer or further encumbrance of the Property or any part thereof or interest in the Property or in Borrower regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer or further encumbrance of the Property or interest in Borrower.

## ARTICLE X:  CERTIFICATES

Section 10.01.  <u>Estoppel Certificates</u>.  (a) After request by Lender, Borrower, within fifteen (15) days and at its expense, will furnish Lender with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, and the unpaid principal amount of the Note, (ii) the rate of interest of the Note, (iii) the date payments of interest and/or principal were last paid, (iv) any offsets or defenses to the payment of the Debt and, if any are alleged, the nature thereof, (v) that the Note, this Security Instrument and the other Loan Documents have not been modified or if modified, giving particulars of such modification and (vi) that there has occurred and is then continuing no Default or if such Default exists, the nature thereof, the period of time it has existed, and the action being taken to remedy such Default.

(b)    Within fifteen (15) days after written request by Borrower, Lender shall furnish to Borrower a written statement confirming the amount of the Debt, the maturity date of the Note and the date to which interest has been paid.

(c)    Borrower shall use all reasonable efforts to obtain estoppel certificates from tenants in form and substance reasonably acceptable to Lender.

## ARTICLE XI:  NOTICES

Section 11.01.  <u>Notices</u>.  Any notice, demand, statement, request or consent made hereunder shall be in writing and delivered personally or sent to the party to whom the notice, demand or request is being made by Federal Express or other nationally recognized overnight

delivery service, as follows and shall be deemed given when delivered personally or one (1) Business Day after being deposited with Federal Express or such other nationally recognized delivery service:

| | |
|---|---|
| If to Lender: | Petra Mortgage Capital Corp. LLC<br>1370 Avenue of the Americas, 23rd Floor<br>New York, NY 10019<br>Attn: Joseph K. Iacono<br>Fax No.: (212) 489-1629 |
| with a copy to: | Proskauer Rose LLP<br>1585 Broadway<br>New York, New York 10036<br>Attn: David J. Weinberger, Esq.<br>Fax No.: (212) 969-2900 |
| If to Borrower: | To Borrower, at the address first written above, |

or such other address as either Borrower or Lender shall hereafter specify by not less than ten (10) days prior written notice as provided herein; provided, however, that notwithstanding any provision of this Article to the contrary, such notice of change of address shall be deemed given only upon actual receipt thereof. Rejection or other refusal to accept or the inability to deliver because of changed addresses of which no notice was given as herein required shall be deemed to be receipt of the notice, demand, statement, request or consent.

## ARTICLE XII:  INDEMNIFICATION

Section 12.01.  Indemnification Covering Property.  In addition, and without limitation, to any other provision of this Security Instrument or any other Loan Document, Borrower shall protect, indemnify and save harmless Lender and its successors and assigns, and each of their agents, employees, officers, directors, stockholders, partners and members (collectively, "Indemnified Parties") for, from and against any claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, known or unknown, contingent or otherwise, whether incurred or imposed within or outside the judicial process, including, without limitation, reasonable attorneys' fees and disbursements imposed upon or incurred by or asserted against any of the Indemnified Parties by reason of (a) ownership of this Security Instrument, the Assignment, the Mortgage, the Property or any part thereof or any interest therein or receipt of any Rents; (b) any accident, injury to or death of any person or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, parking areas, streets or ways; (c) any use, nonuse or condition in, on or about, or possession, alteration, repair, operation, maintenance or management of, the Property or any part thereof or on the adjoining sidewalks, curbs, parking areas, streets or ways; (d) any failure on the part of Borrower to perform or comply with any of the terms of this Security Instrument or the Assignment; (e) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (f) any claim by

64

brokers, finders or similar Persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof; (g) any Imposition including, without limitation, any Imposition attributable to the execution, delivery, filing, or recording of any Loan Document, Lease or memorandum thereof; (h) any lien or claim arising on or against the Property or any part thereof under any Legal Requirement or any liability asserted against any of the Indemnified Parties with respect thereto; (i) any claim arising out of or in any way relating to any tax or other imposition on the making and/or recording of this Security Instrument, the Note or any of the other Loan Documents; (j) a Default under Sections 2.02(f), 2.02(g), 2.02(k), 2.02(t) or 2.02(w) hereof, (k) the failure of any Person to file timely with the Internal Revenue Service an accurate Form 1099-B, Statement for Recipients of Proceeds from Real Estate, Broker and Barter Exchange Transactions, which may be required in connection with the Loan, or to supply a copy thereof in a timely fashion to the recipient of the proceeds of the Loan; (l) the claims of any lessee or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease or (m) the failure to pay any insurance premiums. Notwithstanding the foregoing provisions of this Section 12.01 to the contrary, Borrower shall have no obligation to indemnify the Indemnified Parties pursuant to this Section 12.01 for liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses relative to the foregoing which result from Lender's, and its successors' or assigns', willful misconduct or gross negligence. Any amounts payable to Lender by reason of the application of this Section 12.01 shall constitute a part of the Debt secured by this Security Instrument and the other Loan Documents and shall become immediately due and payable and shall bear interest at the Default Rate from the date the liability, obligation, claim, cost or expense is sustained by Lender, as applicable, until paid. The provisions of this Section 12.01 shall survive the termination of this Security Instrument whether by repayment of the Debt, foreclosure or delivery of a deed in lieu thereof, assignment or otherwise. In case any action, suit or proceeding is brought against any of the Indemnified Parties by reason of any occurrence of the type set forth in (a) through (m) above, Borrower shall, at Borrower's expense, resist and defend such action, suit or proceeding or will cause the same to be resisted and defended by counsel at Borrower's expense for the insurer of the liability or by counsel designated by Borrower (unless reasonably disapproved by Lender promptly after Lender has been notified of such counsel); provided, however, that nothing herein shall compromise the right of Lender (or any other Indemnified Party) to appoint its own counsel at Borrower's expense for its defense with respect to any action which, in the reasonable opinion of Lender or such other Indemnified Party, as applicable, presents a conflict or potential conflict between Lender or such other Indemnified Party that would make such separate representation advisable. Any Indemnified Party will give Borrower prompt notice after such Indemnified Party obtains actual knowledge of any potential claim by such Indemnified Party for indemnification hereunder. The Indemnified Parties shall not settle or compromise any action, proceeding or claim as to which it is indemnified hereunder without notice to Borrower.

## ARTICLE XIII: DEFAULTS

Section 13.01. <u>Events of Default</u>. The Debt shall become immediately due at the option of Lender upon any one or more of the following events ("<u>Event of Default</u>"):

65

(a)    if the final payment, Exit Fee or prepayment premium, if any, due under the Note shall not be paid on Maturity;

(b)    if any monthly payment of interest and/or principal due under the Note (other than the sums described in (a) above) shall not be fully paid on the date upon which the same is due and payable thereunder;

(c)    if payment of any sum (other than the sums described in (a) above or (b) above) required to be paid pursuant to the Note, this Security Instrument or any other Loan Document shall not be paid within five (5) days after Lender delivers written notice to Borrower that same is due and payable thereunder or hereunder;

(d)    if Borrower, Guarantor or, if Borrower or Guarantor is a partnership, any general partner of Borrower or Guarantor, or, if Borrower or Guarantor is a limited liability company, any member of Borrower or Guarantor, shall institute or cause to be instituted any proceeding for the termination or dissolution of Borrower, Guarantor or any such general partner or member;

(e)    if the insurance policies required hereunder are not kept in full force and effect, or if the insurance policies are not assigned and delivered to Lender as herein provided;

(f)    if Borrower or Guarantor attempts to assign its rights under this Security Instrument or any other Loan Document or any interest herein or therein, or if any Transfer occurs other than in accordance with the provisions hereof;

(g)    if any representation or warranty of Borrower or Guarantor made herein or in any other Loan Document or in any certificate, report, financial statement or other instrument or agreement furnished to Lender shall prove false or misleading in any material respect;

(h)    if Borrower, Guarantor or any general partner of Borrower or Guarantor shall make an assignment for the benefit of creditors or shall admit in writing its inability to pay its debts generally as they become due;

(i)    if a receiver, liquidator or trustee of Borrower, Guarantor or any general partner of Borrower or Guarantor shall be appointed or if Borrower, Guarantor or their respective general partners shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower, Guarantor or their respective general partners or if any proceeding for the dissolution or liquidation of Borrower, Guarantor or their respective general partners shall be instituted; however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, Guarantor or their respective general partners, as applicable, upon the same not being discharged, stayed or dismissed within sixty (60) days or if Borrower, Guarantor or their respective general partners shall generally not be paying its debts as they become due;

(j)    if Borrower shall be in default beyond any notice or grace period, if any, under any other mortgage or deed of trust or security agreement covering any part of the

66

Property without regard to its priority relative to this Security Instrument or the Mortgage; provided, however, this provision shall not be deemed a waiver of the provisions of Article IX prohibiting further encumbrances affecting the Property or any other provision of this Security Instrument;

(k)    if the Property becomes subject (i) to any lien which is superior to the lien of this Security Instrument or the Mortgage, other than a lien for real estate taxes and assessments not due and payable, or (ii) to any mechanic's, materialman's or other lien which is or is asserted to be superior to the lien of this Security Instrument or the Mortgage, and such lien shall remain undischarged (by payment, bonding, or otherwise) for ten (10) days unless contested in accordance with the terms hereof;

(l)    if Borrower discontinues the operation of the Property or any part thereof for reasons other than repair or restoration arising from a casualty or condemnation for thirty (30) days or more;

(m)    except as permitted in this Security Instrument, any material alteration, demolition or removal of any of the Improvements without the prior consent of Lender;

(n)    if Borrower consummates a transaction which would cause this Security Instrument or Lender's rights under this Security Instrument, the Note or any other Loan Document to constitute a non-exempt prohibited transaction under ERISA or result in a violation of a state statute regulating government plans subjecting Lender to liability for a violation of ERISA or a state statute; or

(o)    If Borrower fails to comply with Section 5.12 hereof; or

(p)    if a default shall occur under any of the other terms, covenants or conditions of the Note, this Security Instrument or any other Loan Document, other than as set forth in (a) through (o) above, for ten (10) days after notice from Lender in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other default or an additional thirty (30) days if Borrower is diligently and continuously effectuating a cure of a curable non-monetary default, other than as set forth in (a) through (o) above.

Section 13.02.  Remedies.  (a) Upon the occurrence and during the continuance of any Event of Default, Lender may, in addition to any other rights or remedies available to it hereunder or under any other Loan Document, at law or in equity, take such action, without notice or demand, as it reasonably deems advisable to protect and enforce its rights against Borrower and in and to the Property including, but not limited to, the following actions, each of which may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting any other rights and remedies of Lender hereunder, at law or in equity: (i) declare all or any portion of the unpaid Debt to be immediately due and payable; provided, however, that upon the occurrence of any of the events specified in Section 13.01(i), the entire Debt will be immediately due and payable without notice or demand or any other declaration of the amounts due and payable; or

67

(ii) bring an action to foreclose this Security Instrument or the Mortgage and without applying for a receiver for the Rents, but subject to the rights of the tenants under the Leases, enter into or upon the Property or any part thereof, either personally or by its agents, nominees or attorneys, and dispossess Borrower and its agents and servants therefrom, and thereupon Lender may (A) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat, (B) make alterations, additions, renewals, replacements and improvements to or on the Property or any part thereof, (C) exercise all rights and powers of Borrower with respect to the Property or any part thereof, whether in the name of Borrower or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all earnings, revenues, rents, issues, profits and other income of the Property and every part thereof, and (D) apply the receipts from the Property or any part thereof to the payment of the Debt, after deducting therefrom all expenses (including, without limitation, reasonable attorneys' fees and disbursements) reasonably incurred in connection with the aforesaid operations and all amounts necessary to pay the Impositions, insurance and other charges in connection with the Property or any part thereof, as well as just and reasonable compensation for the services of Lender's third-party agents; or (iii) have an appraisal or other valuation of the Property or any part thereof performed by an Appraiser (and Borrower covenants and agrees it shall cooperate in causing any such valuation or appraisal to be performed) and any cost or expense incurred by Lender in connection therewith shall constitute a portion of the Debt and be secured by this Security Instrument or the Mortgage and shall be immediately due and payable to Lender with interest, at the Default Rate, until the date of receipt by Lender; or (iv) sell the Property or institute proceedings for the complete foreclosure of this Security Instrument or the Mortgage, or take such other action as may be allowed pursuant to Legal Requirements, at law or in equity, for the enforcement of this Security Instrument or the Mortgage, in which case the Property or any part thereof may be sold for cash or credit in one or more parcels; or (v) with or without entry, and to the extent permitted and pursuant to the procedures provided by applicable Legal Requirements, institute proceedings for the partial foreclosure of this Security Instrument or the Mortgage, or take such other action as may be allowed pursuant to Legal Requirements, at law or in equity, for the enforcement of this Security Instrument or the Mortgage for the portion of the Debt then due and payable, subject to the lien of this Security Instrument and the Mortgage continuing unimpaired and without loss of priority so as to secure the balance of the Debt not then due; or (vi) institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained in the Loan Documents, or any of them; or (vii) recover judgment on the Note or any guaranty either before, during or after (or in lieu of) any proceedings for the enforcement of this Security Instrument or the Mortgage; or (viii) apply for the appointment of a custodian, trustee, receiver, keeper, liquidator or conservator of the Property or any part thereof, irrespective of the adequacy of the security for the Debt and without regard to the solvency of Borrower or of any Person liable for the payment of the Debt, to which appointment Borrower does hereby consent and such receiver or other official shall have all rights and powers permitted by applicable law and such other rights and powers as the court making such appointment may confer, but the appointment of such receiver or other official shall not impair or in any manner prejudice the rights of Lender to receive the Rent with respect to any of the Property pursuant to this Security Instrument, the Mortgage or the Assignment; or (ix) require, at Lender's option, Borrower to pay monthly in advance to Lender, or any receiver

appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of any portion of the Property occupied by Borrower and may require Borrower to vacate and surrender possession to Lender of the Property or to such receiver and Borrower may be evicted by summary proceedings or otherwise; or (x) without prior notice to Borrower (A) apply all or any portion of the cash collateral in any Sub-Account and Escrow Account, including any interest and/or earnings therein, to carry out the obligations of Borrower under this Security Instrument and the other Loan Documents, to protect and preserve the Property and for any other purpose permitted under this Security Instrument and the other Loan Documents and/or (B) have all or any portion of such cash collateral immediately paid to Lender to be applied against the Debt in the order and priority set forth in the Note; or (ix) pursue any or all such other rights or remedies as Lender may have under applicable law or in equity; provided, however, that the provisions of this Section 13.02(a) shall not be construed to extend or modify any of the notice requirements or grace periods provided for hereunder or under any of the other Loan Documents. Borrower hereby waives, to the fullest extent permitted by Legal Requirements, any defense Borrower might otherwise raise or have by the failure to make any tenants parties defendant to a foreclosure proceeding and to foreclose their rights in any proceeding instituted by Lender.

(b)    The proceeds or avails of any sale made under or by virtue of this Section 13.02, together with any other sums which then may be held by Lender under this Security Instrument, whether under the provisions of this Section 13.02 or otherwise, shall be applied as follows:

First:  To the payment of the third-party costs and expenses reasonably incurred in connection with any such sale and to advances, fees and expenses, including, without limitation, reasonable fees and expenses of Lender's legal counsel as applicable, and of any judicial proceedings wherein the same may be made, and of all expenses, liabilities and advances reasonably made or incurred by Lender under this Security Instrument, together with interest as provided herein on all such advances made by Lender, and all Impositions, except any Impositions or other charges subject to which the Property shall have been sold;

Second:  To the payment of the whole amount then due, owing and unpaid under the Note for principal and interest thereon, with interest on such unpaid principal at the Default Rate from the date of the occurrence of the earliest Event of Default that formed a basis for such sale until the same is paid;

Third:  To the payment of any other portion of the Debt required to be paid by Borrower pursuant to any provision of this Security Instrument, the Note, or any of the other Loan Documents; and

Fourth:  The surplus, if any, to Borrower unless otherwise required by Legal Requirements.

Lender and any receiver or custodian of the Property or any part thereof shall be liable to account for only those rents, issues, proceeds and profits actually received by it.

69

(c)    Lender may adjourn from time to time any sale by it to be made under or by virtue of this Security Instrument by announcement at the time and place appointed for such sale or for such adjourned sale or sales and, except as otherwise provided by any applicable provision of Legal Requirements, Lender, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

(d)    Upon the exercise by Lender of any power, right, privilege, or remedy pursuant to this Security Instrument which requires any consent, approval, registration, qualification, or authorization of any Governmental Authority, Borrower agrees to execute and deliver, or will cause the execution and delivery of, all applications, certificates, instruments, assignments and other documents and papers that Lender or any purchaser of the Property may be required to obtain for such governmental consent, approval, registration, qualification, or authorization and Lender is hereby irrevocably appointed the true and lawful attorney-in-fact of Borrower (coupled with an interest), in its name and stead, to execute all such applications, certificates, instruments, assignments and other documents and papers.

Section 13.03.  Payment of Debt After Default.  If, following the occurrence of any Event of Default, Borrower shall tender payment of an amount sufficient to satisfy the Debt in whole or in part at any time prior to a foreclosure sale of the Property, and if at the time of such tender prepayment of the principal balance of the Note is not permitted by the Note or this Security Instrument, Borrower shall, in addition to the entire Debt, also pay to Lender a sum equal to interest which would have accrued on the principal balance of the Note at an interest rate equal to the LIBOR Margin for the Note plus the greater of (x) the then current LIBOR Rate and (y) the then current average yield for "This Week" as published by the Federal Reserve Board during the most recent full week preceding the date on which Borrower tenders such payment in Federal Reserve Statistical Release H.15 (519) for instruments having a ten (10) year maturity, from the date of such tender to the earlier of (a) the Maturity Date or (b) the first day of the period during which prepayment of the principal balance of the Note would have been permitted together with a prepayment consideration equal to the prepayment consideration which would have been payable as of the first day of the period during which prepayment would have been permitted.  If at the time of such tender, prepayment of the principal balance of the Note is permitted, such tender by Borrower shall be deemed to be a voluntary prepayment of the principal balance of the Note and Borrower shall, in addition to the entire Debt, also pay to Lender the applicable prepayment consideration specified in the Note and this Security Instrument.

Section 13.04.  Possession of the Property.  Upon the occurrence of any Event of Default and the acceleration of the Debt or any portion thereof, Borrower, if an occupant of the Property or any part thereof, upon demand of Lender, shall immediately surrender possession of the Property (or the portion thereof so occupied) to Lender, and if Borrower is permitted to remain in possession, the possession shall be as a month-to-month tenant of Lender and, on demand, Borrower shall pay to Lender monthly, in advance, a reasonable rental for the space so occupied and in default thereof Borrower may be dispossessed.  The covenants herein contained may be enforced by a receiver of the Property or any part thereof.  Nothing in this Section 13.04 shall be deemed to be a waiver of the provisions of this Security Instrument making the Transfer of the Property or any part thereof without Lender's prior written consent an Event of Default.

70

Section 13.05.  <u>Interest After Default</u>.  If any amount due under the Note, this Security Instrument or any of the other Loan Documents is not paid within any applicable notice and grace period after same is due, whether such date is the stated due date, any accelerated due date or any other date or at any other time specified under any of the terms hereof or thereof, then, in such event, Borrower shall pay interest on the amount not so paid from and after the date on which such amount first becomes due at the Default Rate; and such interest shall be due and payable at such rate until the earlier of the cure of all Events of Default or the payment of the entire amount due to Lender, whether or not any action shall have been taken or proceeding commenced to recover the same or to foreclose this Security Instrument or the Mortgage.  All unpaid and accrued interest shall be secured by this Security Instrument and the Mortgage as part of the Debt.  Nothing in this Section 13.05 or in any other provision of this Security Instrument shall constitute an extension of the time for payment of the Debt.

Section 13.06.  <u>Borrower's Actions After Default</u>.  After the happening of any Event of Default and immediately upon the commencement of any action, suit or other legal proceedings by Lender to obtain judgment for the Debt, or of any other nature in aid of the enforcement of the Loan Documents, Borrower will (a) after receipt of notice of the institution of any such action, waive the issuance and service of process and enter its voluntary appearance in such action, suit or proceeding, and (b) if required by Lender, consent to the appointment of a receiver or receivers of the Property or any part thereof and of all the earnings, revenues, rents, issues, profits and income thereof.

Section 13.07.  <u>Control by Lender After Default</u>.  Notwithstanding the appointment of any custodian, receiver, liquidator or trustee of Borrower, or of any of its property, or of the Property or any part thereof, to the extent permitted by Legal Requirements, Lender shall be entitled to obtain possession and control of all property now and hereafter covered by this Security Instrument, the Mortgage and the Assignment in accordance with the terms hereof.

Section 13.08.  <u>Right to Cure Defaults</u>.  (a) Upon the occurrence of any Event of Default, Lender or its agents may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof.  Lender and its agents are authorized to enter upon the Property or any part thereof for such purposes, or appear in, defend, or bring any action or proceedings to protect Lender's interest in the Property or any part thereof or to foreclose this Security Instrument or the Mortgage or collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this Section 13.08, shall constitute a portion of the Debt and shall be immediately due and payable to Lender upon demand.  All such costs and expenses incurred by Lender or its agents in remedying such Event of Default or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate, for the period from the date so demanded to the date of payment to Lender.  All such costs and expenses incurred by Lender or its agents together with interest thereon calculated at the above rate shall be deemed to constitute a portion of the Debt and be secured by this Security Instrument and the Mortgage.

71

(b)     If Lender makes any payment or advance that Lender is authorized by this Security Instrument to make in the place and stead of Borrower (i) relating to the Impositions or tax liens asserted against the Property, Lender may do so according to any bill, statement or estimate procured from the appropriate public office without inquiry into the accuracy of the bill, statement or estimate or into the validity of any of the Impositions or the tax liens or claims thereof; (ii) relating to any apparent or threatened adverse title, lien, claim of lien, encumbrance, claim or charge, Lender will be the sole judge of the legality or validity of same; or (iii) relating to any other purpose authorized by this Security Instrument but not enumerated in this Section 13.08, Lender may do so whenever, in its judgment and discretion, the payment or advance seems necessary or desirable to protect the Property and the full security interest intended to be created by this Security Instrument.  In connection with any payment or advance made pursuant to this Section 13.08, Lender has the option and is authorized, but in no event shall be obligated, to obtain a continuation report of title prepared by a title insurance company.  The payments and the advances made by Lender pursuant to this Section 13.08 and the cost and expenses of said title report will be due and payable by Borrower on demand, together with interest at the Default Rate, and will be secured by this Security Instrument and the Mortgage.

Section 13.09.  Late Payment Charge.  If any portion of the Debt is not paid in full on or before the day on which it is due and payable hereunder, Borrower shall pay to Lender an amount equal to five percent (5%) of such unpaid portion of the Debt ("Late Charge") to defray the expense incurred by Lender in handling and processing such delinquent payment, and such amount shall constitute a part of the Debt.

Section 13.10.  Recovery of Sums Required to Be Paid.  Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due and payable hereunder (after the expiration of any grace period or the giving of any notice herein provided, if any), without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Borrower existing at the time such earlier action was commenced.

Section 13.11.  Marshalling and Other Matters.  Borrower hereby waives, to the fullest extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement, redemption (both equitable and statutory) and homestead laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein.  Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, whether equitable or statutory and on behalf of each and every Person acquiring any interest in or title to the Property or any part thereof subsequent to the date of this Security Instrument and on behalf of all Persons to the fullest extent permitted by applicable law.

Section 13.12.  Tax Reduction Proceedings.  After an Event of Default, Borrower shall be deemed to have appointed Lender as its attorney-in-fact to seek a reduction or reductions in the assessed valuation of the Property for real property tax purposes or for any other purpose and to prosecute any action or proceeding in connection therewith.  This power, being coupled with an

Current/9423275

interest, shall be irrevocable for so long as any part of the Debt remains unpaid and any Event of Default shall be continuing.

Section 13.13. <u>General Provisions Regarding Remedies</u>.

(a)    <u>Right to Terminate Proceedings</u>. Lender may terminate or rescind any proceeding or other action brought in connection with its exercise of the remedies provided in Section 13.02 at any time before the conclusion thereof, as determined in Lender's sole discretion and without prejudice to Lender.

(b)    <u>No Waiver or Release</u>. The failure of Lender to exercise any right, remedy or option provided in the Loan Documents shall not be deemed a waiver of such right, remedy or option or of any covenant or obligation contained in the Loan Documents. No acceptance by Lender of any payment after the occurrence of an Event of Default and no payment by Lender of any payment or obligation for which Borrower is liable hereunder shall be deemed to waive or cure any Event of Default. No sale of all or any portion of the Property, no forbearance on the part of Lender, and no extension of time for the payment of the whole or any portion of the Debt or any other indulgence given by Lender to Borrower or any other Person, shall operate to release or in any manner affect the interest of Lender in the Property or the liability of Borrower to pay the Debt. No waiver by Lender shall be effective unless it is in writing and then only to the extent specifically stated.

(c)    <u>No Impairment; No Releases</u>. The interests and rights of Lender under the Loan Documents shall not be impaired by any indulgence, including (i) any renewal, extension or modification which Lender may grant with respect to any of the Debt; (ii) any surrender, compromise, release, renewal, extension, exchange or substitution which Lender may grant with respect to the Property or any portion thereof; or (iii) any release or indulgence granted to any maker, endorser, guarantor or surety of any of the Debt.

<u>ARTICLE XIV:  COMPLIANCE WITH REQUIREMENTS</u>

Section 14.01. <u>Compliance with Legal Requirements</u>. (a) Borrower shall promptly comply with all present and future Legal Requirements, foreseen and unforeseen, ordinary and extraordinary, whether requiring structural or nonstructural repairs or alterations including, without limitation, all zoning, subdivision, building, safety and environmental protection, land use and development Legal Requirements, all Legal Requirements which may be applicable to the curbs adjoining the Property or to the use or manner of use thereof, and all rent control, rent stabilization and all other similar Legal Requirements relating to rents charged and/or collected in connection with the Leases. Borrower represents and warrants that the Property is in compliance in all respects with all Legal Requirements as of the date hereof, no notes or notices of violations of any Legal Requirements have been entered or received by Borrower and there is no basis for the entering of such notes or notices.

(b)    Borrower shall have the right to contest by appropriate legal proceedings diligently conducted in good faith, without cost or expense to Lender, the validity or application of any Legal Requirement and to suspend compliance therewith if permitted under applicable

73

Legal Requirements, provided (i) failure to comply therewith may not subject Lender to any civil or criminal liability, (ii) prior to and during such contest, Borrower shall furnish to Lender security reasonably satisfactory to Lender, in its discretion, against loss or injury by reason of such contest or non-compliance with such Legal Requirement, (iii) no Default or Event of Default shall exist during such proceedings and such contest shall not otherwise violate any of the provisions of any of the Loan Documents, (iv) such contest shall not, (unless Borrower shall comply with the provisions of clause (ii) of this Section 14.01(b)) subject the Property to any lien or encumbrance the enforcement of which is not suspended or otherwise affect the priority of the lien of this Security Instrument or the Mortgage; (v) such contest shall not affect the ownership, use or occupancy of the Property; (vi) the Property or any part thereof or any interest therein shall not be in any danger of being sold, forfeited or lost by reason of such contest by Borrower; (vii) Borrower shall give Lender prompt notice of the commencement of such proceedings and, upon request by Lender, notice of the status of such proceedings and/or confirmation of the continuing satisfaction of the conditions set forth in clauses (i) - (vi) of this Section 14.01(b); and (viii) upon a final determination of such proceeding, Borrower shall take all steps necessary to comply with any requirements arising therefrom.

(c)    Borrower shall at all times comply with all applicable Legal Requirements with respect to the construction, use and maintenance of any vaults adjacent to the Property. If by reason of the failure to pay taxes, assessments, charges, permit fees, franchise taxes or levies of any kind or nature, the continued use of the vaults adjacent to Property or any part thereof is discontinued, Borrower nevertheless shall, with respect to any vaults which may be necessary for the continued use of the Property, take such steps (including the making of any payment) to ensure the continued use of vaults or replacements.

Section 14.02. <u>Compliance with Recorded Documents; No Future Grants</u>. Borrower shall promptly perform and observe or cause to be performed and observed, all of the terms, covenants and conditions of all Property Agreements and all things necessary to preserve intact and unimpaired any and all appurtenances or other interests or rights affecting the Property.

<u>ARTICLE XV: PREPAYMENT</u>

Section 15.01. <u>Prepayment</u>. (a) Except as set forth in Section 15.01(b) hereof, no prepayment of the Debt may be made in whole or in part.

(b)    At any time, Borrower may prepay the Loan, in whole, but not in part (except pursuant to the provisions of Section 5.11 hereof), as of the last day of an Interest Accrual Period in accordance with the following provisions:

(i)    Lender shall have received from Borrower, not less than thirty (30) days', nor more than ninety (90) days', prior written notice specifying the date proposed for such prepayment and the amount which is to be prepaid.

(ii)    Borrower shall also pay to Lender all interest due through and including the last day of the Interest Accrual Period in which such prepayment is being made,

74

together with any and all other amounts due and owing pursuant to the terms of the Note, this Security Instrument or the other Loan Documents.

(iii)    Any partial prepayment shall be in a minimum amount not less than $25,000 and shall be in whole multiples of $1,000 in excess thereof.

(iv)    No Event of Default shall have occurred and be continuing.

(v)    Any partial prepayment of the Principal Amount, including, without limitation, Unscheduled Payments, shall be applied to the installments of principal last due hereunder and shall not release or relieve Borrower from the obligation to pay the regularly scheduled installments of principal and interest becoming due under the Note.

(vi)    For the purposes hereof, the term "Yield Maintenance Premium" shall mean the greater of (x) one percent (1%) of the Principal Amount which is being prepaid and (y) the premium which shall be the product of (A) a fraction, the numerator of which is the positive excess, if any, of (1) the present value of all future payments of principal and interest due pursuant to the Note, including the principal amount due at maturity, to be made on the Note before the prepayment in question, discounted at an interest rate per annum equal to the average yield for "This Week" as reported by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (the "Treasury Constant Maturity Yield Index") published during the second full week preceding the date on which such premium is payable for instruments having a maturity coterminous with the Stated Maturity Date, over (2) the Principal Amount evidenced by the Note immediately before such prepayment, and the denominator of which is the Principal Amount evidenced by the Note immediately prior to the prepayment, and (B) the Principal Amount evidenced by the Note being prepaid; provided, however, that if there is no Treasury Constant Maturity Yield Index for instruments having a maturity coterminous with the Stated Maturity Date, then the index referred to in (1) above shall be equal to the weighted average yield to maturity of the Treasury Constant Maturity Yield Indices with maturities next longer and shorter than such remaining average life to maturity, calculated by averaging (and rounding upward to the nearest whole multiple of 1/100 of 1% per annum, if the average is not such a multiple) the yields of the relevant Treasury Constant Maturity Yield Indices (rounded, if necessary, to the nearest 1/100 of 1% with any figure of 1/200 of 1% or above rounded upward).

Section 15.02.  Repayment.  Upon any repayment or prepayment of the Loan, including any application of all or any portion of the funds in the Curtailment Reserve Escrow Account and any application of any Loss Proceeds, Borrower shall be required to pay to Lender a non-refundable sum (the "Exit Fee") on the date of such repayment or prepayment equal to one and one-half percent (1.5%) of the Principal Amount being repaid or prepaid.  All Exit Fees shall be deemed to be earned by Lender upon the funding of the Loan.  Notwithstanding the foregoing, if Borrower repays the Principal Amount with a mortgage loan which is made by Petra Mortgage Capital Corp. LLC, the Exit Fee shall be waived.

75

## ARTICLE XVI: ENVIRONMENTAL COMPLIANCE

Section 16.01.  Covenants, Representations and Warranties.  (a) Borrower has not, at any time, and, to Borrower's best knowledge after due inquiry and investigation, except as set forth in the Environmental Report, no other Person has at any time, handled, buried, stored, retained, refined, transported, processed, manufactured, generated, produced, spilled, allowed to seep, leak, escape or leach, or pumped, poured, emitted, emptied, discharged, injected, dumped, transferred or otherwise disposed of or dealt with Hazardous Materials on, to or from the Premises or any other real property owned and/or occupied by Borrower, and Borrower does not intend to and shall not use the Property or any part thereof or any such other real property for the purpose of handling, burying, storing, retaining, refining, transporting, processing, manufacturing, generating, producing, spilling, seeping, leaking, escaping, leaching, pumping, pouring, emitting, emptying, discharging, injecting, dumping, transferring or otherwise disposing of or dealing with Hazardous Materials, except for use and storage for use of heating oil, cleaning fluids, pesticides and other substances customarily used in the operation of properties that are being used for the same purposes as the Property is presently being used, provided such use and/or storage for use is in compliance with the requirements hereof and the other Loan Documents and does not give rise to liability under applicable Legal Requirements or Environmental Statutes or be the basis for a lien against the Property or any part thereof.  In addition, without limitation to the foregoing provisions, Borrower represents and warrants that, to the best of its knowledge, after due inquiry and investigation, except as previously disclosed in writing to Lender, there is no asbestos in, on, over, or under all or any portion of the fire-proofing or any other portion of the Property.

(b)    Borrower, after due inquiry and investigation, knows of no seepage, leak, escape, leach, discharge, injection, release, emission, spill, pumping, pouring, emptying or dumping of Hazardous Materials into waters on, under or adjacent to the Property or any part thereof or any other real property owned and/or occupied by Borrower, or onto lands from which such Hazardous Materials might seep, flow or drain into such waters, except as disclosed in the Environmental Report.

(c)    Borrower shall not permit any Hazardous Materials to be handled, buried, stored, retained, refined, transported, processed, manufactured, generated, produced, spilled, allowed to seep, leak, escape or leach, or to be pumped, poured, emitted, emptied, discharged, injected, dumped, transferred or otherwise disposed of or dealt with on, under, to or from the Property or any portion thereof at any time, except for use and storage for use of heating oil, ordinary cleaning fluids, pesticides and other substances customarily used in the operation of properties that are being used for the same purposes as the Property is presently being used, provided such use and/or storage for use is in compliance with the requirements hereof and the other Loan Documents and does not give rise to liability under applicable Legal Requirements or be the basis for a lien against the Property or any part thereof.

(d)    Borrower represents and warrants that no actions, suits, or proceedings have been commenced, or are pending, or to the best knowledge of Borrower, are threatened with respect to any Legal Requirement governing the use, manufacture, storage, treatment, transportation, or processing of Hazardous Materials with respect to the Property or any part thereof.  Borrower

76

has received no notice of, and, except as disclosed in the Environmental Report, after due inquiry, has no knowledge of any fact, condition, occurrence or circumstance which with notice or passage of time or both would give rise to a claim under or pursuant to any Environmental Statute pertaining to Hazardous Materials on, in, under or originating from the Property or any part thereof or any other real property owned or occupied by Borrower or arising out of the conduct of Borrower, including, without limitation, pursuant to any Environmental Statute.

(e)     Borrower has not waived any Person's liability with regard to Hazardous Materials in, on, under or around the Property, nor has Borrower retained or assumed, contractually or by operation of law, any other Person's liability relative to Hazardous Materials or any claim, action or proceeding relating thereto.

(f)     In the event that there shall be filed a lien against the Property or any part thereof pursuant to any Environmental Statute pertaining to Hazardous Materials, Borrower shall, within sixty (60) days or, in the event that the applicable Governmental Authority has commenced steps to cause the Premises or any part thereof to be sold pursuant to the lien, within fifteen (15) days, from the date that Borrower receives notice of such lien, either (i) pay the claim and remove the lien from the Property, or (ii) furnish (A) a bond satisfactory to Lender in the amount of the claim out of which the lien arises, (B) a cash deposit in the amount of the claim out of which the lien arises, or (C) other security reasonably satisfactory to Lender in an amount sufficient to discharge the claim out of which the lien arises.

(g)     Borrower represents and warrants that (i) except as disclosed in the Environmental Report, Borrower has no knowledge of any violation of any Environmental Statute or any Environmental Problem in connection with the Property,  nor has Borrower been requested or required by any Governmental Authority to perform any remedial activity or other responsive action in connection with any Environmental Problem and (ii) neither the Property nor any other property owned by Borrower is included or, to Borrower's best knowledge, after due inquiry and investigation, proposed for inclusion on the National Priorities List issued pursuant to CERCLA by the United States Environmental Protection Agency (the "EPA") or on the inventory of other potential "Problem" sites issued by the EPA or has been identified by the EPA as a potential CERCLA site or included on, to Borrower's knowledge, after due inquiry and investigation, proposed for inclusion on any list or inventory issued pursuant to any other Environmental Statute, if any, or issued by any other Governmental Authority.  Borrower covenants that Borrower will comply with all Environmental Statutes affecting or imposed upon Borrower or the Property.

(h)     Borrower covenants that it shall promptly notify Lender of the presence and/or release of any Hazardous Materials and of any request for information or any inspection of the Property or any part thereof by any Governmental Authority with respect to any Hazardous Materials and provide Lender with copies of such request and any response to any such request or inspection.  Borrower covenants that it shall, in compliance with applicable Legal Requirements, conduct and complete all investigations, studies, sampling and testing (and promptly shall provide Lender with copies of any such studies and the results of any such test) and all remedial, removal and other actions necessary to clean up and remove all Hazardous Materials in, on, over, under, from or affecting the Property or any part thereof in accordance

77

with all such Legal Requirements applicable to the Property or any part thereof to the satisfaction of Lender.

(i)    Following the occurrence of an Event of Default hereunder, and without regard to whether Lender shall have taken possession of the Property or a receiver has been requested or appointed or any other right or remedy of Lender has or may be exercised hereunder or under any other Loan Document, Lender shall have the right (but no obligation) to conduct such investigations, studies, sampling and/or testing of the Property or any part thereof as Lender may, in its discretion, determine to conduct, relative to Hazardous Materials. All costs and expenses incurred in connection therewith including, without limitation, consultants' fees and disbursements and laboratory fees, shall constitute a part of the Debt and shall, upon demand by Lender, be immediately due and payable and shall bear interest at the Default Rate from the date so demanded by Lender until reimbursed. Borrower shall, at its sole cost and expense, fully and expeditiously cooperate in all such investigations, studies, samplings and/or testings including, without limitation, providing all relevant information and making knowledgeable people available for interviews.

(j)    Borrower represents and warrants that all paint and painted surfaces existing within the interior or on the exterior of the Improvements are not flaking, peeling, cracking, blistering, or chipping, and do not contain lead or are maintained in a condition that prevents exposure of young children to lead-based paint, as of the date hereof, and that the current inspections, operation, and maintenance program at the Property with respect to lead-based paint is consistent with FNMA guidelines and sufficient to ensure that all painted surfaces within the Property shall be maintained in a condition that prevents exposure of tenants to lead-based paint. To Borrower's knowledge, there have been no claims for adverse health effects from exposure on the Property to lead-based paint or requests for the investigation, assessment or removal of lead-based paint at the Property.

(k)    Borrower represents and warrants that except in accordance with all applicable Environmental Statutes and as disclosed in the Environmental Report, (i) no underground treatment or storage tanks or pumps or water, gas, or oil wells are or have been located about the Property, (ii) no PCBs or transformers, capacitors, ballasts or other equipment that contain dielectric fluid containing PCBs are located about the Property, (iii) no insulating material containing urea formaldehyde is located about the Property and (iv) no asbestos-containing material is located about the Property.

Section 16.02.    Environmental Indemnification.    Borrower shall defend, indemnify and hold harmless the Indemnified Parties for, from and against any claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, known or unknown, contingent or otherwise, whether incurred or imposed within or outside the judicial process, including, without limitation, reasonable attorneys' and consultants' fees and disbursements and investigations and laboratory fees arising out of, or in any way related to any Environmental Problem, including without limitation:

78

(a)    the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release or threat of release of any Hazardous Materials in, on, over, under, from or affecting the Property or any part thereof whether or not disclosed by the Environmental Report;

(b)    any personal injury (including wrongful death, disease or other health condition related to or caused by, in whole or in part, any Hazardous Materials) or property damage (real or personal) arising out of or related to any Hazardous Materials in, on, over, under, from or affecting the Property or any part thereof whether or not disclosed by the Environmental Report;

(c)    any action, suit or proceeding brought or threatened, settlement reached, or order of any Governmental Authority relating to such Hazardous Material whether or not disclosed by the Environmental Report; and/or

(d)    any violation of the provisions, covenants, representations or warranties of Section 16.01 hereof or of any Legal Requirement which is based on or in any way related to any Hazardous Materials in, on, over, under, from or affecting the Property or any part thereof including, without limitation, the cost of any work performed and materials furnished in order to comply therewith whether or not disclosed by the Environmental Report.

Notwithstanding the foregoing provisions of this Section 16.02 to the contrary, Borrower shall have no obligation to indemnify Lender for liabilities, claims, damages, penalties, causes of action, costs and expenses relative to the foregoing which result directly from Lender's willful misconduct or gross negligence. Any amounts payable to Lender by reason of the application of this Section 16.02 shall be secured by this Security Instrument and the Mortgage and shall, upon demand by Lender, become immediately due and payable and shall bear interest at the Default Rate from the date so demanded by Lender until paid.

This indemnification shall survive the termination of this Security Instrument whether by repayment of the Debt, foreclosure or deed in lieu thereof, assignment, or otherwise. The indemnity provided for in this Section 16.02 shall not be included in any exculpation of Borrower or its principals from personal liability provided for in this Security Instrument or in any of the other Loan Documents. Nothing in this Section 16.02 shall be deemed to deprive Lender of any rights or remedies otherwise available to Lender, including, without limitation, those rights and remedies provided elsewhere in this Security Instrument or the other Loan Documents.

## ARTICLE XVII:  ASSIGNMENTS

Section 17.01.  Participations and Assignments.  Lender shall have the right to assign this Security Instrument and/or any of the Loan Documents, and to transfer, assign or sell participations and subparticipations (including blind or undisclosed participations and subparticipations) in the Loan Documents and the obligations hereunder to any Person; provided, however, that no such participation shall increase, decrease or otherwise affect either Borrower's or Lender's obligations under this Security Instrument or the other Loan Documents.

79

## ARTICLE XVIII: MISCELLANEOUS

Section 18.01. <u>Right of Entry</u>. Lender and its agents shall have the right to enter and inspect the Property or any part thereof at all reasonable times, and, except in the event of an emergency, upon reasonable notice and to inspect Borrower's books and records and to make abstracts and reproductions thereof.

Section 18.02. <u>Cumulative Rights</u>. The rights of Lender under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled, subject to the terms of this Security Instrument, to every right and remedy now or hereafter afforded by law.

Section 18.03. <u>Liability</u>. If Borrower consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several.

Section 18.04. <u>Exhibits Incorporated</u>. The information set forth on the cover hereof, and the Exhibits annexed hereto, are hereby incorporated herein as a part of this Security Instrument with the same effect as if set forth in the body hereof.

Section 18.05. <u>Severable Provisions</u>. If any term, covenant or condition of the Loan Documents including, without limitation, the Note or this Security Instrument, is held to be invalid, illegal or unenforceable in any respect, such Loan Document shall be construed without such provision.

Section 18.06. <u>Duplicate Originals</u>. This Security Instrument may be executed in any number of duplicate originals and each such duplicate original shall be deemed to constitute but one and the same instrument.

Section 18.07. <u>No Oral Change</u>. The terms of this Security Instrument, together with the terms of the Note and the other Loan Documents constitute the entire understanding and agreement of the parties hereto and supersede all prior agreements, understandings and negotiations between Borrower and Lender with respect to the Loan. This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 18.08. <u>Waiver of Counterclaim, Etc</u>. BORROWER HEREBY WAIVES THE RIGHT TO ASSERT A COUNTERCLAIM, OTHER THAN A COMPULSORY COUNTERCLAIM, IN ANY ACTION OR PROCEEDING BROUGHT AGAINST IT BY LENDER OR ITS AGENTS, AND WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING BROUGHT BY EITHER PARTY HERETO AGAINST THE OTHER OR IN ANY COUNTERCLAIM BORROWER MAY BE PERMITTED TO ASSERT HEREUNDER OR WHICH MAY BE ASSERTED BY LENDER OR ITS AGENTS, AGAINST BORROWER,

OR IN ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY
CONNECTED WITH THIS SECURITY INSTRUMENT OR THE DEBT.

Section 18.09.  Headings; Construction of Documents; etc.  The table of contents,
headings and captions of various paragraphs of this Security Instrument are for convenience of
reference only and are not to be construed as defining or limiting, in any way, the scope or intent
of the provisions hereof.  Borrower acknowledges that it was represented by competent counsel
in connection with the negotiation and drafting of this Security Instrument and the other Loan
Documents and that neither this Security Instrument nor the other Loan Documents shall be
subject to the principle of construing the meaning against the Person who drafted same.

Section 18.10.  Sole Discretion of Lender.  Whenever Lender exercises any right given to
it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the
decision of Lender to approve or disapprove or to decide that arrangements or terms are
satisfactory or not satisfactory shall be in the sole discretion of Lender and shall be final and
conclusive, except as may be otherwise specifically provided herein.

Section 18.11.  Waiver of Notice.  Borrower shall not be entitled to any notices of any
nature whatsoever from Lender except with respect to matters for which this Security Instrument
specifically and expressly provides for the giving of notice by Lender to Borrower and except
with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements,
permitted to waive the giving of notice.

Section 18.12.  Covenants Run with the Land.  All of the grants, covenants, terms,
provisions and conditions herein shall run with the Premises, shall be binding upon Borrower
and shall inure to the benefit of Lender, subsequent holders of this Security Instrument and their
successors and assigns.  Without limitation to any provision hereof, the term "Borrower" shall
include and refer to the borrower named herein, any subsequent owner of the Property, and its
respective heirs, executors, legal representatives, successors and assigns.  The representations,
warranties and agreements contained in this Security Instrument and the other Loan Documents
are intended solely for the benefit of the parties hereto, shall confer no rights hereunder, whether
legal or equitable, in any other Person and no other Person shall be entitled to rely thereon.

Section 18.13.  Applicable Law.  THIS SECURITY INSTRUMENT AND THE
OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED
IN ACCORDANCE WITH, THE LAWS OF THE STATE OF ILLINOIS APPLICABLE TO
CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE
LAW OF THE UNITED STATES OF AMERICA.

Section 18.14.  Security Agreement.  (a) (i) This Security Instrument is a "security
agreement" within the meaning of the UCC.  The Property includes both real and personal
property and all other rights and interests, whether tangible or intangible in nature, of Borrower
in the Property.  The Mortgage is filed as a fixture filing and covers goods which are or are to
become fixtures on the Property.  Borrower by executing and delivering this Security Instrument
and the other Loan Documents has granted to Lender, as security for the Debt,  a security interest
in the Property to the full extent that the Property may be subject to the UCC (said portion of the

81

Property so subject to the UCC being called in this Section 18.14 the "Collateral"). If an Event of Default shall occur, Lender, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the UCC, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Collateral. Upon request or demand of Lender following an Event of Default, Borrower shall, at its expense, assemble the Collateral and make it available to Lender at a convenient place acceptable to Lender. Borrower shall pay to Lender on demand any and all expenses, including reasonable legal expenses and attorneys' fees, incurred or paid by Lender in protecting its interest in the Collateral and in enforcing its rights hereunder with respect to the Collateral. Any disposition pursuant to the UCC of so much of the Collateral as may constitute personal property shall be considered commercially reasonable if made pursuant to a public sale which is advertised at least twice in a newspaper in which sheriff's sales are advertised in the county where the Premises is located. Any notice of sale, disposition or other intended action by Lender with respect to the Collateral given to Borrower in accordance with the provisions hereof at least ten (10) days prior to such action, shall constitute reasonable notice to Borrower. The proceeds of any disposition of the Collateral, or any part thereof, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper. It is not necessary that the Collateral be present at any disposition thereof. Lender shall have no obligation to clean-up or otherwise prepare the Collateral for disposition.

(ii)    The mention in a financing statement filed in the records normally pertaining to personal property of any portion of the Property shall not derogate from or impair in any manner the intention of this Security Instrument. Lender hereby declares that all items of Collateral are part of the real property encumbered hereby to the fullest extent permitted by law, regardless of whether any such item is physically attached to the Improvements or whether serial numbers are used for the better identification of certain items. Specifically, the mention in any such financing statement of any items included in the Property shall not be construed to alter, impair or impugn any rights of Lender as determined by this Security Instrument or the priority of Lender's lien upon and security interest in the Property in the event that notice of Lender's priority of interest as to any portion of the Property is required to be filed in accordance with the UCC to be effective against or take priority over the interest of any particular class of persons, including the federal government or any subdivision or instrumentality thereof. No portion of the Collateral constitutes or is the proceeds of "Farm Products", as defined in the UCC.

(iii)    If Borrower is at any time a beneficiary under a letter of credit now or hereafter issued in favor of Borrower, Borrower shall promptly notify Lender thereof and, at the request and option of Lender, Borrower shall, pursuant to an agreement in form and substance satisfactory to Lender, either (A) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to Lender of the proceeds of any drawing under the letter of credit or (B) arrange for Lender to become the transferee beneficiary of the letter of credit, with Lender agreeing, in each case, that the proceeds of any drawing under the letter to credit are to be applied as provided in this Security Instrument.

82

(iv)    Borrower and Lender acknowledge that for the purposes of Article 9 of the UCC, the law of the State of Illinois shall be the law of the jurisdiction of the bank in which the Central Account is located.

(v)    Lender may comply with any applicable Legal Requirements in connection with the disposition of the Collateral, and Lender's compliance therewith will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(vi)    Lender may sell the Collateral without giving any warranties as to the Collateral. Lender may specifically disclaim any warranties of title, possession, quiet enjoyment or the like.  This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(vii)    If Lender sells any of the Collateral upon credit, Borrower will be credited only with payments actually made by the purchaser, received by Lender and applied to the indebtedness of Borrower.  In the event the purchaser of the Collateral fails to fully pay for the Collateral, Lender may resell the Collateral and Borrower will be credited with the proceeds of such sale.

(b)    Borrower hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, to file with the appropriate public office on its behalf any financing or other statements signed only by Lender, as secured party, or, to the extent permitted under the UCC, unsigned, in connection with the Collateral covered by this Security Instrument.

Section 18.15.  Actions and Proceedings.  Lender has the right to appear in and defend any action or proceeding brought with respect to the Property in its own name or, if required by Legal Requirements or, if in Lender's reasonable judgment, it is necessary, in the name and on behalf of Borrower, which Lender believes will adversely affect the Property, the Mortgage or this Security Instrument and to bring any action or proceedings, in its name or in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Property.

Section 18.16.  Usury Laws.  This Security Instrument and the Note are subject to the express condition, and it is the expressed intent of the parties, that at no time shall Borrower be obligated or required to pay interest on the principal balance due under the Note at a rate which could subject the holder of the Note to either civil or criminal liability as a result of being in excess of the maximum interest rate which Borrower is permitted by law to contract or agree to pay.  If by the terms of this Security Instrument or the Note, Borrower is at any time required or obligated to pay interest on the principal balance due under the Note at a rate in excess of such maximum rate, such rate of interest shall be deemed to be immediately reduced to such maximum rate and the interest payable shall be computed at such maximum rate and all prior interest payments in excess of such maximum rate shall be applied and shall be deemed to have been payments in reduction of the principal balance of the Note.  No application to the principal balance of the Note pursuant to this Section 18.16 shall give rise to any requirement to pay any prepayment fee or charge of any kind due hereunder, if any.

.83

Section 18.17. Remedies of Borrower. In the event that a claim or adjudication is made that Lender has acted unreasonably or unreasonably delayed acting in any case where by law or under the Note, this Security Instrument or the Loan Documents, it has an obligation to act reasonably or promptly, Lender shall not be liable for any monetary damages, and Borrower's remedies shall be limited to injunctive relief or declaratory judgment.

Section 18.18. Offsets, Counterclaims and Defenses. Any assignee of this Security Instrument, the Mortgage, the Assignment and the Note shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to the Note, the Assignment, the Mortgage or this Security Instrument which Borrower may otherwise have against any assignor of this Security Instrument, the Assignment and the Note and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon this Security Instrument, the Mortgage, the Assignment or the Note and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

Section 18.19. No Merger of Rights. If Borrower's and Lender's estates become the same including, without limitation, upon the delivery of a deed by Borrower in lieu of a foreclosure sale, or upon a purchase of the Property by Lender in a foreclosure sale, this Security Instrument, the Mortgage and the liens created hereby shall not be destroyed or terminated by the application of the doctrine of merger of rights and in such event Lender shall continue to have and enjoy all of the rights and privileges of Lender as to the separate estates; and, as a consequence thereof, upon the foreclosure of the liens created by this Security Instrument and the Mortgage, any Leases or subleases then existing and created by Borrower shall not be destroyed or terminated by application of the law of merger or as a result of such foreclosure unless Lender or any purchaser at any such foreclosure sale shall so elect. No act by or on behalf of Lender or any such purchaser shall constitute a termination of any Lease or sublease unless Lender or such purchaser shall give written notice thereof to such lessee or sublessee.

Section 18.20. Restoration of Rights. In case Lender shall have proceeded to enforce any right under this Security Instrument by foreclosure sale, entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely, then, in every such case, Borrower and Lender shall be restored to their former positions and rights hereunder with respect to the Property subject to the lien hereof.

Section 18.21. Waiver of Statute of Limitations. The pleadings of any statute of limitations as a defense to any and all obligations secured by this Security Instrument are hereby waived to the full extent permitted by Legal Requirements.

Section 18.22. Advances. This Security Instrument and the Mortgage shall cover any and all advances made pursuant to the Loan Documents, rearrangements and renewals of the Debt and all extensions in the time of payment thereof, even though such advances, extensions or renewals be evidenced by new promissory notes or other instruments hereafter executed and irrespective of whether filed or recorded. Likewise, the execution of this Security Instrument shall not impair or affect any other security which may be given to secure the payment of the Debt, and all such additional security shall be considered as cumulative. The taking of additional

84

security, execution of partial releases of the security, or any extension of time of payment of the Debt shall not diminish the force, effect or lien of this Security Instrument or the Mortgage and shall not affect or impair the liability of Borrower and shall not affect or impair the liability of any maker, surety, or endorser for the payment of the Debt.

Section 18.23.  <u>Application of Default Rate Not a Waiver</u>.  Application of the Default Rate shall not be deemed to constitute a waiver of any Default or Event of Default or any rights or remedies of Lender under this Security Instrument, any other Loan Document or applicable Legal Requirements, or a consent to any extension of time for the payment or performance of any obligation with respect to which the Default Rate may be invoked.

Section 18.24.  <u>Certain Additional Rights of Lender</u>.  Notwithstanding anything to the contrary which may be contained in this Security Instrument, Lender shall have:

(a)    the right to routinely consult on a regular basis (no less frequently than quarterly) with and advise Borrower's management regarding the significant business activities and business and financial developments of Borrower, <u>provided</u>, <u>however</u>, that such consultations shall not include discussions of environmental compliance programs or disposal of hazardous substances, and, <u>provided</u>, <u>further</u>, that Lender shall have the right to call special meetings at any reasonable times;

(b)    the right, without restricting any other rights of Lender under this Security Instrument (including any similar right), to restrict financing to be obtained in connection with future property transactions, refinancing of any acquisition financings, and unsecured debt unless the Loan has been paid in full;

(c)    the right, without restricting any other right of Lender under this Security Instrument (including any similar right), to restrict, upon the occurrence of an Event of Default, Borrower's payments of management, consulting, director or similar fees to Affiliates of Borrower (or their personnel);

(d)    the right, without restricting any other rights of Lender under this Security Instrument (including any similar right), to approve any operating expenditures and/or capital expenditures of Borrower that (i) vary by more than 15% from the expenses set forth in the related approved operating budget and/or approved capital plan for the immediately preceding fiscal year or (ii) when added to all prior operating and capital expenditures for the year, exceed 15% of aggregate budgeted operating and capital expenditures set forth in the related approved operating budget and/or approved capital plan for the immediately preceding fiscal year;

(e)    the right, without restricting any other rights of Lender under this Security Instrument (including any similar right), to approve any acquisition by Borrower of any other significant property (other than personal property required for the day to day operation of the Premises);

(f)    the right, without restricting any other rights of Lender under this Security Instrument (including any similar right), in the event of an Event of Default, to vote the owners'

85

interests in Borrower pursuant to irrevocable proxies granted, at the request of Borrower in advance for this purpose; and

(g)     the right, without restricting any other rights of Lender under this Security Instrument (including any similar right), to restrict the transfer of voting interests in Borrower held by its members, and the right to restrict the transfer of interests in such member, except for any transfer which does not require Lender's consent.

The rights contained in this Section 18.24 may be exercised by any Person which owns or Controls, directly or indirectly, substantially all of the interests in Lender or the Loan.

Section 18.25.  No Joint Venture or Partnership.  Borrower and Lender intend that the relationship created hereunder be solely that of mortgagor and mortgagee or grantor and beneficiary or borrower and lender, as the case may be.  Nothing herein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

Section 18.26.  Time of the Essence.  Time shall be of the essence in the performance of all obligations of Borrower hereunder.

Section 18.27.  Borrower's Obligations Absolute.  Borrower acknowledges that Lender and/or certain Affiliates of Lender are engaged in the business of financing, owning, operating, leasing, managing, and brokering real estate and in other business ventures which may be viewed as adverse to or competitive with the business, prospect, profits, operations or condition (financial or otherwise) of Borrower.  Except as set forth to the contrary in the Loan Documents, all sums payable by Borrower hereunder shall be paid without notice or demand, counterclaim, set-off, deduction or defense and without abatement, suspension, deferment, diminution or reduction, and the obligations and liabilities of Borrower hereunder shall in no way be released, discharged, or otherwise affected (except as expressly provided herein) by reason of:  (a) any damage to or destruction of or any Taking of the Property or any portion thereof; (b) any restriction or prevention of or interference with any use of the Property or any portion thereof; (c) any title defect or encumbrance or any eviction from the Premises or any portion thereof by title paramount or otherwise; (d) any bankruptcy proceeding relating to Borrower, any General Partner, or any guarantor or indemnitor, or any action taken with respect to this Security Instrument or any other Loan Document by any trustee or receiver of Borrower or any such General Partner, guarantor or indemnitor, or by any court, in any such proceeding; (e) any claim which Borrower has or might have against Lender; (f) any default or failure on the part of Lender to perform or comply with any of the terms hereof or of any other agreement with Borrower; or (g) any other occurrence whatsoever, whether similar or dissimilar to the foregoing, whether or not Borrower shall have notice or knowledge of any of the foregoing.

Section 18.28.  Publicity.  All promotional news releases, publicity or advertising by Manager, Borrower or their respective Affiliates through any media intended to reach the general public shall not refer to the Loan Documents or the financing evidenced by the Loan Documents, or to Lender or to any of its Affiliates without the prior written approval of Lender or such

86

Affiliate, as applicable, in each instance, such approval not to be unreasonably withheld or delayed. Lender shall be authorized to provide information relating to the Property, the Loan and matters relating thereto to rating agencies, underwriters, potential securities investors, auditors, regulatory authorities and to any Persons which may be entitled to such information by operation of law and may use basic transaction information (including, without limitation, the name of Borrower, the name and address of the Property and the Loan Amount) in press releases or other marketing materials.

Section 18.29. <u>Securitization Opinions</u>. In the event the Loan is included as an asset of a Securitization by Lender or any of its Affiliates, Borrower shall, within ten (10) Business Days after Lender's written request therefor, at Borrower's sole cost and expense, deliver opinions in form and substance and delivered by counsel reasonably acceptable to Lender and each Rating Agency, as may be reasonably required by Lender and/or the Rating Agency in connection with such securitization. Borrower's failure to deliver the opinions required hereby within such ten (10) Business Day period shall constitute an "Event of Default" hereunder.

Section 18.30. <u>Cooperation with Rating Agencies; etc</u>. Borrower covenants and agrees that in the event the Loan is to be included as an asset of a Securitization, Borrower shall (a) gather any information reasonably required by each Rating Agency in connection with such a Securitization, (b) at Lender's request, meet with representatives of each Rating Agency to discuss the business and operations of the Property, and (c) cooperate with the reasonable requests of each Rating Agency and Lender in connection with all of the foregoing as well as in connection with all other matters and the preparation of any offering documents with respect thereto, including, without limitation, entering into any amendments or modifications to this Security Instrument or to any other Loan Document which may be requested by Lender to conform to Rating Agency or market standards for a Securitization provided that no such modification shall modify (a) the interest rate payable under the Note, (b) the stated maturity of the Note, (c) the amortization of principal under the Note, (d) Section 18.32 hereof, (e) any other material economic term of the Loan or (f) any provision, the effect of which would materially increase Borrower's obligations or materially decrease Borrower's rights under the Loan Documents. Borrower acknowledges that the information provided by Borrower to Lender may be incorporated into the offering documents for a Securitization and to the fullest extent permitted, Borrower irrevocably waives all rights, if any, to prohibit such disclosures including, without limitation, any right of privacy. Lender and each Rating Agency shall be entitled to rely on the information supplied by, or on behalf of, Borrower and Borrower indemnifies and holds harmless the Indemnified Parties, their Affiliates and each Person who controls such Persons within the meaning of Section 15 of the Securities Act or Section 20 of the Securities Exchange Act of 1934, as same may be amended from time to time, for, from and against any claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, known or unknown, contingent or otherwise, whether incurred or imposed within or outside the judicial process, including, without limitation, reasonable attorneys' fees and disbursements that arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in such information or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in such information or necessary in order to make the statements in such information, or in light of the circumstances under which they were made, not misleading.

87

Section 18.31. <u>Securitization Financials</u>.  Borrower covenants and agrees that, upon Lender's written request therefor in connection with a Securitization, Borrower shall, at Borrower's sole cost and expense, promptly deliver (a) audited financial statements and related documentation prepared by an Independent certified public accountant that satisfy securities laws and requirements for use in a public registration statement (which may include up to three (3) years of historical audited financial statements) and (b) if, at the time one or more Disclosure Documents are being prepared in connection with a Securitization, Lender expects that Borrower alone or Borrower and one or more of its Affiliates collectively, or the Property alone or the Property and any other parcel(s) of real property, together with improvements thereon and personal property related thereto, that is "related", within the meaning of the definition of Significant Obligor, to the Property (a "<u>Related Property</u>") collectively, will be a Significant Obligor, Borrower shall furnish to Lender upon request (i) the selected financial data or, if applicable, net operating income, required under Item 1112(b)(1) of Regulation AB and meeting the requirements thereof, if Lender expects that the principal amount of the Loan, together with any loans made to an Affiliate of Borrower or secured by a Related Property that is included in a Securitization with the Loan (a "<u>Related Loan</u>"), as of the cut-off date for such Securitization may, or if the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization and at any time during which the Loan and any Related Loans are included in a Securitization does, equal or exceed ten percent (10%) (but less than twenty percent (20%)) of the aggregate principal amount of all mortgage loans included or expected to be included, as applicable, in the Securitization or (ii) the financial statements required under Item 1112(b)(2) of Regulation AB and meeting the requirements thereof, if Lender expects that the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization may, or if the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization and at any time during which the Loan and any Related Loans are included in a Securitization does, equal or exceed twenty percent (20%) of the aggregate principal amount of all mortgage loans included or expected to be included, as applicable, in the Securitization.  Such financial data or financial statements shall be furnished to Lender within ten (10) Business Days after notice from Lender in connection with the preparation of Disclosure Documents for the Securitization and, with respect to the data or financial statements required pursuant to clause (b) hereof, (A) not later than thirty (30) days after the end of each fiscal quarter of Borrower and (B) not later than seventy-five (75) days after the end of each Fiscal Year; provided, however, that Borrower shall not be obligated to furnish financial data or financial statements pursuant to clauses (A) or (B) of this sentence with respect to any period for which a filing pursuant to the Securities Exchange Act of 1934 in connection with or relating to the Securitization is not required.

Section 18.32. <u>Exculpation.</u>  Notwithstanding anything herein or in any other Loan Document to the contrary, except as otherwise set forth in this Section 18.32 to the contrary, Lender shall not enforce the liability and obligation of Borrower or any Person holding a direct or indirect interest in Borrower or (a) if Borrower or any of its direct or indirect owners is a partnership, its or their direct or indirect constituent partners or any of their respective partners, (b) if Borrower or any of its direct or indirect owners is a trust, its or their beneficiaries or any of their respective Partners (as hereinafter defined), (c) if Borrower or any of its direct or indirect owners is a corporation, any of its or their direct or indirect shareholders, directors, principals, officers or employees, or (d) if Borrower or any of its direct or indirect owners is a limited

88

liability company, any of its or their direct or indirect members (the Persons described in the foregoing clauses (a) - (d), as the case may be, are hereinafter referred to as the "Partners") to perform and observe the obligations contained in this Security Instrument or any of the other Loan Documents by any action or proceeding, including, without limitation, any action or proceeding wherein a money judgment shall be sought against Borrower or the Partners, except that Lender may bring a foreclosure action, action for specific performance, or other appropriate action or proceeding (including, without limitation, an action to obtain a deficiency judgment) against Borrower solely for the purpose of enabling Lender to realize upon (i) Borrower's interest in the Property, (ii) the Rent to the extent received by Borrower during the existence of an Event of Default (all Rent covered by this clause (ii) being hereinafter referred to as the "Recourse Distributions") and not applied towards Debt Service or the operation or maintenance of the Property and (iii) any other collateral then subject to the Loan Documents (the collateral described in the foregoing clauses (i) - (iii) is hereinafter referred to as the "Default Collateral"); provided, however, that any judgment in any such action or proceeding shall be enforceable against Borrower and the Partners only to the extent of any such Default Collateral. The provisions of this Section shall not, however, (a) impair the validity of the Debt evidenced by the Note or in any way affect or impair the lien of this Security Instrument or any of the other Loan Documents or the right of Lender to foreclose this Security Instrument during the existence of an Event of Default the cure of which has not been accepted by Lender; (b) impair the right of Lender to name Borrower as a party defendant in any action or suit for judicial foreclosure and sale under this Security Instrument or the Mortgage; (c) affect the validity or enforceability of the Note, this Security Instrument, or any of the other Loan Documents, or impair the right of Lender to seek a personal judgment against Guarantor to the extent and for the obligations guaranteed in the Guaranty; (d) impair the right of Lender to obtain the appointment of a receiver; (e) impair the enforcement of the Assignment; (f) impair the right of Lender to bring suit for a monetary judgment against Borrower with respect to fraud or material misrepresentation by Borrower, or any Affiliate of Borrower in connection with this Security Instrument, the Note or the other Loan Documents, and the foregoing provisions shall not modify, diminish or discharge the liability of Borrower or Guarantor to the extent of Guarantor's liability under the Guaranty delivered by Guarantor with respect to same; (g) impair the right of Lender to bring suit for a monetary judgment to obtain the Recourse Distributions received by Borrower including, without limitation, the right to bring suit for a monetary judgement to proceed against any Guarantor to the extent of Guarantor's liability under any guaranty delivered by Guarantor and the foregoing provisions shall not modify, diminish or discharge the liability of Borrower or Guarantor with respect to same; (h) impair the right of Lender to bring suit for a monetary judgment against Borrower with respect to Borrower's misappropriation of tenant security deposits or Rent, and the foregoing provisions shall not modify, diminish or discharge the liability of Borrower or Guarantor to the extent of Guarantor's liability under any guaranty delivered by Guarantor with respect to same; (i) impair the right of Lender to obtain Loss Proceeds due to Lender pursuant to this Security Instrument; (j) impair the right of Lender to enforce the provisions of Sections 2.02(g) (other than the provisions of clause (vii) thereof), 12.01, 16.01 or 16.02, inclusive of this Security Instrument, even after repayment in full by Borrower of the Debt or to bring suit for a monetary judgment against Borrower with respect to any obligation set forth in said Sections; (k) prevent or in any way hinder Lender from exercising, or constitute a defense, or counterclaim, or other basis for relief in respect of the

89

exercise of, any other remedy against any or all of the collateral securing the Note as provided in the Loan Documents; (l) impair the right of Lender to bring suit for a monetary judgment against Borrower with respect to any misapplication or conversion of Loss Proceeds, and the foregoing provisions shall not modify, diminish or discharge the liability of Borrower or Guarantor to the extent of Guarantor's liability under any guaranty delivered by Guarantor with respect to same; (m) impair the right of Lender to sue for, seek or demand a deficiency judgment against Borrower solely for the purpose of foreclosing the Property or any part thereof, or realizing upon the Default Collateral; provided, however, that any such deficiency judgment referred to in this clause (m) shall be enforceable against Borrower and Guarantor only to the extent of any of the Default Collateral; (n) impair the ability of Lender to bring suit for a monetary judgment against Borrower with respect to arson or waste to all of the Property or damage to the Property resulting from the gross negligence or willful misconduct of Borrower or, to the extent that there is sufficient cash flow, failure to pay any Imposition; (o) impair the right of Lender to bring a suit for a monetary judgment against Borrower in the event of the exercise of any right or remedy under any federal, state or local forfeiture laws resulting in the loss of the lien of this Security Instrument or the Mortgage, or the priority thereof, against the Property; (p) be deemed a waiver of any right which Lender may have under Sections 506(a), 506(b), 1111(b) or any other provision of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt; (q) impair the right of Lender to bring suit for monetary judgment against Borrower with respect to any losses resulting from any claims, actions or proceedings initiated by Borrower (or any Affiliate of Borrower) alleging that the relationship of Borrower and Lender is that of joint venturers, partners, tenants in common, joint tenants or any relationship other than that of debtor and creditor; or (r) impair the right of Lender to bring suit for a monetary judgment against Borrower in the event of a Transfer in violation of the provisions of Article IX hereof.  The provisions of this Section 18.32 shall be inapplicable to Borrower if (a) any proceeding, action, petition or filing under the Bankruptcy Code, or any similar state or federal law now or hereafter in effect relating to bankruptcy, reorganization or insolvency, or the arrangement or adjustment of debts, shall be (A) filed by Borrower or Guarantor or (B) filed against Borrower or Guarantor and consented to or acquiesced in by Borrower or Guarantor or if any Affiliate of Borrower or Guarantor, or if Borrower or Guarantor or any Affiliate of either of them shall institute any proceeding for Borrower's dissolution or liquidation, or Borrower or Guarantor shall make an assignment for the benefit of creditors, or (b) Borrower or any Affiliate contests or in any material way interferes with, directly or indirectly (collectively, a "Contest"), any foreclosure action, UCC sale or other material remedy exercised by Lender upon the occurrence of an Event of Default whether by making any motion, bringing any counterclaim (other than a compulsory counterclaim), claiming any defense, seeking any injunction or other restraint, commencing any action, or otherwise (provided that if any such Person obtains a non-appealable order successfully asserting a Contest, Borrower shall have no liability under this clause (b)), in which event Lender shall have recourse against all of the assets of Borrower including, without limitation, any right, title and interest of Borrower in and to the Property.

    Section 18.33.  Mezzanine Loan Option.  (a)  Lender shall have the right at any time to divide the Loan into two or more parts (the "Mezzanine Option"):  a "mortgage loan" and one or more "mezzanine loans."  The principal amount of the mortgage loan plus the principal amount of the mezzanine loan(s) shall equal the outstanding principal balance of the Loan immediately

Current/9423275

prior to the creation of the mortgage loan and the mezzanine loan(s). In effectuating the foregoing, Lender will make one or more loans to one or more entities that will be the direct or indirect equity owner(s) of Borrower as described in Section 18.33(b) (collectively, the "Mezzanine Borrower"). The Mezzanine Borrower will contribute the amount of the mezzanine loan(s) to Borrower (in its capacity as borrower under the mortgage loan, "mortgage borrower") and the mortgage borrower will apply the contribution to pay down the Loan to the mortgage loan amount. The mortgage loan and the mezzanine loan(s) will be on the same terms and subject to the same conditions set forth in the Loan Documents except as follows. The mezzanine loan(s) shall be made pursuant to Lender's standard mezzanine loan documents.

(b)     Lender shall have the right to establish different interest rates and debt service payments for the mortgage loan and the mezzanine loan(s) and to require the payment of the mortgage loan and the mezzanine loan(s) in such order of priority as may be designated by Lender; provided, that (i) the total loan amounts for the mortgage loan and the mezzanine loan(s) shall equal the amount of the Loan immediately prior to the creation of the mortgage loan and the mezzanine loan(s), (ii) the weighted average interest rate of the mortgage loan and the mezzanine loan(s) shall on the date created equal the interest rate which was applicable to the Loan immediately prior to creation of the mortgage loan and mezzanine loan(s) and (iii) the debt service payments on the mortgage loan note and the mezzanine loan note(s) shall on the date created equal the debt service payment which was due under the Loan immediately prior to creation of a mortgage loan and a mezzanine loan(s).

(c)     The Mezzanine Borrower shall be a special purpose, bankruptcy remote entity pursuant to applicable Rating Agency criteria and shall own directly or indirectly one hundred percent (100%) of the mortgage borrower. The security for the mezzanine loan(s) shall be a pledge of one hundred percent (100%) of the direct and indirect ownership interests in the mortgage borrower.

(d)     Borrower shall cooperate with all reasonable requests of Lender in order to convert the Loan into a mortgage loan and one or more mezzanine loans and shall execute and deliver such documents as shall reasonably be required by Lender in connection therewith, including, without limitation, the delivery of non-consolidation, enforceability, authorization and execution opinions and an "Eagle 9" or "UCC plus" (or equivalent) UCC insurance policy and the modification of organizational documents and loan documents and the transfer of the membership interest in Borrower to the Mezzanine Borrower.

It shall be an Event of Default if Borrower fails to comply with any of the terms, covenants or conditions of this Section 18.33 after expiration of ten (10) Business Days notice thereof.

Section 18.34. <u>Component Notes</u>. Lender, without in any way limiting Lender's other rights hereunder, in its sole and absolute discretion, shall have the right at any time to require Borrower to execute and deliver "component" notes (including senior and junior notes), which notes may be paid in such order of priority as may be designated by Lender, provided that (a) the aggregate principal amount of such "component" notes shall equal the outstanding principal balance of the Loan immediately prior to the creation of such "component" notes, (b) the

91

weighted average interest rate of all such "component" notes shall on the date created equal the interest rate which was applicable to the Loan immediately prior to the creation of such "component" notes, (c) the debt service payments on all such "component" notes shall on the date created equal the debt service payment which was due under the Loan immediately prior to the creation of such component notes and (d) the other terms and provisions of each of the "component" notes shall be identical in substance and substantially similar in form to the Loan Documents. Borrower shall cooperate with all reasonable requests of Lender in order to establish the "component" notes and shall execute and deliver such documents as shall reasonably be required by Lender in connection therewith, all in form and substance reasonably satisfactory to Lender, including, without limitation, the severance of security documents if requested. It shall be an Event of Default if Borrower fails to comply with any of the terms, covenants or conditions of this Section 18.34 after the expiration of ten (10) Business Days after notice thereof.

* * * * *

92

IN WITNESS WHEREOF, Borrower and Lender have duly executed this Security Instrument the day and year first above written.

Borrower's Organizational Identification
Number: 5644-060-7

J. JIREH'S CORPORATION, Borrower

By: _____
Name:  David E. Wish
Title:    President

By: _____
Name:  Lance W. Kupisch
Title:    Secretary

PETRA MORTGAGE CAPITAL CORP.
LLC, Lender

By: _____
Name:
Title:

88

IN WITNESS WHEREOF, Borrower and Lender have duly executed this Security Instrument the day and year first above written.

Borrower's Organizational Identification
Number: 5644-060-7

J. JIREH'S CORPORATION, Borrower

By: _____
    Name:  David E. Wish
    Title:   President

By: _____
    Name:  Lance W. Kupisch
    Title:   Secretary

PETRA MORTGAGE CAPITAL CORP.
LLC, Lender

By: _____
    Name:
    Title:

EXHIBIT A

Legal Description of Premises

PARCEL 1: THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 32, TOWNSHIP 43 NORTH, RANGE 7, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN MCHENRY COUNTY, ILLINOIS.

PARCEL 2: THE NORTH HALF OF THE SOUTH HALF OF THE SOUTHEAST QUARTER OF SECTION 32, TOWNSHIP 43 NORTH, RANGE 7, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN MCHENRY COUNTY, ILLINOIS.

PARCEL 3: THAT PART OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 33, TOWNSHIP 43 NORTH, RANGE 7, EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF SAID QUARTER, QUARTER; THENCE SOUTHERLY ALONG THE WEST LINE OF SAID QUARTER, QUARTER, A DISTANCE OF 1096.30 FEET TO THE CENTER LINE OF STATE ROUTE 47; THENCE NORTHEASTERLY ALONG SAID CENTER LINE, BEING ALONG A CURVE TO THE RIGHT, HAVING A RADIUS OF 2873.39 FEET, A DISTANCE OF 793.91 FEET; THENCE NORTHEASTERLY ALONG SAID CENTER LINE, BEING TANGENT TO THE LAST DESCRIBED CURVE, A DISTANCE OF 318.36 FEET; THENCE NORTHEASTERLY ALONG SAID CENTER LINE, BEING ALONG A CURVE TO THE LEFT, HAVING A RADIUS OF 2765.81 FEET AND BEING TANGENT TO THE LAST DESCRIBED COURSE, A DISTANCE OF 122.94 FEET TO THE NORTH LINE OF SAID QUARTER, QUARTER; THENCE WESTERLY ALONG SAID NORTH LINE, A DISTANCE OF 555.68 FEET TO THE PLACE OF BEGINNING, (EXCEPT THAT PART OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 33, TOWNSHIP 43 NORTH, RANGE 7, EAST OF THE THIRD PRINCIPAL MERIDIAN, LYING EASTERLY OF A LINE DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF THE SAID SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SAID SECTION 33; THENCE EAST ALONG THE NORTH LINE OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER, FOR A DISTANCE OF 488.45 FEET TO A POINT WHICH LIES 60.0 FEET AS MEASURED RADIALLY FROM THE CENTER LINE OF F. A. ROUTE 64 (ILLINOIS ROUTE 47) FOR A PLACE OF BEGINNING; THENCE SOUTHWESTERLY ALONG A CURVE TO THE RIGHT, HAVING A RADIUS OF 2231.8 FEET AND BEING TANGENT TO A LINE WHICH FORMS AN ANGLE OF 121 DEGREES, 23 MINUTES, 10 SECONDS TO THE RIGHT, WITH THE PROLONGATION OF THE LAST DESCRIBED LINE AT THE LAST DESCRIBED POINT, FOR A DISTANCE OF 86.8 FEET TO A POINT, SAID CURVE BEING CONCENTRIC WITH THE CENTER LINE OF F. A. ROUTE 64; THENCE SOUTHWESTERLY ALONG A LINE WHICH IS TANGENT TO THE LAST DESCRIBED CURVE AT THE LAST DESCRIBED POINT, SAID LINE BEING PARALLEL WITH AND 60.0 FEET AS MEASURED AT RIGHT ANGLES FROM THE CENTER LINE OF F.A. ROUTE 64, FOR A DISTANCE OF 319.05 FEET TO A POINT; THENCE SOUTHWESTERLY ALONG A CURVE TO THE LEFT, HAVING A RADIUS OF 2924.8 FEET, BEING TANGENT TO THE LAST DESCRIBED LINE AT THE LAST DESCRIBED POINT AND BEING CONCENTRIC WITH THE CENTER LINE OF F. A. ROUTE 64, FOR A DISTANCE OF 625.5 FEET TO A POINT IN THE WEST LINE OF SAID SECTION 33, WHICH LIES 412.2 FEET NORTHERLY OF THE SOUTHWEST CORNER OF SAID SECTION 33, FOR A POINT OF TERMINUS), IN MCHENRY COUNTY, ILLINOIS.

PARCEL 4: PART OF THE SOUTH HALF OF THE SOUTH HALF OF THE SOUTHEAST QUARTER OF SECTION 32, TOWNSHIP 43 NORTH, RANGE 7, EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHEAST CORNER OF SAID SECTION; THENCE NORTH ON THE EAST LINE THEREOF 443.2 FEET TO AN IRON STAKE FOR A PLACE OF BEGINNING; THENCE NORTH 46 DEGREES, 54 MINUTES WEST ALONG THE CENTER OF THE CREEK 151.0 FEET TO AN IRON STAKE; THENCE NORTH 60 DEGREES, 36 MINUTES WEST ALONG THE CENTER OF SAID CREEK 223.7 FEET TO A POINT ON THE NORTH LINE OF THE SOUTH HALF OF THE SOUTH HALF OF SAID SOUTHEAST QUARTER; THENCE EAST ON SAID NORTH LINE, 305.6 FEET TO THE EAST LINE OF SAID SECTION; THENCE SOUTH 215.2 FEET TO THE PLACE OF BEGINNING, IN MCHENRY COUNTY, ILLINOIS.

PARCEL 5: THAT PART OF THE NORTHWEST 1/4 OF THE SOUTHWEST 1/4 OF SECTION 33,

TOWNSHIP 43 NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN, LYING WESTERLY OF
THE WESTERLY RIGHT OF WAY LINE OF STATE ROUTE 47 (EXCEPTING THEREFROM THAT PART
DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE CENTER LINE OF STATE
ROUTE 47 WITH THE NORTH LINE OF THE SOUTHWEST 1/4 OF SAID SECTION 33, THENCE
WESTERLY ALONG SAID NORTH LINE 217.80 FEET; THENCE SOUTHERLY PARALLEL WITH THE
CENTER LINE OF STATE ROUTE 47, A DISTANCE OF 100.00 FEET; THENCE EASTERLY PARALLEL
WITH THE NORTH LINE OF SAID SOUTHWEST 1/4, 217.80 FEET TO THE CENTER LINE OF STATE
ROUTE 47; THENCE NORTHERLY ALONG SAID CENTER LINE 100.00 FEET TO THE PLACE OF
BEGINNING), IN MCHENRY COUNTY, ILLINOIS.

EXHIBIT B

SUMMARY OF RESERVES

| Reserve Items | Initial Deposit Amount | Monthly Installment Amount |
|---|---|---|
| Basic Carrying Costs<br>• Taxes<br>• Insurance Premiums | <br>$10,234.12<br>$515.00 | <br>$0<br>$0 |
| Initial Engineering Deposits<br>• Predevelopment Costs<br>• Environmental Remediation | <br>$926,750.88<br>$62,500.00 | Not Applicable |
| Initial Debt Service Reserve Deposit | $3,900,000.00 | Not Applicable |
| Cash Reserve Deposit | $500,000.00 | Not Applicable |

## EXHIBIT C

Property:_____

Location:_____

Cash Flow Statement for Month of:_____     Year:

|  | Current Month | Year to Date |
|---|---|---|
| **REVENUE** |  |  |
| Net Rental Revenue |  |  |
| Other Revenue |  |  |
| Effective Gross Income | _____ | _____ |
| **OPERATING EXPENSES** |  |  |
| Common Area Maintenance |  |  |
| Payroll |  |  |
| Administration |  |  |
| Leasing |  |  |
| Service |  |  |
| Clean & Decorate |  |  |
| Utilities |  |  |
| Repairs & Maintenance |  |  |
| Taxes |  |  |
| Insurance |  |  |
| Management Fees |  |  |
| Other | _____ | _____ |
| Total Operating Expenses | _____ | _____ |
| Net Operating Income |  |  |
| **RECURRING EXPENSES** |  |  |
| To Include Expenses for: Carpet Replacement, Appliance Replacement, HVAC/Water Heater Replacement; Miniblinds/Drapes/Ceiling Fans: | _____ | _____ |
| **NON-RECURRING EXPENSES** |  |  |
| To Include Capital Expenses for: Playground, Major Signage, Lawns/Trees/Shrubs, Paving/Parking, Roof Replacement, Carpentry/Siding/Balconies, Exterior Paint, Major Concrete/Sidewalks, Foundations, Major Exterior, Boiler Replacement, Major HVAC Replacement, Plumbing Replace, Electrical Replace, Other Major, Fire & Storm, Ins. Loss Recovery: |  |  |
| Net Cash Flow | _____ | _____ |

Certified By:_____

Name:_____

Title:_____

Management Company:_____

EXHIBIT D

Required Engineering Work

Work

Compliance, to Lender's satisfaction, with the report dated April 20, 2007 from LandAmerica Commercial Services attached hereto, including without limitation, compliance with the recommendations, opinions, and instructions contained therein.

Required Completion Date

ninety (90) days from the date hereof



April 20, 2007

Mr. John Bucci
Petra Mortgage Capital, LLC
1370 Avenue of Americas, 23rd Floor
New York, NY 10019

RE:    Desk Review of Environmental Reports
       Huntley Land Deal
       11817 Illinois Route 47
       Huntley, IL 60142
       LAC Project Number: 07-48990.1


LandAmerica Assessment Corporation (LAC) has reviewed the following documents and information regarding the above referenced property:

- *Phase 1 Environmental Site Assessment,* 11817 Illinois Route 47, Huntley, Illinois 60142, prepared by STS Consultants, Ltd. (STS), and dated August 5, 2005

- *Phase 1 Environmental Site Assessment,* Approximate 20-Acre Vacant Parcel, West Side of Illinois Route 47 at Dean Street, Huntley, Illinois, prepared by Pioneer Engineering & Environmental Services, Inc. (Pioneer), and dated August 3, 2006

LAC has reviewed the above referenced documents to determine how closely they conform to the following scopes of work and guidelines (collectively ªScopeº) listed below. The documents were reviewed for thoroughness in addressing potential environmental concerns at the time of their writing, as well as noting those issues, if any that will need to be addressed or updated.

- American Society for Testing and Materials (ASTM) Standard Guide for Environmental Site Assessments: Phase I Environmental Site Assessment Process E 1527-05

- Standard & Poors (S&P) Structured Finance Ratings Real Estate Finance: Environmental Criteria

LAC understands that the original reports may not have been originally performed for the client and, therefore, may not have been conducted per Scope listed above. It is LAC's understanding, however, that meeting the Scope is required. LAC recommends that, if necessary, the party who contracted with the consultant for the original assessment be contacted in order to authorize any additional work.

## PROJECT SUMMARY

It is LAC's understanding that the parcels of land previously assessed by STS and Pioneer, totaling approximately 104 acres, are both included in the Scope of Work for this desktop review.

At the time of the report issued by STS in 2005, the subject property consisted of three parcels with a combined site size of approximately 84 acres, with approximately 1,031 feet of street frontage along Illinois Route 47. At the time of the STS assessment, the subject property was improved with an unoccupied two-story residential dwelling, a two-story barn structure, a small brick storage shed, a three-sided metal shed, and gravel-covered

driveway areas. The remainder of the subject property was used for agricultural purposes, specifically, soybean and corn crops.

At the time of the report issued by Pioneer in 2006, the subject property consisted of one 20-acre parcel of land that is bordered to the east by Illinois Route 47. The majority of the subject property was covered with soybean crops; however, the southeastern portion of the subject property contained two areas covered with wetlands-type vegetation (i.e. cattails). Mature trees and bushes were located along the western and southern borders of the subject property and also bordered the southeasterly-located wetland areas. There were no permanent structures on this parcel at the time of Pioneer's assessment.

In general, the documents reviewed meet the Scope, with the exception of the following issues:

- The reports should be certified to Petra Mortgage Capital LLC (Client) using the following reliance language:

"This report may be relied upon by Petra Mortgage Capital LLC, its successors and/or assigns, in determining whether to make a loan evidenced by a note (the "Property Note") which is further secured by the property. This report may be relied upon by any purchaser or assignee of the Property Note in determining whether to acquire the Property Note or an interest therein (which may include securities which are secured all or in part by the Property Note). In addition, this report may be relied upon by any rating agency involved in rating securities secured by, or representing an interest in, the Property Note. This report may be used in connection with the materials offering for sale of the Property Note, or an interest in the Property Note, and in presentations to any rating agency."

- The reports are both over 6 months old and should both be updated as their "shelf-life" has expired. LAC recommends that new Phase I ESA or Phase I ESA Updates be performed.

- The qualifications of the report preparer were not included within the Pioneer ESA. The Pioneer ESA should be updated to include this information.

Additionally, the following environmental issues were identified, requiring further action:

- Previous reports were reviewed as part of the STS ESA in 2005. These reports included a previous Environmental Transaction Screen report, prepared by STS and dated April 22, 1999, and a previous ESA report, prepared by STS and dated July 29, 2004. According to the STS Transaction Screen, one REC was identified. Several areas of surficial staining were identified within and in the vicinity of the northernmost storage shed on the subject property. STS did not observe these areas of staining during its 2004 site reconnaissance. According to the former subject property owner, these stained areas were excavated and removed from the subject property as a condition of his property purchase in 1999. No documentation was provided to STS concerning the remedial efforts and/or subsequent sampling. STS was not aware of a regulatory requirement to further assess these environmental issues. However, STS recommended that documentation regarding the remedial efforts (excavation and removal of stained soils) performed on the subject property from the previous subject property owner be obtained and reviewed to assess whether the potential exists for residual stained soil to remain on the subject property. LAC concurs that this documentation should be reviewed before it can be determined if additional excavation or sampling is required. The cost for LAC to perform an additional review is $750. If supporting documentation cannot be provided, then an additional Phase II limited subsurface investigation could be performed to determine potential impact to baseline conditions. STS observed several mounds/piles of demolition debris, asphalt, concrete debris, and soil/gravel in the vicinity of the structures/former structures on the subject property. STS noted several five-gallon, partially filled or empty containers within the barn. The labels of these containers indicated they contained paint and wall texture materials.

STS observed two air-conditioning units and a refrigerator lying on the ground surface near the location of the former northern pole-shed. These containers and air-conditioning units appeared to be in good condition with no indication of leaks, coolant spills, or vegetative stress. STS determined these materials do not present an REC with respect to the subject property but should be properly disposed of. LAC concurs with this recommendation.

- STS also observed an approximately 9 square foot area of surficially stained soil/gravel in the former area of the southwestern storage shed on the subject property. STS observed that the staining appeared to be limited to the top few inches of soil and as such, is not expected to pose a significant environmental liability. However, STS recommended that the area of stained soil be excavated, removed from the subject property, and disposed of in accordance with applicable regulations. LAC concurs with this recommendation, but in order to remove the stained soil, it may be subject to characterization.

- Limited Soil Sampling/Analysis of the subject property was completed by STS, dated August 27, 2004, as summarized within the STS 2005 ESA report. The chemical analysis indicated no detections of BTEX or pesticides/herbicides above laboratory limits. The PNA analysis detected several compounds above the laboratory's detection limits. Based on a comparison of the detected PNA compounds and the cleanup objectives, one compound from one sample exceeds the cleanup objectives. Benzo(a)pyrene was detected at a concentration of 1.3 milligrams per kilograms (mg/kg) in sample S-3, collected at a depth of 8 to 12 inches below the ground surface from the area of the former northern pole shed located in the central portion of the subject property. This concentration exceeds the soil ingestion cleanup objective of 0.8 mg/kg for benzo(a)pyrene. However, STS noted that benzo(a)pyrene was not detected at levels in excess of remediation objectives established to protect construction workers (17 mg/kg). None of the other PNA compounds were detected at levels in excess of the commercial/industrial cleanup objectives. STS concluded that two options exist for an exceedance of the soil ingestion cleanup objectives. The first option is to remove and to properly dispose of the soil at a permitted landfill. The second option is to cap the area with a barrier that would reduce the risk of direct contact with the soil, such as asphalt or concrete pavement, or a three-foot thick cover of clean fill. LAC concludes this issue to present A REC and concurs with STS and recommends that one of the two options be completed prior to the future development of the subject property. All work should be completed in accordance with local, state, and federal regulations. Additional Phase II LSI actions will be warranted to determine the extent of the contaminants present in order to determine adequate area for excavation and disposal.

- Both the Pioneer and STS reports identified areas of potential wetlands on the subject property, but a formal wetland delineation was outside the scope of both prior ESA reports. LAC recommends that wetland areas be positively identified at the subject property, through a wetlands delineation, if future development is planned.

*In review of the Reports and potential contaminants identified and that planned development of the Site, it is LAC's opinion that the best course of action is to remove any impacted soil from the Property. Overall, LAC recommends that a new Phase I ESA and Phase II Limited Subsurface Investigation be performed at the Property to delineate the extent of the contaminants, where applicable. As the staining that was identified appears to be surficial and the contaminants identified appeared to be related to a petroleum release (i.e., possibly from tractor storage near the shed) found at a relatively shallow gradient beneath ground surface, the typical cost for removal is estimated to be $50,000. This cost allows for assessment, profiling, sampling, reporting to regulatory agencies (if required), transportation and disposal off-site. Additional actions and costs may be warranted pending the findings of the investigations.*

LAC has performed this report review and prepared this report in accordance with generally accepted consulting practices, and makes no other warranties, either expressed or implied, as to the character and nature of such

services or product. LAC, its officers, and its employees have no present or contemplated interest in the subject property. LAC's employment and compensation for preparing this report are not contingent upon the observations or conclusions. The information in this report is from sources deemed and assumed to be reliable; however, no representation or warranty is made as to the accuracy thereof.

This report may be relied upon by Petra Mortgage Capital LLC, its successors and/or assigns, in determining whether to make a loan evidenced by a note (the "Property Note") which is further secured by the property. This report may be relied upon by any purchaser or assignee of the Property Note in determining whether to acquire the Property Note or an interest therein (which may include securities which are secured all or in part by the Property Note). In addition, this report may be relied upon by any rating agency involved in rating securities secured by, or representing an interest in, the Property Note. This report may be used in connection with the materials offering for sale of the Property Note, or an interest in the Property Note, and in presentations to any rating agency.

## DOCUMENT REVIEW

### PHASE I COMPONENTS

| I. CERTIFICATION, AGE AND DOCUMENTATION | | ADEQUATELY ADDRESSED | CONCERN/ ACTION |
|---|---|---|---|
| 1. | Report Certified to Client | No | Low/Update |
| 2. | Report less than 6 months old | No | Low/Update |
| 3. | References | Yes | Low/None |
| 4. | Photographs | Yes | Low/None |
| 5. | Qualification of Report Preparer | No | Low/Update |

Comments:

The reports should include the following specific reliance and conveyance language:

"This report may be relied upon by Petra Mortgage Capital LLC, its successors and/or assigns, in determining whether to make a loan evidenced by a note (the "Property Note") which is further secured by the property. This report may be relied upon by any purchaser or assignee of the Property Note in determining whether to acquire the Property Note or an interest therein (which may include securities which are secured all or in part by the Property Note). In addition, this report may be relied upon by any rating agency involved in rating securities secured by, or representing an interest in, the Property Note. This report may be used in connection with the materials offering for sale of the Property Note, or an interest in the Property Note, and in presentations to any rating agency."

The provided reports are both over 6 months old and should be updated.

Additionally, the qualifications of the report preparer were not included within the Pioneer ESA. The Pioneer ESA should be updated to include this information.

| II. PROPERTY SETTING | | ADEQUATELY ADDRESSED | CONCERN/ ACTION |
|---|---|---|---|
| 1. | Legal Description | Yes | Low/None |
| 2. | Description of Subject Property Improvements | Yes | Low/None |
| 3. | Age of Current Improvements | Yes | Low/None |
| 4. | Current and Planned Uses of Tenants | Yes | Low/None |

DESKTOP REVIEW
HUNTLEY LAND DEAL
11817 ILLINOIS ROUTE 47

LAC PROJECT NO. 07–48990.1
PAGE 5 OF 8

| | | |
|---|---|---|
| 5.   Neighboring Properties | Yes | Low/None |
| 6.   Utilities | Yes | Low/None |
| 7.   Topographic Map | Yes | Low/None |
| 8.   Geology/Soil/Hydrology/Drainage | Yes | Low/None |

**Comments:**

The property setting was sufficiently described.

| III.   REGULATORY DATABASE REVIEW/INTERVIEWS | ADEQUATELY ADDRESSED | CONCERN/ ACTION |
|---|---|---|
| 1.   Radius Review (per Client scope) | Yes | Low/None |
| 2.   Property on Any List | No | Low/None |
| 3.   Nearby Sites of Concern | Yes | Low/None |
| 4.   Interview with Current Owner/Operator | Yes | Low/None |
| 5.   Interview with Tenants | Yes | Low/None |
| 6.   Local Fire, Building and Health Departments | Yes | Low/None |

**Comments:**

The appropriate radii were utilized and sufficient discussion was provided as to why the identified sites would not be considered recognized environmental conditions to the subject property. No concerns were identified during the interviews conducted.

| IV.   HISTORICAL REVIEW (Subject & Adjoining properties) | ADEQUATELY ADDRESSED | CONCERN/ ACTION |
|---|---|---|
| 1.   Aerial Photographs | Yes | Low/None |
| 2.   Fire Insurance/Historical Maps | Yes | Low/None |
| 3.   Assessor's Office/Tax Files | No | Low/None |
| 4.   Recorded Land Title Records/Chain of Title | No | Low/None |
| 5.   USGS Topographic Maps | Yes | Low/None |
| 6.   Local Street Directories | No | Low/None |
| 7.   Building Department Records | Yes | Low/None |
| 8.   Zoning/Land Use Records | Yes | Low/None |
| 9.   Other Historical Sources (Maps, interviews, etc.) | Yes | Low/None |
| 10.  Previous Reports | Yes | High/Update |

**Comments:**

The history of the subject property was sufficiently documented to the earlier of the property's first developed use or 1940.

Previous reports were reviewed as part of the STS ESA in 2005. These reports included a previous Environmental Transaction Screen report, prepared by STS and dated April 22, 1999, and a previous ESA report, prepared by STS and dated July 29, 2004. According to the STS Transaction Screen, one REC was identified. Several areas of surficial staining were identified within and in the vicinity of the northernmost storage shed on the subject property. STS did not observe these areas of staining during its 2004 site reconnaissance. According to the former subject property owner, these stained areas were excavated and removed from the subject property as a condition of his property purchase in 1999. No documentation was provided to STS concerning the remedial efforts and/or subsequent sampling. STS was not aware of a regulatory requirement to further assess these environmental issues. However, STS recommended that documentation regarding the remedial efforts (excavation and removal of stained soils) performed on the subject property from the previous subject property owner be obtained and reviewed to assess whether the potential exists for residual stained soil to remain on the subject property.

No other concerns requiring additional investigation were noted.

| V.    ASTM SITE RECONNAISSANCE) | ADEQUATELY ADDRESSED | CONCERN/ ACTION |
|---|---|---|
| 1.   Hazardous Substances/Chemical Usage/Storage | Yes | Low/None |
| 2.   Above Ground or Underground Storage Tanks | Yes | Low/None |
| 3.   Odors | Yes | Low/None |
| 4.   Pools of Liquids, Drains or Sumps | Yes | Low/None |
| 5.   PCBs (Electrical and Hydraulic Equipment) | Yes | Low/None |
| 6.   Means of Heating and Cooling | Yes | Low/None |
| 7.   Interior Stains or Corrosion | Yes | Low/None |
| 8.   Pits, Ponds or Lagoons | Yes | Low/None |
| 9.   Stained Soil or Pavement | Yes | Low/ Routine Solution |
| 10.  Stressed Vegetation | Yes | Low/None |
| 11.  Solid Waste | Yes | Low/None |
| 12.  Waste Water | Yes | Low/None |
| 13.  Wells | Yes | Low/None |
| 14.  Septic Systems | Yes | Low/None |

**Comments:**

STS observed several mounds/piles of demolition debris, asphalt, concrete debris, and soil/gravel in the vicinity of the structures/former structures on the subject property. STS noted several five-gallon, partially filled or empty containers within the barn. The labels of these containers indicated they contained paint and wall texture materials. STS observed two air-conditioning units and a refrigerator lying on the ground surface near the location of the former northern pole-shed. These containers and air-conditioning units appeared to be in good condition with no indication of leaks, coolant spills, or vegetative stress. STS determined these

materials do not present an REC with respect to the subject property but should be properly disposed of.

STS also observed an approximately 9 square foot area of surficially stained soil/gravel in the former area of the southwestern storage shed on the subject property. STS observed that the staining appeared to be limited to the top few inches of soil and as such, is not expected to pose a significant environmental liability. However, STS recommended that the area of stained soil be excavated, removed from the subject property, and disposed of in accordance with applicable regulations.

No other ASTM scope concerns were noted during the visual reconnaissance of the subject property.

| VI.  ASTM NON-SCOPE CONSIDERATIONS | ADEQUATELY ADDRESSED | CONCERN/ ACTION |
|---|---|---|
| 1.   Asbestos-Containing Materials | Yes | Low/None |
| 2.   Radon | Yes | Low/None |
| 3.   Lead-Based Paint | Yes | Low/None |
| 4.   Lead in Drinking Water | Yes | Low/None |
| 5.   Wetlands | Yes | Med/Further Action |

**Comments:**

The Pioneer report identified two areas covered with wetlands-type vegetation (i.e. cattails) on the southeastern portion of the subject property. This area was labeled as a certified wetland 98001 (circa 2/24/98) on an aerial photograph on file at the McHenry Soil and Water Conservation District. Pioneer indicated that their assessment did not include further investigation of potential wetland issues.

STS observed evidence of hydrophytic vegetation on the central-eastern portion of the subject property near Route 47. The regulatory database report prepared by EDR indicated Federal Wetlands may be present within the subject property. A wetland assessment is beyond the scope of a Phase I ESA, therefore, a formal wetland delineation was recommended by STS to identify wetlands within the subject property if future development is planned.

LAC concurs with the STS recommendation that wetlands should be identified on the subject property if future development is planned.

No other ASTM non-scope concerns were noted during the visual reconnaissance of the subject property.

| VII. OTHER REPORTS | ADEQUATELY ADDRESSED | CONCERN/ ACTION |
|---|---|---|
| 1.   Geotechnical Engineering Report | NA | NA |
| 2.   Asbestos/Lead-Based Paint Surveys | NA | NA |
| 3.   Electromagnetic/Ground Penetrating Radar | NA | NA |
| 4.   Sampling (soil, soil gas, groundwater) | Yes | Med/Further Action |
| 5.   Tank Removal or Other Remediation | NA | NA |
| 6.   Site Closure Reports | NA | NA |
| 7.   Material Safety Data Sheets | NA | NA |

DESKTOP REVIEW
HUNTLEY LAND DEAL
11817 ILLINOIS ROUTE 47

LAC PROJECT NO. 07-48990.1
PAGE 8 OF 8

**Comments:**

The environmental issues identified during the STS ESA and past agricultural use of the subject property prompted a Limited Soil Sampling/Analysis of the subject property by STS, dated August 27, 2004. The chemical analysis indicated no detections of BTEX or pesticides/herbicides above laboratory limits. The PNA analysis detected several compounds above the laboratory's detection limits. Based on a comparison of the detected PNA compounds and the cleanup objectives, one compound from one sample exceeds the cleanup objectives. Benzo(a)pyrene was detected at a concentration of 1.3 milligrams per kilograms (mg/kg) in sample S-3, collected at a depth of 8 to 12 inches below the ground surface from the area of the former northern pole shed located in the central portion of the subject property. This concentration exceeds the soil ingestion cleanup objective of 0.8 mg/kg for benzo(a)pyrene. However, STS noted that benzo(a)pyrene was not detected at levels in excess of remediation objectives established to protect construction workers (17 mg/kg). None of the other PNA compounds were detected at levels in excess of the commercial/industrial cleanup objectives.

STS concluded that two options exist for an exceedance of the soil ingestion cleanup objectives. The first option is to remove and to properly dispose of the soil at a permitted landfill. The second option is to cap the area with a barrier that would reduce the risk of direct contact with the soil, such as asphalt or concrete pavement, or a three-foot thick cover of clean fill.

No other documents were provided to review.

| | |
|---|---|
| Low | No information was obtained that identified a recognized environmental condition; or any issues identified can be addresses with a standard operations and maintenance (O&M) program or a routine solution. |
| Med | An issue was identified that with further investigation could become a Low concern or a High concern; the property has completed remediation activities and is awaiting a No Further Action letter from the state; or, the subject property may have been impacted by a neighboring property, but should not be liable for any cleanup costs. |
| High | An recognized environmental condition has been identified at the subject property that requires additional investigation or remediation activities. |

LAC appreciates this opportunity to assist you on this project. Please do not hesitate to contact us if you have any questions or if we can be of further service to you.

Sincerely

LANDAMERICA ASSESSMENT CORPORATION

Melissa Rowley
Professional Associate

Mandeep S. Sandhu
Client Manager

# *EXHIBIT B*

Portofino Bay

## PROMISSORY NOTE

Note Amount:    $33,645,000

Maturity Date:    The Payment Date in May, 2008

THIS PROMISSORY NOTE (this "Note"), is made as of April 30, 2007 by the undersigned, as maker ("Borrower"), in favor of PETRA MORTGAGE CAPITAL CORP. LLC and its successors or assigns, as payee ("Lender").

## R E C I T A L S:

A.    This Note evidences a loan (the "Loan") made by Lender to Borrower in the original principal amount of THIRTY-THREE MILLION SIX HUNDRED FORTY-FIVE THOUSAND AND NO/100 DOLLARS ($33,645,000.00) (the "Loan Amount") and secured by, inter alia, that certain Mortgage, Security Agreement, Assignment of Rents and Fixture Filing of even date herewith (as same may hereafter be amended, modified or supplemented, the "Security Instrument") entered into pursuant to that certain Loan and Security Agreement of even date herewith (as same may be amended, modified or supplemented, the "Loan Agreement") between Borrower, as borrower, and Lender, as lender;

B.    Borrower and Lender intend these Recitals to be a material part of this Note.

NOW, THEREFORE, FOR VALUE RECEIVED, Borrower does hereby covenant and promise to pay to the order of Lender, without any counterclaim, setoff or deduction whatsoever, on the Maturity Date (as hereinafter defined), in immediately available funds, at 1370 Avenue of the Americas, 23rd Floor, New York, NY 10019 or at such other place as Lender may designate to Borrower in writing from time to time, in legal tender of the United States of America, the Loan Amount and all other amounts due or becoming due hereunder, to the extent not previously paid in accordance herewith, together with all interest accrued thereon through the date the Loan is repaid in full, at the Interest Rate (as hereinafter defined) to be computed on the basis of the actual number of days elapsed in a 360 day year, on so much of the Loan Amount as is from time to time outstanding on the first day of the applicable Interest Accrual Period (as hereinafter defined).

SECTION 1.    DEFINITIONS

As used herein, the following terms shall have the meanings herein specified unless the context otherwise requires.  Defined terms in this Note shall include in the singular number the plural and in the plural number the singular.  All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Loan Agreement.

"Additional Taxes" shall have the meaning set forth in Section 2.1(d) hereof.

Current/9423220

"Board" shall mean the Board of Governors of the Federal Reserve System, and any successor thereof.

"Capital Adequacy Rule" shall mean any law, rule or regulation regarding capital adequacy, or any interpretation or administration thereof adopted by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or any request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency.

"First Interest Accrual Period" shall mean the period commencing on the Closing Date and ending on, but excluding, the Payment Date first occurring after the Closing Date.

"Interest Accrual Period" shall mean the period from the ninth (9th) day of each month through and including the eighth (8th) day of the following month, provided that, notwithstanding the foregoing, (a) Lender shall have the one (1) time right to change the Interest Accrual Period by giving notice of such change to Borrower and (b) the first (1st) Interest Accrual Period shall be the First Interest Accrual Period.

"Interest Determination Date" shall mean (i) with respect to any Interest Accrual Period prior to the Interest Accrual Period that commences in the month during which the Securitization Closing Date occurs, two (2) LIBOR Business Days prior to the fifteenth (15th) day of the calendar month in which the applicable Interest Accrual Period commences; (ii) with respect to the Interest Accrual Period that commences in the month in which the Securitization Closing Date occurs, the date that is two (2) LIBOR Business Days prior to the Securitization Closing Date and (iii) with respect to each Interest Accrual Period thereafter, the date that is two (2) LIBOR Business Days prior to the fifteenth (15th) day of the calendar month in which such Interest Accrual Period commences, provided that notwithstanding the foregoing, (a) Lender shall have the one (1) time right to change the Interest Determination Date by giving notice of such change to Borrower and (b) with respect to the First Interest Accrual Period, the Interest Determination Date shall be two (2) LIBOR Business Days prior to the Closing Date.

"Interest Rate" shall mean the rate per annum (expressed as a percentage) equal to the LIBOR Rate plus the LIBOR Margin, or if Lender shall exercise its rights under Section 2.6, the interest rate specified therein.

"LIBOR Business Day" shall mean any day on which banks are open for dealing in foreign currency and exchange in London, England.

"LIBOR Margin" shall mean six hundred fifteen (615) basis points per annum.

"LIBOR Rate" shall mean the rate per annum calculated as set forth below:

(i)    With respect to each Interest Accrual Period, the rate for deposits in Dollars, for a period equal to one month, which appears on the Dow Jones Market Service (formerly Telerate) Page 3750 as of 11:00 a.m., London time, on the related Interest Determination Date. If such rate does not appear on Dow Jones Market Service Page 3750, the rate for that Interest Accrual Period shall be determined on the basis of the rates at which deposits in Dollars are offered by

2

any four major reference banks in the London interbank market selected by Lender to provide such bank's offered quotation of such rates at approximately 11:00 a.m., London time, on the related Interest Determination Date to prime banks in the London interbank market for a period of one month, commencing on the first day of such Interest Accrual Period and in an amount that is representative for a single such transaction in the relevant market at the relevant time. Lender shall request the principal London office of any four major reference banks in the London interbank market selected by Lender to provide a quotation of such rates, as offered by each such bank. If at least two such quotations are provided, the rate for that Interest Accrual Period shall be the arithmetic mean of the quotations. If fewer than two quotations are provided as requested, the rate for that Interest Accrual Period shall be the arithmetic mean of the rates quoted by major banks in New York City selected by Lender, at approximately 11:00 a.m., New York City time, on the Interest Determination Date with respect to such Interest Accrual Period for loans in Dollars to leading European banks for a period equal to one month, commencing on the first day of such Interest Accrual Period and in an amount that is representative for a single transaction in the relevant market at the relevant time. Lender shall determine the LIBOR Rate for each Interest Accrual Period and the determination of the LIBOR Rate by Lender shall be binding upon Borrower absent manifest error.

(ii)     In the event that Lender shall have determined in its reasonable discretion that none of the methods set forth in the definition of "LIBOR Rate" herein are available, then Lender shall forthwith give notice by telephone of such determination, confirmed in writing, to Borrower at least one (1) day prior to the last day of the related Interest Accrual Period. If such notice is given, the LIBOR Rate, commencing with such related Interest Accrual Period, shall be the LIBOR Rate in effect for the most recent Interest Accrual Period.

(iii)     Notwithstanding the foregoing, for the purposes of this Note, the LIBOR Rate shall in no event be less than 5.350% per annum.

"Parent" shall mean, with respect to Lender, any Person Controlling Lender.

"Payment" shall have the meaning set forth in Section 2.2(a) hereof.

"Payment Date" shall mean the ninth (9th) day of each month, or if such day is not a Business Day, the immediately preceding Business Day. Notwithstanding the foregoing, Lender shall have the one (1) time right to change the Payment Date by giving notice of such change to Borrower.

"Securitization Closing Date" shall mean the date upon which a Securitization closes.

SECTION 2.     PAYMENTS AND LOAN TERMS

Section 2.1.     Payments.

3

(a)     Payments under this Note, calculated in accordance with the terms hereof, shall be due and payable as follows:

(i)     interest at the Interest Rate for the First Interest Accrual Period shall be due and payable on the Closing Date;

(ii)     interest at the Interest Rate in effect for the Interest Accrual Period immediately preceding each Payment Date shall be due and payable on the Payment Date in June, 2007 and on each subsequent Payment Date through and including the month preceding the month during which occurs the Maturity Date, as such Maturity Date may be extended from time to time pursuant to Section 2.1(e) hereof;

(iii)     the entire outstanding Principal Amount, together with all accrued and unpaid interest and any other charges and sums due hereon and on the other Loan Documents shall be due and payable on the Payment Date occurring in May, 2008 (the "Maturity Date"), as such Maturity Date may be extended from time to time pursuant to Section 2.1(e) hereof.

(b)     Payments shall be paid by Borrower, without setoff or counterclaim, by wire transfer to Lender or to such other location or account as Lender may specify to Borrower from time to time, in Federal or other immediately available funds in lawful money of the United States of America, not later than 12:00 Noon, New York City time, on each Payment Date. If any payment hereunder or under any of the other Loan Documents becomes due and payable on a day other than a Business Day, such payment shall not be payable until the next succeeding Business Day; provided, however, if such next succeeding Business Day falls within the next calendar month, such payment shall be due and payable on the immediately preceding Business Day.  If the date for any payments of principal is extended on account of the foregoing or on account of operation of law or otherwise, interest thereon shall be payable at the then applicable rate during such extension.

(c)     Lender shall determine the LIBOR Rate as in effect from time to time on each Interest Determination Date, and each such determination of the LIBOR Rate shall be conclusive and binding absent manifest error.

(d)     Payments made by Borrower under this Note shall be made free and clear of, and without reduction for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding income and franchise taxes of the United States of America or any political subdivision or taxing authority thereof or therein (such non-excluded taxes being called "Additional Taxes").  If any Additional Taxes are required to be withheld from any amounts payable to Lender hereunder or under any of the other Loan Documents, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Additional Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Note.

4

(e)     Notwithstanding anything contained herein or in any other Loan Document, Borrower shall have one (1) option to extend the term of the Loan from the original Maturity Date for a period of six (6) months (the "Extension Option", and the term extended pursuant thereto, an "Extension Term"); provided that, with respect to the exercise of each Extension Option (i) Lender has received written notice not more than one hundred twenty (120) days but not less than sixty (60) days prior to the Maturity Date that Borrower desires to extend the Maturity Date (the "Maturity Date Notice"), (ii) no Default has occurred and is continuing as of the date of the Maturity Date Notice or the date the applicable Extension Term would commence, (iii) Borrower has delivered proof, satisfactory to Lender in all respects, that either the existing Rate Cap Agreement has been extended or a replacement Rate Cap Agreement has been obtained in form and substance substantially similar to the Rate Cap Agreement delivered on the Closing Date and issued by a cap provider having a long-term unsecured debt rating of "AA" (or its equivalent) by each Rating Agency with a LIBOR Rate strike price of 5.5% per annum and a term of not less than six (6) months (and if Lender is not the named beneficiary thereunder, the same has been pledged to Lender) and (iv) Borrower has delivered to Lender an amount, as reasonably determined by Lender, equal to the anticipated debt service for the Loan through the Extension Term, plus an amount, as reasonably determined by Lender, equal to the projected Basic Carrying Costs due with respect to the Extension Term, which sums shall be deposited by Lender into the Debt Service Reserve Escrow Account or the Basic Carrying Costs Escrow Account, as applicable.  Provided that all of the foregoing conditions have been satisfied, as determined by Lender in its sole discretion, following the giving of the Maturity Date Notice, the term "Maturity Date" when used herein and in the other Loan Documents shall mean the date to which the Maturity Date has been extended as if such date was the original Maturity Date set forth herein.  Simultaneously with the delivery of the Maturity Date Notice, Borrower shall pay to Lender an extension additional interest payment in the amount of one percent (1%) of the outstanding principal balance of the Loan as of the date of the Maturity Date Notice.  In the event that Lender determines that the conditions set forth in this subsection (e) have not been satisfied, the applicable exercise of such Extension Option shall be of no further force or effect and any extension additional interest payment previously paid to Lender in connection with the subject extension request only and not any previously consented to extensions, less any actual costs incurred by Lender in connection with its review of Borrower's request for an extension of the Maturity Date, shall be credited towards the outstanding principal balance of the Loan at Maturity.  All costs and expenses incurred in connection with each request for, and, if applicable, each extension of the Maturity Date, including without limitation, reasonable attorneys' fees incurred by Lender and any sums incurred in connection with the extension or replacement of the Rate Cap Agreement (and, if applicable, the pledging of same to Lender) shall be at the sole cost and expense of Borrower and shall be paid by Borrower on demand to Lender.

Section 2.2.    Application of Payments.

(a)     Each and every payment (a "Payment") made by Borrower to Lender in accordance with the terms of this Note and/or the terms of any one or more of the other Loan Documents and all other proceeds received by Lender with respect to the Debt, shall be applied as follows:

(1)     Payments other than Unscheduled Payments shall be applied (i) first, to all interest (other than Default Rate Interest) which shall be due and payable with

respect to the Loan Amount pursuant to the terms hereof as of the date the Payment is received (including any Interest Shortfalls and interest thereon to the extent permitted by applicable law), (ii) second, to all Late Charges, Default Rate Interest or other premiums and other sums payable hereunder or under the other Loan Documents (other than those sums included in clause (i) of this Section 2.2(a)(1)) in such order and priority as determined by Lender in its sole discretion and (iii) on the Maturity Date, to the Loan Amount until the Loan Amount has been paid in full.

(2)        Unscheduled Payments shall be applied at the end of the Interest Accrual Period in which such Unscheduled Payments are received as a principal prepayment of the Loan Amount to amortize the Loan Amount.

(b)        To the extent that Borrower makes a Payment or Lender receives any Payment or proceeds for Borrower's benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause, then, to such extent, the obligations of Borrower hereunder intended to be satisfied shall be revived and continue as if such Payment or proceeds had not been received by Lender.

Section 2.3.    Prepayments.

The Debt may not be prepaid, in whole or in part, except as set forth in Article XV of the Loan Agreement.

Section 2.4.    Indemnity.

Borrower agrees to indemnify Lender and to hold it harmless from any cost, loss or expense which Lender may sustain or incur as a consequence of (a) Borrower making a payment or prepayment of principal on the Loan on a day which is not a Payment Date with respect thereto, (b) default by Borrower in making any prepayment after Borrower has given a notice of prepayment, and (c) any acceleration of the maturity of the Loan by Lender in accordance with the terms of this Note and the other Loan Documents, including, but not limited to, any such reasonable cost, loss or expense arising in liquidating the Loan and from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain the Loan hereunder.

Section 2.5.    Increased Cost and Reduced Return.

(a)        If, on or after the date hereof, the adoption of any applicable law, rule or regulation, or any change in any applicable law, rule or regulation, or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Lender with any request or directive (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, or any such Governmental Authority, central bank or comparable agency shall impose, modify or deem applicable any reserve (including, without limitation, any such requirement imposed by the Board (but excluding with respect to any such requirement reflected in the then effective LIBOR Rate)), special deposit, insurance assessment or similar requirement against assets of, deposits with or

for the account of, or credit extended by, Lender or shall impose on Lender or on the London interbank market any other condition affecting any loan bearing interest based upon the LIBOR Rate, and the result of any of the foregoing is to increase the cost to Lender of maintaining the Loan at the Interest Rate (based upon the LIBOR Rate), or to reduce the amount of any sum received or receivable by Lender under this Note with respect thereto, by an amount deemed by Lender to be material, then, within ten (10) days after demand by Lender, Borrower shall pay to Lender such additional amount or amounts as will compensate Lender for such increased cost or reduction.

(b)     If Lender shall have determined that, after the date hereof, the adoption of any Capital Adequacy Rule has or would have the effect of reducing the rate of return on capital of Lender (or its Parent) as a consequence of Lender's obligations hereunder to a level below that which Lender (or its Parent) could have achieved but for such adoption, change, request or directive (taking into consideration its policies with respect to capital adequacy) by an amount deemed by Lender to be material, then from time to time, within fifteen (15) days after demand by Lender, Borrower shall pay to Lender such additional amount or amounts as will compensate Lender (or its Parent) for such reduction.

(c)     Lender will promptly notify Borrower of any event of which it has knowledge, occurring after the date hereof, which will entitle Lender to compensation pursuant to this Section 2.5.  A certificate of Lender claiming compensation under either Sections 2.5(a) or 2.5(b) and setting forth the additional amount or amounts to be paid to it hereunder shall be conclusive in the absence of manifest error; _provided_ that any certificate delivered by Lender pursuant to this Section 2.5(c) shall (i) in the case of a certificate in respect of amounts payable pursuant to Section 2.5(a), set forth in reasonable detail the basis for and the calculation of such amounts, and (ii) in the case of a certificate in respect of amounts payable pursuant to Section 2.5(b), (A) set forth at least the same amount of detail in respect of the calculation of such amount as Lender provides in similar circumstances to other similarly situated borrowers from Lender, and (B) include a statement by Lender that it has allocated to the Loan a proportionately equal amount of any reduction of the rate of return on Lender's capital due to a Capital Adequacy Rule as it has allocated to each of its other outstanding loans that are affected similarly by such Capital Adequacy Rule.

Section 2.6.    Deposits Unavailable.

In the event, and on each occasion, that (a) Lender shall have determined that Dollar deposits in the principal amounts of the Loan are not generally available to Lender in the London interbank market, for such periods and amounts then outstanding hereunder or that reasonable means do not exist for ascertaining the LIBOR Rate, or (b) Lender determines that the rate at which such Dollar deposits are being offered will not adequately and fairly reflect the cost to Lender of maintaining the Loan at the Interest Rate (based upon the LIBOR Rate) during such month, Lender shall, as soon as practicable thereafter, give written notice of such determination to Borrower.  In the event of any such determination, until the circumstances giving rise to such notice no longer exist, the Loan shall bear interest at the interest rate applicable to the immediately preceding Interest Accrual Period.

Section 2.7.    Illegality.

Current/9423220

If, on or after the date of this Note, the adoption of any applicable law, rule or regulation, or any change in any applicable law, rule or regulation, or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Lender with any request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency shall make it unlawful or impossible for Lender to maintain the Loan at the Interest Rate (based upon the LIBOR Rate), Lender shall forthwith give notice thereof to Borrower. If Lender shall determine that it may not lawfully continue to maintain the Loan at the Interest Rate (based upon the LIBOR Rate) to maturity and shall so specify in such notice, the Loan shall bear interest at the interest rate applicable to the immediately preceding Interest Accrual Period.

SECTION 3.    DEFAULTS

Section 3.1.    Events of Default.

This Note is secured by, among other things, the Security Instrument which specifies various Events of Default, upon the happening of which all or portions of the sums owing under this Note may be declared immediately due and payable as more specifically provided therein. Each Event of Default under the Loan Agreement or any one or more of the other Loan Documents shall be an Event of Default hereunder.

Section 3.2.    Remedies.

If an Event of Default shall occur hereunder or under any other Loan Document, the Principal Amount and, to the extent permitted by applicable law, all accrued but unpaid interest on the Principal Amount shall, commencing on the date of the occurrence of such Event of Default, at the option of Lender, immediately and without notice to Borrower, accrue interest at the Default Rate until such Event of Default is cured or if not cured or such cure is not accepted by Lender, until the repayment of the Debt. The foregoing provision shall not be construed as a waiver by Lender of its right to pursue any other remedies available to it under the Security Instrument, the Loan Agreement or any other Loan Document, nor shall it be construed to limit in any way the application of the Default Rate.

SECTION 4.    EXCULPATION

Section 4.1.    Exculpation.

Notwithstanding anything to the contrary contained in this Note or the other Loan Documents, the obligations of Borrower hereunder shall be non-recourse except with respect to the Property and as otherwise provided in Section 18.32 of the Loan Agreement, the terms of which are incorporated herein.

SECTION 5.    MISCELLANEOUS

Section 5.1.    Further Assurances.

8

Borrower shall execute and acknowledge (or cause to be executed and acknowledged) and deliver to Lender all documents, and take all actions, required by Lender from time to time to confirm the rights created or now or hereafter intended to be created under this Note and the other Loan Documents, to protect and further the validity, priority and enforceability of this Note and the other Loan Documents, to subject to the Loan Documents any property of Borrower intended by the terms of any one or more of the Loan Documents to be encumbered by the Loan Documents, or otherwise carry out the purposes of the Loan Documents and the transactions contemplated thereunder; provided, however, that no such further actions, assurances and confirmations shall increase Borrower's obligations under this Note or any Loan Documents.

Section 5.2.    Modification, Waiver in Writing.

No modification, amendment, extension, discharge, termination or waiver (a "Modification") of any provision of this Note, the Security Instrument, the Loan Agreement or any one or more of the other Loan Documents, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on, Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances. Lender does not hereby agree to, nor does Lender hereby commit itself to, enter into any Modification. However, in the event Lender does ever agree to a Modification, such Modification shall only be upon the terms and conditions set forth in the Loan Agreement.

Section 5.3.    Costs of Collection.

Borrower agrees to pay all costs and expenses of collection incurred by Lender, in addition to principal, interest and late or delinquency charges (including, without limitation, reasonable attorneys' fees and disbursements) and including all costs and expenses incurred in connection with the pursuit by Lender of any of its rights or remedies referred to in Section 3 hereof or its rights or remedies referred to in any of the Loan Documents or the protection of or realization of collateral or in connection with any of Lender's collection efforts, whether or not suit on this Note, on any of the other Loan Documents or any foreclosure proceeding is filed, and all such costs and expenses shall be payable on demand, together with interest at the Default Rate thereon, and also shall be secured by the Security Instrument and all other collateral at any time held by Lender as security for Borrower's obligations to Lender.

Section 5.4.    Maximum Amount.

(a)    It is the intention of Borrower and Lender to conform strictly to the usury and similar laws relating to interest and the collection of other charges from time to time in force, and all agreements between Borrower and Lender, whether now existing or hereafter arising and whether oral or written, are hereby expressly limited so that in no contingency or event whatsoever, whether by acceleration of maturity hereof or otherwise, shall the amount paid or agreed to be paid in the aggregate to Lender as interest or other charges hereunder or under the other Loan Documents or in any other security agreement given to secure the Debt, or in any

9

other document evidencing, securing or pertaining to the Debt, exceed the maximum amount permissible under applicable usury or such other laws (the "Maximum Amount"). If under any circumstances whatsoever fulfillment of any provision hereof, or any of the other Loan Documents, at the time performance of such provision shall be due, shall involve transcending the Maximum Amount, then ipso facto, the obligation to be fulfilled shall be reduced to the Maximum Amount. For the purposes of calculating the actual amount of interest or other charges paid and/or payable hereunder, in respect of laws pertaining to usury or such other laws, all charges and other sums paid or agreed to be paid hereunder to the holder hereof for the use, forbearance or detention of the Debt, outstanding from time to time shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread from the date of disbursement of the proceeds of this Note until payment in full of all of the Debt, so that the actual rate of interest on account of the Debt is uniform through the term hereof. The terms and provisions of this Section 5.4 shall control and supersede every other provision of all agreements between Borrower or any endorser and Lender.

(b)    If under any circumstances Lender shall ever receive an amount which would exceed the Maximum Amount, such amount shall be deemed a payment in reduction of the Loan Amount owing hereunder and any other obligation of Borrower in favor of Lender, and shall be so applied in accordance with Section 2.2 hereof, or if such excessive interest exceeds the unpaid balance of the Loan Amount and any other obligation of Borrower in favor of Lender, the excess shall be deemed to have been a payment made by mistake and shall be refunded to Borrower.

Section 5.5.    Waivers.

Borrower hereby expressly and unconditionally waives presentment, demand, protest, notice of protest or notice of any kind, including, without limitation, any notice of intention to accelerate and notice of acceleration, except as expressly provided herein, and in connection with any suit, action or proceeding brought by Lender on this Note, any and every right it may have to (a) a trial by jury, (b) interpose any counterclaim therein (other than a counterclaim which can only be asserted in the suit, action or proceeding brought by Lender on this Note and cannot be maintained in a separate action) and (c) have the same consolidated with any other or separate suit, action or proceeding.

Section 5.6.    Governing Law.

This Note and the obligations arising hereunder shall be governed by, and construed in accordance with, the laws of the State of Illinois applicable to contracts made and performed in such State and any applicable law of the United States of America.

Section 5.7.    Headings.

The Section headings in this Note are included herein for convenience of reference only and shall not constitute a part of this Note for any other purpose.

Section 5.8.    Assignment.

10

Lender shall have the right to transfer, sell and assign this Note, the Security Instrument, the Loan Agreement and/or any of the other Loan Documents or any interest therein, and the obligations hereunder, to any Person.  All references to "Lender" hereunder shall be deemed to include the assigns of the Lender.

Section 5.9.    Severability.

Wherever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note.

Section 5.10.    Joint and Several.

If Borrower consists of more than one Person or party, the obligations and liabilities of each such Person or party hereunder shall be joint and several.

Section 5.11.    Register.

Borrower or its agent shall maintain a register (the "Register") which will reflect by book entry Lender's right, title and interest in this Note, including both principal and stated interest.  Borrower or its agent shall immediately upon notification by Lender of a transfer of any interest in this Note make a book entry in the Register to record any such transfer.  Failure to make such recordation, or any error with respect to such recordation, shall not affect Borrower's obligations under the Loan Documents.  Borrower or its agent shall furnish to Lender (at the expense of the holder of this Note) a copy of the Register on request.  Borrower shall not incur any liability to Lender for its failure to maintain the Register, absent the gross negligence or willful misconduct of Borrower in connection therewith.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

Current/9423220

IN WITNESS WHEREOF, this Note has been duly executed by the Borrower the day and year first written above.

BORROWER:

J. JIREH'S CORPORATION, an Illinois corporation

By: _____
Name:  David E. Wish
Title:    President

By: _____
Name:  Lance W. Kupisch
Title:    Secretary

Note

JUDGE GOTTSCHALL
MAGISTRATE JUDGE SCHENKIER

# _EXHIBIT C_

Portofino Bay

# GUARANTY

THIS GUARANTY ("Guaranty") is executed as of April 30, 2007, by DAVID E. WISH and LANCE W. KUPISCH (hereinafter collectively referred to as "Guarantor"), for the benefit of PETRA MORTGAGE CAPITAL CORP. LLC ("Lender").

A.    J. JIREH'S CORPORATION, an Illinois corporation ("Borrower") is indebted to Lender with respect to a loan ("Loan") pursuant to a certain promissory note dated of even date herewith, payable to the order of Lender in the original principal amount of THIRTY-THREE MILLION SIX HUNDRED FORTY-FIVE THOUSAND AND NO/100 DOLLARS ($33,645,000.00) (together with all renewals, modifications, increases and extensions thereof, the "Note"), which is secured by the liens and security interests created by that certain mortgage, security agreement, assignment of rents and fixture filing (the "Security Instrument"), by Borrower for the benefit of Lender, dated of even date herewith and further evidenced, secured or governed by a Loan and Security Agreement, dated of even date herewith, between Borrower and Lender (the "Loan Agreement") and the other Loan Documents (as defined in the Loan Agreement); and

B.    Lender is not willing to make the Loan, or otherwise extend credit, to Borrower unless Guarantor unconditionally guarantees payment and performance to Lender of the Guaranteed Obligations (as hereinafter defined); and

C.    Guarantor is the owner of a direct or indirect interest in Borrower, and Guarantor will directly benefit from Lender's making the Loan to Borrower.

NOW, THEREFORE, as an inducement to Lender to make the Loan to Borrower thereunder, and to extend such additional credit as Lender may from time to time agree to extend under the Loan Documents, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## ARTICLE I.
## NATURE AND SCOPE OF GUARANTY

Section 1.1.  GUARANTY OF OBLIGATION.  Guarantor hereby absolutely, irrevocably and unconditionally guarantees to Lender (and its successors and assigns), jointly and severally, the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether upon demand by Lender or by lapse of time, by acceleration of maturity or otherwise.  Guarantor hereby absolutely, irrevocably and unconditionally covenants and agrees that it is liable, jointly and severally, for the Guaranteed Obligations as a primary obligor, and that each Guarantor shall fully perform, jointly and severally, each and every term and provision hereof.

Section 1.2.  DEFINITION OF GUARANTEED OBLIGATIONS.  As used herein, the term "Guaranteed Obligations" shall mean, and Guarantor shall be liable for, and shall indemnify, defend and hold Lender and each other Indemnified Party harmless from and against, any and all Losses (as hereinafter defined) incurred or suffered by Lender or any other Indemnified Party

arising out of or in connection with the matters listed below:

     (a)     fraud or material misrepresentation by Borrower, Guarantor or any Affiliate of Borrower or Guarantor in connection with the Loan Agreement, the Security Instrument, the Note or the other Loan Documents;

     (b)     the misappropriation by Borrower, Guarantor or any Affiliate of Borrower or Guarantor of any tenant security deposits or Rent;

     (c)     the misapplication or conversion of Loss Proceeds;

     (d)     any act of intentional damage, arson or waste of or to the Property by Borrower, Guarantor or any Affiliate of Borrower or Guarantor;

     (e)     Borrower's failure to comply with the provisions of <u>Sections 12.01</u>, <u>16.01</u> or <u>16.02</u>, inclusive, of the Loan Agreement;

     (f)     the exercise of any right or remedy under any federal, state or local forfeiture laws resulting in the loss or impairment of the lien of the Security Instrument, or the priority thereof, against the Property; or

     (g)     any claims, actions or proceedings initiated by Borrower or any Affiliate of Borrower alleging that the relationship of Borrower and Lender is that of joint venturers, partners, tenants in common, joint tenants or any relationship other than that of debtor and creditor.

     In addition, (a) in the event (i) any proceeding, action, petition or filing under the Bankruptcy Code, or any similar state or federal law now or hereafter in effect relating to bankruptcy, reorganization or insolvency, or the arrangement or adjustment of debts, shall be filed by, consented to or acquiesced in by Borrower or Guarantor or any Affiliate of either of them, or if Borrower or Guarantor or any Affiliate of either of them shall institute any proceeding for Borrower's dissolution or liquidation, or shall make an assignment for the benefit of creditors, (ii) of a Transfer in violation of the provisions of Article IX of the Loan Agreement, (iii) of a violation of the provisions of Section 2.02(g) of the Loan Agreement, (iv) Borrower fails to comply with the provisions of Section 5.12 of the Loan Agreement within the time period set forth therein, or (v) Borrower or any Affiliate of Borrower contests or in any material way interferes with, directly or indirectly (collectively, a "<u>Contest</u>"), any foreclosure action, UCC sale or other material remedy exercised by Lender upon the occurrence of any Event of Default under the Loan Documents whether by making any motion, bringing any counterclaim, claiming any defense, seeking any injunction or other restraint, commencing any action, or otherwise (provided that if any such Person obtains a non-appealable order successfully asserting a Contest, Guarantor shall have no liability under this clause (iv)), then the Guaranteed Obligations shall also include the unpaid balance of the Debt and (b) the Guaranteed Obligations shall include the payment when due, whether at stated maturity, by acceleration or otherwise, of the Debt and all obligations and liabilities of Borrower under the Loan Documents, including, without limitation, the obligation of Borrower to pay Lender all principal, interest, late fees and other sums due from time to time as required under the Loan Documents, provided, however, notwithstanding

anything herein to the contrary, the liability of Guarantor under this clause (b) is limited to an aggregate amount, of $18,822,500.

For purposes of this Guaranty, the term "Losses" includes any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, punitive damages, foreseeable and unforeseeable consequential damages, of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense).

Section 1.3.  NATURE OF GUARANTY.  This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance, is joint and several and is not a guaranty of collection.  This Guaranty shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural Person) Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs).  The obligations of Guarantor under this Guaranty shall survive any foreclosure proceeding, any foreclosure sale and delivery of any deed in lieu of foreclosure, and any release of record of the Security Instrument. The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations.  This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

Section 1.4.  GUARANTEED OBLIGATIONS NOT REDUCED BY OFFSET.  The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower, or any other Person, against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

Section 1.5.  PAYMENT BY GUARANTOR.  If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at maturity or earlier by acceleration or otherwise, Guarantor shall, immediately upon demand by Lender, and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity, or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein.  Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations, and may be made from time to time with respect to the same or different items of Guaranteed Obligations.  Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

Section 1.6.  NO DUTY TO PURSUE OTHERS.  It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce this Guaranty against Guarantor, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other Person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the

3

Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

Section 1.7. <u>WAIVERS</u>. Guarantor agrees to the provisions of the Loan Documents, and hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note or of any other Loan Documents, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents arising under the Loan Documents or in connection with the Property, (v) the occurrence of any breach by Borrower or Event of Default, (vi) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, or (ix) any other action at any time taken or omitted by Lender, and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and the obligations hereby guaranteed.

Section 1.8. <u>PAYMENT OF EXPENSES</u>. In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, immediately upon demand by Lender, pay Lender all costs and expenses (including court costs and reasonable attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder. The covenant contained in this section shall survive the payment and performance of the Guaranteed Obligations.

Section 1.9. <u>EFFECT OF BANKRUPTCY</u>. In the event that, pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law, or any judgment, order or decision thereunder, Lender must rescind or restore any payment, or any part thereof, received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect, and this Guaranty shall remain in full force and effect. It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.

Section 1.10. Deferral of Rights of Subrogation, Reimbursement and Contribution.

(a)    Notwithstanding any payment or payments made by any Guarantor hereunder, unless and until payment in full of the Debt (and including interest accruing on the Note after the commencement of a proceeding by or against Borrower under the Bankruptcy Code which interest the parties agree shall remain a claim that is prior and superior to any claim of Guarantor notwithstanding any contrary practice, custom or ruling in cases under the Bankruptcy Code) (i) no Guarantor will assert or exercise any right of Lender or of such Guarantor against Borrower to recover the amount of any payment made by such Guarantor to Lender by way of subrogation, reimbursement, contribution, indemnity, or otherwise arising by

4

contract or operation of law, and such Guarantor shall not have any right of recourse to or any claim against assets or property of Borrower; and (ii) each Guarantor agrees not to seek contribution or indemnity or other recourse from any other Guarantor.

(b)    Until payment in full of the Debt (and including interest accruing on the Note after the commencement of a proceeding by or against Borrower under the Bankruptcy Code which interest the parties agree shall remain a claim that is prior and superior to any claim of Guarantor notwithstanding any contrary practice, custom or ruling in cases under the Bankruptcy Code), Guarantor agrees not to accept any payment or satisfaction of any kind of indebtedness of Borrower to Guarantor and hereby assigns such indebtedness to Lender, including the right to file proof of claim and to vote thereon in connection with any such proceeding under the Bankruptcy Code, including the right to vote on any plan of reorganization. If any amount of the type more particularly described in the first sentence of this Section 1.10(b) shall nevertheless be paid to a Guarantor by Borrower or another Guarantor prior to payment in full of all sums owed to Lender under the Loan Documents (the "Obligations"), such amount shall be held in trust for the benefit of Lender and shall forthwith be paid to Lender to be credited and applied to the Guaranteed Obligations, whether matured or unmatured.

(c)    The provisions of this Section 1.10 shall survive the termination of this Guaranty, and any satisfaction and discharge of Borrower by virtue of any payment, court order or any applicable law.

Section 1.11.  "BORROWER".  The term "Borrower" as used herein shall include any new or successor corporation, association, partnership (general or limited), joint venture, limited liability company, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of Borrower or any interest in Borrower.

## ARTICLE II.
## EVENTS AND CIRCUMSTANCES NOT REDUCING OR DISCHARGING GUARANTOR'S OBLIGATIONS

Guarantor hereby consents and agrees to each of the following, and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following, and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) which Guarantor might otherwise have as a result of or in connection with any of the following:

Section 2.1.  MODIFICATIONS.  Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, Note, Loan Documents, or other document, instrument, contract or understanding between Borrower and Lender, or any other parties, pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

Section 2.2.  ADJUSTMENT.  Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or any Guarantor.

Section 2.3.  CONDITION OF BORROWER OR GUARANTOR.  The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of

Borrower, Guarantor or any other Person at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Guarantor, or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor, or any changes in the shareholders, partners or members of Borrower or Guarantor; or any reorganization of Borrower or Guarantor.

Section 2.4. INVALIDITY OF GUARANTEED OBLIGATIONS. The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations, or any document or agreement executed in connection with the Guaranteed Obligations, for any reason whatsoever, including without limitation the fact that (i) the Guaranteed Obligations, or any part thereof, exceed the amount permitted by law, (ii) the act of creating the Guaranteed Obligations or any part thereof, is ultra vires, (iii) the officers or representatives executing the Note or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations, or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (vii) the Note or any of the other Loan Documents has been forged or otherwise is irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other Person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

Section 2.5. RELEASE OF OBLIGORS. Any full or partial release of the liability of Borrower on the Guaranteed Obligations, or any part thereof, or of any co-guarantors, or any other Person or entity now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other Person, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other parties will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other parties to pay or perform the Guaranteed Obligations.

Section 2.6. OTHER COLLATERAL. The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

Section 2.7. RELEASE OF COLLATERAL. Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including without limitation negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security, at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

Section 2.8. CARE AND DILIGENCE. The failure of Lender or any other Person to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of such collateral, property or security, including but not limited to

any neglect, delay, omission, failure or refusal of Lender (i) to take or prosecute any action for the collection of any of the Guaranteed Obligations, (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

Section 2.9. UNENFORCEABILITY. The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectibility or value of any of the collateral for the Guaranteed Obligations.

Section 2.10. MERGER. The reorganization, merger or consolidation of Borrower into or with any other corporation or entity.

Section 2.11. PREFERENCE. Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws, or for any reason Lender is required to refund such payment or pay such amount to Borrower or someone else.

Section 2.12. OTHER ACTIONS TAKEN OR OMITTED. Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether or not contemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Loan Documents and extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

Section 3.1. BENEFIT. Guarantor is an Affiliate of Borrower, is the owner of a direct or indirect interest in Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

Section 3.2. FAMILIARITY AND RELIANCE. Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; provided, however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

Section 3.3. NO REPRESENTATION BY LENDER. Neither Lender nor any other Person has

made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

Section 3.4. GUARANTOR'S FINANCIAL CONDITION. As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is, and will be, Solvent.

Section 3.5. LEGALITY. The execution, delivery and performance by Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not, and will not, contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, mortgage, deed of trust, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor. This Guaranty is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

Section 3.6. SURVIVAL. All representations and warranties made by Guarantor herein shall survive the execution hereof.

Section 3.7. REVIEW OF DOCUMENTS. Guarantor has examined the Note and all of the Loan Documents.

Section 3.8. LITIGATION. Except as otherwise disclosed to Lender, there are no proceedings pending or, so far as Guarantor knows, threatened before any court or administrative agency which, if decided adversely to Guarantor, would materially adversely affect the financial condition of Guarantor or the authority of Guarantor to enter into, or the validity or enforceability of, this Guaranty.

Section 3.9. TAX RETURNS. Guarantor has filed all required federal, state and local tax returns and has paid all taxes as shown on such returns as they have become due. No claims have been assessed and are unpaid with respect to such taxes.

## ARTICLE IV.
## SUBORDINATION OF CERTAIN INDEBTEDNESS

Section 4.1. SUBORDINATION OF ALL GUARANTOR CLAIMS. As used herein, the term "Guarantor Claims" shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon are direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the Person or Persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor. The Guarantor Claims shall include, without limitation, all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations to the extent the provisions of Section 1.10 hereof are unenforceable. Upon the occurrence of an Event of Default or the occurrence of an event which would, with the

giving of notice or the passage of time, or both, constitute an Event of Default, Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other Person any amount upon the Guarantor Claims.

Section 4.2. CLAIMS IN BANKRUPTCY. In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Guarantor as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims. Guarantor hereby assigns such dividends and payments to Lender. Should Lender receive, for application upon the Guaranteed Obligations, any such dividend or payment which is otherwise payable to Guarantor, and which, as between Borrower and Guarantor, shall constitute a credit upon the Guarantor Claims, then upon payment to Lender in full of the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that portion of the Guaranteed Obligations which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

Section 4.3. PAYMENTS HELD IN TRUST. In the event that, notwithstanding anything to the contrary in this Guaranty, Guarantor should receive any funds, payment, claim or distribution which is prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay them promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

Section 4.4. LIENS SUBORDINATE. Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attach. Without the prior written consent of Lender, Guarantor shall not (i) exercise or enforce any creditor's right it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgages, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower held by Guarantor.

## ARTICLE V.
## MISCELLANEOUS

Section 5.1. NO WAIVER; REMEDIES CUMULATIVE. No failure or delay on the part of Lender in exercising any right, remedy, power or privilege hereunder or under the other Loan Documents and no course of dealing between Guarantor and Lender shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege

9

hereunder or under the other Loan Documents preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege hereunder or thereunder. The rights and remedies provided herein and in the other Loan Documents are cumulative and not exclusive of any rights or remedies provided by law. The giving of notice to or demand on Guarantor which notice or demand is not required hereunder or under the other Loan Documents shall not entitle Guarantor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights, remedies, powers or privileges of Lender in any circumstances not requiring notice or demand.

Section 5.2. NOTICES. All notices, requests and other communications to any party hereunder or under the Note shall be given in the manner set forth in Article XI of the Loan Agreement, and to each addressee at the address set forth below:

| Guarantor: | David E. Wish<br>201 North Church Road<br>Bensenville, Illinois 60106<br>Facsimile No.: (630) 595-4598 |
| --- | --- |
| | Lance W. Kupisch<br>201 North Church Road<br>Bensenville, Illinois 60106<br>Facsimile No.: (630) 595-4598 |
| Lender: | Petra Capital Management Corp. LLC<br>1370 Avenue of the Americas, 23rd Floor<br>New York, NY 10019<br>Attn: Joseph K. Iacono<br>Facsimile: (212) 489-1629 |
| With a copy to: | Proskauer Rose LLP<br>1585 Broadway<br>New York, New York 10036<br>Attn: David J. Weinberger, Esq.<br>Facsimile No.: (212) 969-2900 |

or such other address as Guarantor or Lender shall hereafter specify by not less than ten (10) days prior written notice as provided herein; provided, however, that notwithstanding any provision of this Section to the contrary, such notice of change of address shall be deemed given only upon actual receipt thereof. Rejection or other refusal to accept or the inability to deliver because of changed addresses of which no notice was given as herein required shall be deemed to be receipt of the notice, demand, statement, request or consent.

Section 5.3. GOVERNING LAW; JURISDICTION. This Guaranty shall be governed by and construed in accordance with the laws of the State of Illinois and the applicable laws of the United States of America. Guarantor hereby irrevocably submits to the jurisdiction of any court of competent jurisdiction located in the State of Illinois in connection with any proceeding out of or relating to this Guaranty.

Section 5.4.  <u>INVALID PROVISIONS</u>.  If any provision of this Guaranty is held to be invalid, illegal or unenforceable in any respect, this Guaranty shall be construed without such provision.

Section 5.5.  <u>AMENDMENTS</u>.  The terms of this Guaranty, together with the terms of the other Loan Documents, constitute the entire understanding and agreement of the parties hereto and supersede all prior agreements, understandings and negotiations between Guarantor and Lender with respect to the Guaranteed Obligations.  This Guaranty, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act on the part of Guarantor or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 5.6.  <u>PARTIES BOUND; ASSIGNMENT</u>.  This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that Guarantor may not, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder.

Section 5.7.  <u>HEADINGS; CONSTRUCTION OF DOCUMENTS; DEFINITIONS</u>.  The headings and captions of various sections of this Guaranty are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.  Guarantor acknowledges that it was represented by competent counsel in connection with the negotiation and drafting of this Guaranty and the other Loan Documents and that neither this Guaranty nor the other Loan Documents shall be subject to the principle of construing the meaning against the Person who drafted same.  All capitalized terms not otherwise defined herein shall have the meanings set forth in the Loan Agreement.

Section 5.8.  <u>RECITALS</u>.  The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered <u>prima facie</u> evidence of the facts and documents referred to therein.

Section 5.9.  <u>COUNTERPARTS</u>.  To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required.  It shall not be necessary that the signature or acknowledgment of, or on behalf of, each party, or that the signature of all Persons required to bind any party, or the acknowledgment of such party, appear on each counterpart.  All counterparts shall collectively constitute a single instrument.  It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, and the respective acknowledgments of, each of the parties hereto. Any signature or acknowledgment page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures or acknowledgments thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature or acknowledgment pages.

Section 5.10.  <u>CUMULATIVE RIGHTS</u>.  The rights of Lender under this Guaranty shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others.  No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.  Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled, subject to the terms of this Guaranty, to every right

11

and remedy now or hereafter afforded by law.

     Section 5.11.  WAIVER OF COUNTERCLAIM AND RIGHT TO TRIAL BY JURY.
GUARANTOR HEREBY WAIVES THE RIGHT TO ASSERT A COUNTERCLAIM, OTHER
THAN A COMPULSORY COUNTERCLAIM, IN ANY ACTION OR PROCEEDING
BROUGHT AGAINST IT BY LENDER OR ITS AGENTS, AND WAIVES TRIAL BY JURY
IN ANY ACTION OR PROCEEDING BROUGHT BY EITHER PARTY HERETO AGAINST
THE OTHER OR IN ANY COUNTERCLAIM GUARANTOR MAY BE PERMITTED TO
ASSERT HEREUNDER OR WHICH MAY BE ASSERTED BY LENDER OR ITS AGENTS
AGAINST GUARANTOR, OR IN ANY MATTERS WHATSOEVER ARISING OUT OF OR
IN ANY WAY CONNECTED WITH THIS GUARANTY, THE DEBT OR THE
GUARANTEED OBLIGATIONS.

* * * * *

IN WITNESS WHEREOF, Guarantor has duly executed this Guaranty as of the day and year first above written.

GUARANTOR:

David E. Wish

Lance W. Kupisch

JUDGE GOTTSCHALL
MAGISTRATE JUDGE SCHENKIER

# _EXHIBIT D_

Portofino Bay

### ALLONGE TO PROMISSORY NOTE

ALLONGE to that certain Promissory Note (the "Note") dated as of _April 30_, 2007, in the principal sum of THIRTY-THREE MILLION SIX HUNDRED FORTY-FIVE THOUSAND AND NO/100 DOLLARS ($33,645,000.00) executed by J. JIREH'S CORPORATION, an Illinois corporation, in favor of PETRA MORTGAGE CAPITAL CORP. LLC, a Delaware limited liability company ("Assignor").

Pay to the order of PETRA FUND REIT CORP., a Maryland Coporation without recourse, warranty or representation.

Dated: _____, 20___

PETRA MORTGAGE CAPITAL CORP. LLC,
a Delaware limited liability company

By: _____
Name: Joseph Iacono
Title: Vice President

# *EXHIBIT E*

## OMNIBUS ASSIGNMENT

        **THIS OMNIBUS ASSIGNMENT** (this "**Assignment**"), made as of the ___ day of _____, 2007 by PETRA MORTGAGE CAPITAL CORP. LLC, a Delaware limited liability company, having an address at 1370 Avenue of the Americas, New York, New York 10019 ("**Assignor**"), to PETRA FUND REIT CORP., a Maryland corporation, having an address at 1370 Avenue of the Americas, New York, New York 10019 ("**Assignee**").

        KNOW ALL MEN BY THESE PRESENTS, that in consideration of the sum of TEN DOLLARS ($10.00) lawful money of the United States and other good and valuable consideration, to it in hand paid at or before the ensealing and delivery of these presents, the Assignor by these presents does grant, bargain, sell, convey, assign, transfer and set over unto Assignee without recourse and without covenant, representation or warranty in any respect (except as expressly provided herein and in the Master Repurchase Agreement (as hereinafter defined)), all of Assignor's right, title and interest as the Lender in the documents referenced in Schedule A as the "Loan Documents" together with any proceeds of any of the foregoing relating to the loan (the "**Loan**") evidenced and/or secured by the Loan Documents, and all of Assignor's right, title and interest in, to and under all other documents executed and/or delivered in connection with the Loan Documents, including, without limitation, all of Assignor's right, title and interest in any collateral, security, certificates of deposit, letters of credit, performance bonds, demands, causes of action, all related certificates, bank accounts, operating accounts, reserve accounts, escrow accounts and other accounts, opinions, financial statements of Borrower (as defined on Schedule A attached hereto), and any guarantors and any other collateral arising out of and/or executed and/or delivered in or to or with respect to the Loan Documents, all rights and benefits of Assignor related to the Loan Documents and such other documents, and all of Assignor's rights, title and interest in, to and under all claims and choses in action related to the Loan and/or the Loan Documents.

        Assignor represents and warrants that Schedule A represents a true, correct and complete list of all material loan documents delivered by Borrower in connection with the Loan Agreement (as defined on Schedule A attached hereto), that true counterpart originals of the Loan Documents have been delivered by Borrower in connection with the Loan Agreement (as defined on Schedule A attached hereto), that true counterpart originals of the Loan Documents have been delivered by Assignor to Assignee, that Assignor currently owns the Loan and the related rights described above and that the Loan Documents and the related rights described above are not, and have not been, pledged, nor assigned by Assignor, to another party and are not otherwise encumbered, that the principal amount outstanding under the Loan as of the execution and delivery of this Assignment is $_____, that interest payable under the Loan Documents has been paid through the date hereof, that the Loan Documents have not been amended, modified, supplemented or restated, that, to Assignor's knowledge, there currently exists no default under any of the Loan Documents, that Assignor is duly formed and is validly existing under the laws of the jurisdiction under which it was incorporated with full power to execute and deliver this Assignment, and that all actions necessary to authorize the execution, delivery, and performance of this Assignment on behalf of Assignor have been duly taken, and

all such actions continue in full force and effect as of the date hereof. Assignor hereby indemnifies Assignee for any claim made by Borrower for any additional interest paid on the Loan to Assignor prior to the date hereof.

This Assignment is being delivered subject to the terms and provisions of that certain Master Repurchase Agreement dated as of August 11, 2006 ("**Master Repurchase Agreement**").

TO HAVE AND TO HOLD unto Assignee, its successors, and assigns forever.

Assignee joins in this Assignment to evidence its acceptance thereof, provided that Assignee shall not be deemed to have assumed any obligations of Assignor under the Loan Documents except to the extent necessary in order to satisfy any conditions set forth in the Loan Documents to the effectiveness of (i) the assignments and transfers contemplated hereby, and (ii) upon the occurrence of an Event of Default (as defined in the Master Repurchase Agreement), the exercise by Assignee of its rights and remedies under the Transaction Documents (as defined in the Master Repurchase Agreement); provided, that no such assumption or deemed assumption by the Assignee under the foregoing provisions, or any other obligation or agreement on the part of the Assignee by which the Assignee may be bound by any of the terms or provisions of the Loan Documents, shall limit or otherwise affect the indemnification obligations or any other obligations and liabilities of Assignor and the other parties to the Transaction Documents, including without limitation the indemnification obligations of the Assignor under the Master Repurchase Agreement arising as a result of this Assignment and any assumption or deemed assumption by the Assignee of any obligations of Assignor under the Loan Documents or any other obligation or agreement on the part of the Assignee by which the Assignee may be bound by any of the terms or provisions of the Loan Documents.

This Assignment shall be governed by the laws of the State of New York without giving effect to the conflict of laws principles thereof.

This Assignment may be executed by one or more parties to this Assignment in any number of counterparts and all said counterparts taken together shall be deemed to constitute one and the same instrument.

2

IN WITNESS WHEREOF, Assignor and Assignee have caused these presents to be duly executed as of the day and year first written above.

**ASSIGNOR:**

**PETRA MORTGAGE CAPITAL CORP., LLC,** a Delaware limited liability company

By: _____
    Name: Joseph Iacono
    Title: Vice President

**ASSIGNEE:**

**PETRA FUND REIT CORP.,** a Maryland corporation

By: _____
    Name: Joseph Iacono
    Title: Vice President

**Schedule A**

**Schedule of Loan Documents**

1)  Loan and Security Agreement between J. Jireh's Corporation ("**Borrower**") and Petra Mortgage Capital Corp. LLC ("**Lender**");
2)  Promissory Note in in the original principal amount of $33,645,000.00;
3)  Mortgage, Security Agreement, Assignment of Rents and Fixture Filing by Borrower in favor of Lender;
4)  Assignment of Leases and Rents and Security Deposits by Borrower in favor of Lender;
5)  Guaranty by David E. Wish and Lance W. Kupisch ("**Guarantors**"), and Borrower in favor of Lender;
6)  Central Account Agreement by and among Borrower, Lender and Wells Fargo Bank, National Association
7)  Collateral Assignment of Interest Rate Hedge Agreement by Borrower in favor of Lender.
8)  Consent and Agreement
9)  Receipt and Closing Certificate
10) Certificate as to Property Matters
11) Disbursement Authorization
12) Post-Closing Agreement

Note: All of the above documents are dated April 30, 2007.

**Items 1 through 23 above are collectively referred to in this Assignment as the "Loan Documents"**

08CV2921
TG
JUDGE GOTTSCHALL
MAGISTRATE JUDGE SCHENKIER

# *EXHIBIT F*

PETRA MORTGAGE CAPITAL CORP. LLC


May 12, 2008

<u>BY FEDERAL EXPRESS</u>

J. Jireh's Corporation
201 North Church Road
Bensenville, Illinois 60106
Attention:  David E. Wish

> Re:    That certain mortgage loan (the "<u>Loan</u>") dated as of April 30, 2007, made by and
> Petra Mortgage Capital Corp. LLC ( "<u>Lender</u>") to J. Jireh's Corporation
> ("<u>Borrower</u>") in the original principal sum of $33,645,000.00.

Dear Sirs:

Notice is hereby given that, as a result of your failure to pay to Lender all sums due to Lender on
May 9, 2008 (the "<u>Maturity Date</u>") as required pursuant to the express terms of the notes
evidencing the Loan (collectively, the "<u>Note</u>"), an Event of Default exists pursuant to Section
13.01(a) of that certain Loan and Security Agreement dated as of April 30, 2007 given by
Borrower to Lender in connection with the Loan (the "<u>Loan Agreement</u>").

Lender hereby declares the entire unpaid indebtedness evidenced by the Note, including all
advanced and unpaid principal and all accrued and unpaid interest thereon, together with all
other sums due and owing under the Note and the other Loan Documents (including, without
limitation, late charges and legal fees incurred by Lender), with interest accruing at the Default
Rate from and after the occurrence of the Maturity Date, to be immediately due and payable.
Payment of all sums due to Lender should be made to Lender as provided for in the Loan
Documents.  To determine the total amount due, please contact the undersigned at the telephone
number set forth below.

The Event of Default referred to herein is not intended to be a complete list of all of the defaults
or Events of Default by Borrower under the Note, the Mortgage, the Loan Agreement or any of
the other Loan Documents and Lender hereby reserves the right to declare any and all additional
defaults or Events of Default which may have occurred or may hereafter occur.

Lender reserves all of its rights and remedies under the Loan Documents with respect to all
defaults and/or Events of Default which have occurred or may hereafter occur including, without
limitation, exercising all of the rights and remedies set forth in Section 13.02 of the Loan
Agreement.

Please be advised that any past or future negotiations between you or your representatives or
agents and Lender and its representatives do not and shall not constitute a waiver of any of
Lender's rights to exercise its rights and remedies under the Loan Documents or at law or in
equity.  Any alleged waiver of any of Lender's rights shall not be effective unless in writing duly

J. Jireh's Corporation
May __, 2008
Page 2

executed by an authorized representative of Lender.  Neither Borrower nor any other obligor for
the indebtedness owed under the Loan Documents shall be entitled to rely upon any oral
statements made or purported to be made by or on behalf of Lender or its agents in connection
with any alleged agreement by or on behalf of Lender to refrain from exercising any of Lender's
rights under the Loan Documents or otherwise at law or in equity.

Nothing set forth herein (a) is intended, nor shall it be deemed, to modify, limit, release, reduce
or waive any of Lender's rights, remedies, and/or privileges under the Loan Documents, or at
law or in equity, all of which are hereby specifically reserved and the enumeration of any
specific defaults herein is not intended, nor shall it be deemed, to waive other defaults that may
currently exist under the Loan Documents or (b) shall be construed as a charge of or demand for
more interest than applicable usury laws allow or of any amount which is not recoverable or
chargeable by Lender under the Loan Documents or the law, and if any amount is stated or
referred to in this letter as being due, owing or payable which exceeds the maximum amount of
interest allowed by applicable law or which is not lawfully recoverable or chargeable under the
Loan Documents or the law, then only such of that amount as does not exceed such maximum
amount and is lawfully chargeable or recoverable shall be considered as being demanded by this
letter, and this sentence governs and controls over any conflicting or inconsistent provisions of
this letter.

All capitalized terms not otherwise defined herein shall have the meanings set forth in the Loan
Agreement.

If you have any questions, please feel free to call the undersigned at (212) 812-6165.

Sincerely,

Name: JOSEPH IACONO
Title:  V.P

J. Jireh's Corporation
May __, 2008
Page 3


CC:

David J. Weinberger
Proskauer Rose LLP
1585 Broadway
New York, NY 10036
Fax: (212) 960-2900

David E. Wish
201 North Church Road
Bensenville, Illinois 60106
Facsimile No.: (630) 595-4598

Lance W. Kupisch
201 North Church Road
Bensenville, Illinois 60106
Facsimile No.: (630) 595-4598

08CV2921                    TG
JUDGE GOTTSCHALL
MAGISTRATE JUDGE SCHENKIER

# *EXHIBIT G*

PETRA MORTGAGE CAPITAL CORP. LLC

May 12, 2008

BY FEDERAL EXPRESS

David E. Wish
201 North Church Road
Bensenville, Illinois 60106

Lance W. Kupisch
201 North Church Road
Bensenville, Illinois 60106

> Re:   That certain mortgage loan (the "Loan") dated as of April 30, 2007, made by and
> Petra Mortgage Capital Corp. LLC ( "Lender") to J. Jireh's Corporation
> ("Borrower") in the original principal sum of $33,645,000.00.

Dear Sirs:

Notice is hereby given that, as a result of the failure by Borrower to pay to Lender all sums due
to Lender on May 9, 2008 (the "Maturity Date") as required pursuant to the express terms of the
note evidencing the Loan (the "Note"), an Event of Default exists pursuant to Section 13.01(a) of
that certain Loan and Security Agreement dated as of April 30, 2007 given by Borrower to
Lender in connection with the Loan (the "Loan Agreement").

By letter to Borrower of even date herewith, Lender declared the entire unpaid indebtedness
evidenced by the Note, including all advanced and unpaid principal and all accrued and unpaid
interest thereon, together with all other sums due and owing under the Note and the other Loan
Documents (including, without limitation, late charges and legal fees incurred by Lender), with
interest accruing at the Default Rate from and after the occurrence of the Maturity Date, to be
immediately due and payable.

Pursuant to that certain Guaranty dated as of April 30, 2007, David E. Wish and Lance W.
Kupisch (collectively, "Guarantor") guaranteed, among other things, "the payment when due,
whether at stated maturity, by acceleration or otherwise, of the Debt and all obligations and
liabilities of Borrower under the Loan Documents, including, without limitation, the obligation
of Borrower to pay Lender all principal, interest, late fees and other sums due from time to time
as required under the Loan Documents, provided, however, notwithstanding anything herein to
the contrary, the liability of Guarantor under this clause... is limited to an aggregate amount, of
$18,822,500."  Lender hereby makes demand of Guarantor to pay all sums due under the
Guaranty.  To determine the total amount due, please contact the undersigned at the telephone
number set forth below.

The sums referred to herein are not intended to be a complete list of all sums due under the
Guaranty or any of the other Loan Documents and Lender hereby reserves the right to demand

J. Jireh's Corporation
May __, 2008
Page 2

any and all additional sums which may now or may hereafter be due. Lender reserves all of its rights and remedies under the Guaranty and the other Loan Documents.

Please be advised that any past or future negotiations between you or your representatives or agents and Lender and its representatives do not and shall not constitute a waiver of any of Lender's rights to exercise its rights and remedies under the Loan Documents or at law or in equity. Any alleged waiver of any of Lender's rights shall not be effective unless in writing duly executed by an authorized representative of Lender. Neither Guarantor nor any other obligor for the indebtedness owed under the Loan Documents shall be entitled to rely upon any oral statements made or purported to be made by or on behalf of Lender or its agents in connection with any alleged agreement by or on behalf of Lender to refrain from exercising any of Lender's rights under the Loan Documents or otherwise at law or in equity.

Nothing set forth herein (a) is intended, nor shall it be deemed, to modify, limit, release, reduce or waive any of Lender's rights, remedies, and/or privileges under the Loan Documents, or at law or in equity, all of which are hereby specifically reserved and the enumeration of any specific defaults herein is not intended, nor shall it be deemed, to waive other defaults that may currently exist under the Loan Documents or (b) shall be construed as a charge of or demand for more interest than applicable usury laws allow or of any amount which is not recoverable or chargeable by Lender under the Loan Documents or the law, and if any amount is stated or referred to in this letter as being due, owing or payable which exceeds the maximum amount of interest allowed by applicable law or which is not lawfully recoverable or chargeable under the Loan Documents or the law, then only such of that amount as does not exceed such maximum amount and is lawfully chargeable or recoverable shall be considered as being demanded by this letter, and this sentence governs and controls over any conflicting or inconsistent provisions of this letter.

All capitalized terms not otherwise defined herein shall have the meanings set forth in the Loan Agreement.

If you have any questions, please feel free to call the undersigned at (212) 812-6165.

Sincerely,

Name: Joseph Iacono
Title: V. P

J. Jireh's Corporation
May __, 2008
Page 3


CC:

David J. Weinberger
Proskauer Rose LLP
1585 Broadway
New York, NY 10036
Fax: (212) 960-2900